UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
MIDLAND DIVISION

| | | |
|---|---|---|
| MEGAN MARIE McMURRY, Individually and a/n/f of J.M., and ADAM SETH McMURRY, Individually and a/n/f of J.M., Plaintiffs, v. MIDLAND INDEPENDENT SCHOOL DISTRICT, ALEXANDRA WEAVER and KEVIN BRUNNER, Defendants. | § § § § § § § § § § § § | CIVIL ACTION NO. 7:20-cv-00242 |

## PLAINTIFFS' ORIGINAL COMPLAINT

Megan Marie McMurry, Individually and a/n/f of J.M., and Adam Seth McMurry, Individually and a/n/f of J.M. (hereinafter collectively referred to as "Plaintiffs"), bring this, their Original Complaint against Midland Independent School District (hereinafter referred to as the "Midland ISD"), Alexandra Weaver, Individually, and Kevin Brunner, Individually (collectively termed the "Defendants"), and in support thereof, Plaintiffs would respectfully show the following:

### I.  Nature & Purpose of the Action

1.      Plaintiffs bring claims against Defendants for violations of federal law pursuant to 28 U.S.C. § 1983 for violations of the Fourth and Fourteenth Amendments to the U.S. Constitution arising out of their acts and omissions occurring on and after October 26, 2018. They further bring forth state claims pursuant to the common law claims of breach of contract, defamation, and invasion of privacy.

## II. <u>Jurisdiction</u>

2.      Jurisdiction is conferred upon this Court pursuant to 28 U.S.C.A. §§ 1331 and 1343 because the matters in controversy arise under the United States Constitution and laws of the United States of America.

3.      This Court also has supplemental jurisdiction over various state and common law claims pursuant to 28 U.S.C. § 1367.

## III. <u>Venue</u>

4.      Under 28 U.S.C. § 1391, venue is proper before this Court because the events and omissions giving rise to the Plaintiffs' claims occurred in the Western District of Texas.

## IV. <u>Parties</u>

5.      Megan Marie McMurry and Adam Seth McMurry are citizens of the State of Texas and currently reside in McKinney, Texas.

6.      J.M., a Minor Child, is the daughter of Megan Marie McMurry and Adam Seth McMurry who resides with her parents in McKinney, Texas.

7.      Defendant Midland Independent School District is a school district organized under the laws of the State of Texas and responsible for the care, management and control of all public school business within its jurisdiction and also for the acts and omissions of its staff, such as Alexandra Weaver and Kevin Brunner. It can be served by and through their Interim Superintendent, Dr. Ann Dixon, at 615 W. Missouri Avenue, Midland, Texas 79701, or through Rick Davis, President of its Board of Trustees, at 615 W. Missouri Avenue, Midland, Texas 79701.

8.      Defendant Alexandra Weaver is an individual who can be served with process at 6009 E. County Road 120, Midland, Texas 79706.

9.      Defendant Kevin Brunner is an individual who can be served with process at the Midland Independent School District Police Department, 615 W. Missouri Avenue, Midland, Texas 79701.

## V.  **Background Facts**

10.      Megan McMurry and Adam "Seth" McMurry are husband and wife. Between 2017 and 2018, Megan McMurry worked at Midland ISD as a special education behavior teacher and had an unblemished service record while serving in that role at the school district's Abell Junior High School campus. Ms. McMurry has also had a successful career in special education prior to Midland ISD, serving as a consultant in her field in various international schools around the world. Adam Seth McMurry works in the oil and gas industry. He served in the Mississippi Army National Guard for more than 20 years before transferring to the U.S. Army Reserves in March 2020.

11.      The McMurrys have two children—J.M. and C.M.—who do well academically and are described as being mature for their ages. The family has at various times lived overseas when Ms. McMurry worked in special education consulting. In 2018, Mr. McMurry was deployed to Kuwait and then to Syria with the Mississippi Army National Guard. Despite his being out of the country, Mr. McMurry was stationed in a location that offered reliable cellular and internet service. Mr. McMurry was able to maintain continuous contact with his family by text, email, and Facetime, and he remained involved in his children's care each day as he regularly contacted them to discuss family business, school work, and their daily routines.

12.      The McMurrys lived on the third floor of an upscale apartment building in Midland, Texas that was gated and had off-duty police officers who lived within the compound. In the 2018-2019 school year, C.M., who was 12 at the time, attended Abell

Junior High School and maintained a perfect attendance record. Meanwhile, J.M., who was 14 at the time, was homeschooled online through K-12's Texas Virtual Academy run by the Hallsville Independent School District, which required her to stay home in the apartment each day to perform her online instruction. Therefore, at the time of the incident at issue in this case, J.M. was not a student of Midland ISD. When she was not in school, J.M. worked part-time as a babysitter for many families, including neighbors, and made good money in this role. Both children knew how to perform household chores and generally take care of themselves when their parents were not home. In addition, they considered themselves fully capable of attending to emergencies if any parent were gone because they had cell phones to contact their parents and emergency responders, had access to adult neighbors who were friends of the family, kept two large dogs to protect them, and knew how to administer CPR.

13.    In the summer of 2018, Ms. McMurry began to explore a job offer to teach at an international school in Kuwait where the McMurrys had lived before. In furtherance of that, Ms. McMurry scheduled a trip to Kuwait to visit the school to determine if she wanted to take the position and made travel arrangements for the period of time between October 25, 2018 and October 30, 2018. Though the McMurry children were invited to accompany their mother, they told their parents that they preferred to stay in Midland. Because Ms. McMurry sent an email to the junior high school staff about her trip, it was common knowledge at the school that she would be out of the country for several days. School district employees also knew that Mr. McMurry was deployed overseas at this time.

14.    Though the McMurrys did not have relatives in the Midland area, they were friends with neighbors Gabriel and Vanessa Vallejos. The two families would

socialize on occasion, and J.M. babysat their son after school and on weekends until they got home from work. Ms. McMurry made arrangements for Mr. and Ms. Vallejos to care for the children in her absence and lined up several colleagues at work to drive C.M. to and from school. Mr. and Ms. Vallejos were given full responsibility for the McMurry children when Ms. McMurry was gone as had been the case in other instances when they watched the McMurry children while Ms. McMurry had to go out of town. It was agreed that the Vallejoses would take the children to a football game one evening and go out for dinner a few times. The McMurrys made sure their children understood they could have no visitors while Ms. McMurry was gone and that Mr. McMurry would be readily accessible by phone when Ms. McMurry was traveling by air. The McMurrys felt confident that their children were in good hands when Ms. McMurry left for her trip.

15.     In the afternoon of October 25, 2018, Ms. McMurry drove to Dallas, Texas to catch her plane for the long trip. Meanwhile, J.M. finished her studies and babysat the Vallejoses' son after he came home by school bus. One of Ms. McMurry's colleagues, a school counselor, drove C.M. home from school. In the early evening, the McMurry children and the Vallejoses mutually agreed that the children would simply stay in their own apartment that night because they could sleep in their own beds and watch their dogs instead of sleeping on couches in the Vallejoses' apartment. Ms. Vallejos testified at trial that she felt confident the children were safe to sleep overnight in the McMurry's apartment.

16.     The incident at issue in this case occurred on October 26, 2018. In 2018, Alexandra Weaver served as a police officer for the Midland ISD Police Department along with her supervisor, Kevin Brunner. Ms. Weaver was stationed at Abell Junior High School and knew Megan McMurry and her children. A school counselor—one of

the individuals with whom Ms. McMurry arranged to take C.M. to and from school during her absence—contacted Officer Weaver by text to say she was sick and to ask if Officer Weaver could take C.M. to school knowing that she lived near the McMurrys. (The counselor ended up getting another co-worker, Ms. McMurry's teaching aide, to take C.M. to school that morning.)

17.     This fateful text triggered a series of events that would turn the lives of the McMurrys upside-down because of Officer Weaver's excessively eager investigation into the McMurry children out of alleged "concern" for their welfare. Eventually, the investigation would lead to a seizure of the McMurry's daughter by the Midland ISD police in violation of state law and the pursuit by the school district police officers of abandonment charges against Ms. McMurry—a complaint that would later lead to a criminal trial in Midland, Texas ending with Ms. McMurry's acquittal by a jury.

18.     According to Officer Weaver's police report, the catalyst of the investigation happened when the school counselor allegedly told Ms. Weaver that the children were left at home *alone* for the weekend while Ms. McMurry was gone. Upon information and belief, Officer Weaver misrepresented the content of this communication in her police report because the school counselor would later testify at Ms. McMurry's criminal trial that she had no personal knowledge of Ms. McMurry's caretaking arrangements in her absence, that she only heard that the children would be cared for by neighbors and that is all she really knew.

19.     Officer Weaver then contacted Officer Brunner, telling him (according to his police report about the incident) that Officer Weaver informed him that she had learned that Ms. McMurry had left her children home alone and had in fact been told of this fact by another (i.e., by the school counselor who said she was sick).

20.     Before trying to contact Mr. McMurry, the Vallejoses, or J.M. herself, who was not even a student of the school district at this time, Officer Weaver and Officer Brunner questioned Ms. McMurry's teaching aide at the school about Ms. McMurry's trip. Though the aide later testified at Ms. McMurry's trial that she had no personal knowledge of Ms. McMurry's caretaking arrangements and that she did not believe Ms. McMurry had neglected her children, she told the officers in their meeting at the school that she "had heard" that a neighbor was "checking on" the children, which Officer Weaver said in her police report had "implied" that the children were not going to be residing with adults in this interim. Significantly, the employee told the officers that she had taken C.M. to school that morning and so it was abundantly clear to them that J.M., who was not enrolled in the school district, was the only child back at the McMurry's apartment on this morning doing her online, homeschool lessons.

21.     What is notable about this interview is that the police officers questioned the teaching aide in tandem with two employees of the school district—the junior high school principal at the time and an assistant principal. Thus, the school district administration took upon itself to assist the two police officers in their investigation of an alleged complaint about child abandonment, assuming one had been made in the first place by this point in time.

22.     Officer Weaver and Officer Brunner decided to conduct their own off-campus welfare check on J.M. without contacting another law enforcement agency to handle the matter, setting in motion a series of events during which they flagrantly violated the rights of J.M. and her parents and which made clear they were agitating for the criminal prosecution of Ms. McMurry for abandonment of children. It should be noted that Officer Weaver had already met and knew J.M. from the middle school where

the young girl attended school the previous school year and worked as an office assistant and was cognizant that J.M. was not a student of Midland ISD, that she was homeschooled, and that she had typically stayed at home alone each day since the beginning of the school semester as Ms. McMurry went to work at the school district.

23.     The officers traveled to the McMurry apartment and prompted an assistant manager of the apartment complex to knock on the door. The manager testified at Ms. McMurry's criminal trial that the police officer's request made her feel uncomfortable. The officers kept out of sight of the door peephole when the employee knocked. When J.M. opened the door, the officers appeared and asked about the whereabouts of Ms. McMurry. Mr. Brunner told J.M. that they were going to talk to her somewhere else and that she needed to go back inside to change into warmer clothing. Startled by the appearance of the officers at her doorstep, J.M. became upset and began to cry and she would continue to cry for the next several hours as these events unfolded.

24.     During this brief exchange, no officer asked for J.M.'s consent to talk to her, nor did they make clear she could refuse their entry into the apartment or her removal by them from the premises. While standing at the threshold of the apartment door, neither officer asked J.M. detailed questions about her caretaking arrangements or about any matter that might enable them to assess any risk she might face. The presence of the police in their regalia on this date signaled to J.M. that her liberty of movement was restricted and restrained and that she was compelled to accompany them to wherever they planned to take her.

25.     Officer Weaver followed J.M. in the apartment, and as J.M. changed in a bedroom at the officer's request, J.M. could see from a partially open door that Officer Weaver began to search the apartment and opened up cabinets, drawers, and the

refrigerator, which occurred without J.M.'s consent. J.M. sent a quick text to her father that read, "Dad, I'm scared. The police are here." After dressing, J.M. was escorted by the officers out of the apartment, down the stairs, and to the nearby apartment office building where the officers started to question J.M. in a conference room without notifying her of her Miranda rights.

26.     Oddly, the officers failed to ask J.M. detailed questions about her caretaking arrangement while they were with her in the apartment office. Lt. Brunner simply asked J.M. about when Vanessa Vallejo last "checked on" her. As this was happening, Mr. McMurry repeatedly called J.M. by Facetime and sent her multiple texts to try to learn what was happening, asking by text, "Why can I not FaceTime audio you? . . . Can you not FaceTime audio? Are you there?" But the officers ordered J.M. not to text or call anyone, and the officers made no attempt to contact Mr. McMurry who remained in the dark about what was going on between the police and his daughter until many hours later when the officers finally let them talk. Officer Weaver conceded at Ms. McMurry's trial that she barred J.M. from contacting her father.

27.     Although it seems that the officers failed to clarify the facts about the caretaking arrangements from persons with personal knowledge, they were not deterred from contacting the Texas Department of Family and Protective Services (CPS) to file a complaint about Ms. McMurry and misrepresent facts about this matter. Officer Weaver contacted the CPS hotline in Austin, Texas before the officers arrived at the apartment complex, and Officer Brunner contacted the local office of CPS when he was at the apartment complex. One or both of them told CPS that Ms. McMurry had left the children home alone, that a neighbor would only "periodically check" on them, and that the *children* did not go to school that day (despite the fact both officers had already been

told that C.M. was sitting in class at the junior high school and even though Officer Weaver knew that J.M. was homeschooled and not enrolled in Midland ISD). Lt. Brunner later stated in his Affidavits for Probable Cause to indict Ms. McMurry that he told the agency he would be taking J.M. to Abell Junior High School for "safety purposes," thus indicating that he made a decision to transport J.M. to the school without receiving a request or directive from CPS.

28.     Thereafter, Lt. Brunner contacted Vanessa Vallejos by telephone telling her, "I've got to speak to you because a 14-year old and a 12-year old being left home alone is a criminal offense." In their short conversation, Lt. Brunner asked Ms. Vallejos no questions about the caretaking arrangements for the McMurry children and clarified to Ms. Vallejos that she was not the target of their investigation. He asked if Ms. Vallejos preferred to speak with him in person. When she said yes, he directed her to meet him at Abell Junior High School because he said that they would be taking J.M. to the school.

29.     J.M. told the office staff at the apartment complex that she wanted to reach her father. When one of the apartment employees informed the officers that J.M. wanted to speak to Mr. McMurry, Lt. Brunner again refused to let J.M. call him.

30.     Afterwards, the officers took J.M. to their police car, placed her in the back seat, and drove her to Abell Junior High School, about a six-mile drive. Lt. Brunner would later explain in his Affidavits for Probable Cause that this was done so that J.M. would not be home alone in the apartment. When Lt. Brunner saw J.M. start texting on her phone, he commanded that she put down her phone. During the ride, J.M noticed a call coming from Vanessa Vallejos. J.M. asked if she could answer the call and again Lt. Brunner told her no. J.M. remained tearful and distraught during the ride, telling the

officers, "I'm very scared."

31.     There are few circumstances under Texas law that allow a law enforcement officer to seize a child. This was not one of them. For example, an officer may detain a child to assist an injured party, pursuant to the laws of arrest, or when the officer suspects probable cause of delinquent conduct. Additionally, a law enforcement officer may detain a child when exigent circumstances exist that reasonably cause the officer to believe the child is in imminent danger of physical or sexual abuse if she remains in the home. The latter ground is apparently the premise upon which the officers relied to detain J.M. At Ms. McMurry's criminal trial, Ms. Weaver later claimed that she found alcohol in the refrigerator which heightened her concerns about the children, even though she mentioned nothing of this in her police report. More telling, Officer's Weaver body camera video of her unlawful search of the house showed no alcohol in the refrigerator, and Ms. McMurry did not usually keep alcohol in the apartment and she had left none there before her trip to Kuwait. Officer Weaver testified that her "concern" was also heightened when J.M. left the apartment because she did not lock the door. But Ms. Weaver neglected to inquire about how the locking mechanism even worked. Had she done so, she would have learned that the apartment complex used a Smart Lock mechanism for all doors that connect to cell phones via Bluetooth. In other words, when a resident leaves the apartment with a cell phone on their person, the door automatically locks.

32.     At Abell Junior High School, the officers walked J.M. through the school's main front door as she sobbed in full sight of employees and students, leaving her feeling humiliated and distressed. One student texted J.M. to ask why she was being detained. The officers confined J.M. in one of the administration offices so they could

leave to question others. The junior high school principal, meanwhile, continued in her effort to lend support to the police officers' action, sitting in during their interviews with the Vallejoses and with C.M., whom they had pulled out of class.

33.    At Ms. McMurry's trial, the Vallejoses testified that Lt. Brunner did most of the talking during his 12-minute conversation with them at Abell Junior High School and that they barely spoke. During one exchange, Lt. Brunner said, "From my rationale, there's a difference between being at work and letting the kid be at home a couple of hours versus being in a different country." The Vallejoses remained confused as to why J.M. had been detained in the first place and taken to the school, but Lt. Brunner explained, "I felt it was a safer environment than for her being home alone." Contradictorily, the officers did not accuse the Vallejoses themselves of abandoning the children because of their previous night stay in the McMurry apartment (seemingly, the main fact that triggered the officers' "concerns"). Even more strangely, Lt. Brunner told the couple—despite having custodial care of J.M. and C.M. during this time—that they could leave the middle school before the CPS investigator arrived to talk to the children. Mr. Vallejos testified at trial that it seemed like Mr. Brunner did not want them there. But the two indicated that they refused to leave until the investigation was done so they could take the children back into their custody and take them home.

34.    When the officers were finished, Vanessa Vallejos met up with J.M. in the principal's office and asked if J.M. could call her father. Remarkably, the school district employees did not contact Mr. McMurry directly to inform him that J.M. was detained at the school and that police officers would be interviewing C.M. even though they had his contact information given that the school district's handbook requires such parental notice except for abuse investigations. Not until several hours after the officers first

seized J.M. did they allow her to call her father. Mr. McMurry and J.M. finally connected via a Facetime call with Vanessa Vallejos nearby. Mr. McMurry asked the two to summon of one of the school district employees or officers to speak with him. Though they asked, none wanted to speak with him.

35.    It bears mention that Ms. McMurry was still on a plane that began its descent into Kuwait City while most of this was occurring. Once the plane landed and Ms. McMurry reactivated her phone, she immediately received calls from CPS and others, but none from the police officers or any administrators from Midland ISD. When Ms. McMurry later contacted Officer Weaver that afternoon, the officer told her that she had received an "anonymous", "credible" tip about the children, that J.M. was removed from the "situation," and that it was protocol for the police to "remove" a child "from an endangered situation and to take them to a safe place."

36.    In the afternoon, a special investigator from CPS arrived to investigate the officers' complaint. At Ms. McMurry's trial, several employees of CPS testified about the agency's investigation of the Midland ISD complaint, including the special investigator who went to Abell Junior High School (himself a former police officer), a program director for the agency's investigations unit, and the unit's supervisor. After conferring with the children at the school, the Vallejoses, the police officers, Ms. McMurry who they promptly reached by telephone, and the school counselor who was supposed to take C.M. to school that morning, the department promptly closed the investigation. CPS witnesses at trial testified that they had determined that the children had not been left unattended without adult supervision. Overall, the testimony of the witnesses and the report of the agency showed that the McMurry children's needs were being met, that Ms. McMurry had made appropriate child care arrangements for the children and for

C.M.'s transportation to school in her absence, that the children were able to respond to emergencies, that they faced no unreasonable risk of harm, and that there was no finding of abuse or neglect. The special investigator on the scene notified the parties that the children could leave with Ms. Vallejos to return to their home to the apparent chagrin of Officers Brunner and Weaver.

37.     Despite the outcome of the CPS investigation, Officer Weaver and Lt. Brunner persisted in trying to build a criminal case against Ms. McMurry. The following Monday, Officer Weaver conducted an interview with the counselor who said she was sick the previous Friday and who could not take C.M. to school. On the Friday before, the same school counselor had told CPS that she had no concerns for the children about their caretaking arrangements during Ms. McMurry's trip. Upon information and belief, however, Officer Weaver coached the counselor about how to answer questions before she started the recorded interview and prompted the counselor to say negative things about Ms. McMurry, most of which had little to do with the weekend at issue.

38.     Meanwhile, Ms. McMurry cancelled her visit with the international school in Kuwait and spent the remaining days there trying to catch an early flight home to no avail. She finally returned to Midland on October 30, 2018. As the police officers told Ms. McMurry they wanted to obtain her statement, despite her being cleared by CPS, Ms. McMurry realized that the officers still wanted to pursue abandonment charges against her.

39.     The month of November 2018 was especially trying for the McMurry family. J.M. was rattled and frightened by the experience and remained distraught and upset. Megan McMurry was likewise disturbed, upset, and anguished by what her daughter had been put through, as well as the shame and embarrassment of being

accused of abdicating her caretaking responsibilities. Both she and J.M. began to experience sleeplessness, depression, anxiety, and disruption in their daily routines. Ms. McMurry's marriage with her husband suffered. Ms. McMurry and J.M. entered therapy in November 2018 that would continue through the middle of 2020. J.M. became fearful and distrustful of law enforcement, and she panicked during an episode months later when she was pulled over by police for a moving violation. Mr. McMurry felt angry and frustrated that he was separated from his family by distance during this time, and he struggled to stay focused over the next seven months during his dangerous mission for the Mississippi Army National Guard.

40.    Making matters worse, Officer Weaver gossiped about the criminal investigation with other employees at the school district even though Ms. McMurry had not been charged with a crime. She told others that Ms. McMurry had "abandoned" her children, that she was going to jail, and that a "federal warrant" would be issued for her arrest. Students at Abell Junior High School asked C.M. if his mother might soon be arrested and if she had abandoned him. C.M. began to feel so uncomfortable there that he asked his parents to remove him from school.

41.    Officer Weaver's defamation of Ms. McMurry and her announcing to others at Abell Junior High School that McMurry would be charged with a crime and sent to jail tarnished her reputation there.

42.    Furthermore, the police officers' sustained effort to charge Ms. McMurry with a crime undermined her employment relationship with the school district. When Ms. McMurry decided to travel to Kuwait to view the international school that had offered her a job, she resigned as a teacher for the 2018 to 2019 school year with the consent of the school district. However, the two parties later agreed that Ms. McMurry

could continue to teach in the school district until she made a final decision about whether to stay at Midland ISD or not, and the school district continued to keep Ms. McMurry in her position as a special education teacher with the same compensation and benefits that she received before.

43.     When Ms. McMurry returned to Midland, she met with Midland ISD's chief of human capital management at his request on October 31, 2018. During this meeting, the chief notified Ms. McMurry verbally and in writing that the school district was putting her on administrative leave without pay pending the outcome of the "current investigation" of the abandonment of children complaint. He further told Ms. McMurry that her job would be waiting for her once the investigation was completed and she was cleared of any wrongdoing. The school official then informed Ms. McMurry that she was barred from appearing on campus or attending school-related events, even though her son was still enrolled in the junior high school, and he instructed her to refrain from discussing the leave with others.

44.     As such, the school district continued to maintain control over Ms. McMurry and issue directives to her as an employee in the interim, which it would not have done if Ms. McMurry had been an at-will educator with no employment contract under chapter 21 of the Texas Education Code. These actions revealed that the school district rescinded its previous action to accept Ms. McMurry's resignation, that Ms. McMurry's contract was reinstated, and that Ms. McMurry resumed her duties as a special education teacher under contract for the 2018 to 2019 school year.

45.     Though the school district continued to pay her salary through the end of 2018, Ms. McMurry's role vis-à-vis the school district remained in flux because it did not ask her to return to the classroom, nor did it ever tell her that it intended to terminate

her as a teacher. Upset by how the school district police handled the seizure of her daughter and lacking clarity about her job status, Ms. McMurry filed a grievance against Midland ISD on November 16, 2018 pursuant to the school district's board policy manual, complaining about J.M.'s detention and seeking formal reinstatement of her job, among other things.

46.    On December 4, 2018, Officer Brunner filed two separate Affidavits for Probable Cause to initiate arrest warrants for Ms. McMurry for "abandoning or endangering" her children. However, the affidavits contained no new details about the McMurrys' caretaking arrangements for their children than what was already known on October 26, 2018. Under state law, the crime of abandonment occurs when a person, having custody or care of a child under 15, intentionally leaves the child in a place without providing reasonable and necessary care so that it exposes the child to an unreasonable risk of harm. Tex. Penal Code § 22.041. In the affidavits, Mr. Brunner acknowledged that he brought J.M. to Abell Junior High School where C.M. was located because he had anticipated that CPS would be taking the children into custody after it conducted its investigation. At the trial on the abandonment charge, Officer Weaver justified the probable cause affidavit by stating that in her opinion, the children were left for an extended period of time without reasonable and proper care *immediately* available to the children because they had spent the night of October 25, 2018 in their apartment, even though the word "immediately" is not embedded in the Penal Code section on abandonment. She further admitted at trial that the law does not place an age limit of when a child may sleep in a residence overnight without an adult.

47.    Faced with the outstanding arrest warrant, Ms. McMurry turned herself into the Midland County Jail on December 6, 2018 and she remained in jail for 19 hours

while the staff there completed the processing of her bail bond.

48.     The school district took up Ms. McMurry's grievance the following year. The administrative process for grievances has three stages of review. The parties held a grievance hearing for the first stage, known as Level 1, on January 8, 2019. On January 21, 2019, the school district's executive director for secondary education issued a written decision denying Ms. McMurry's grievance. Regarding the detention of J.M., he said, "I have determined that it was *not* inappropriate to transport your daughter to Abell [Junior High School]. The decision was made because . . . Abell was a safe environment where an administrator could be present and where your daughter could be supervised." As for Ms. McMurry's teaching job, the executive director claimed that Ms. McMurry was only a temporary employee and that the district had not extended her teaching contract, thus denying her claim for reinstatement. But the school official failed to explain why the school district continued to pay Ms. McMurry her salary through the end of the 2018 calendar year.

49.     Ms. McMurry appealed this decision to the next stage. The parties held a Level 2 hearing on February 22, 2019, and the school district's chief academic officer issued a written decision dated March 7, 2019 denying Ms. McMurry's requested relief. He said, "It appears the officers acted in good faith to ensure [the McMurry] children were safe and secure. . . . Once it was determined that [the] children did not have adequate supervision, Abell was the best place to continue the inquiry."

50.     Unhappy with this decision, Ms. McMurry took her grievance to the Midland ISD Board of Trustees in what is known as a Level 3 Appeal. There, Ms. McMurry made a presentation to the board through an attorney on June 24, 2019. The school district's counsel told the board in the same meeting that the McMurry children

were interviewed at the school "to find out what *we needed to do as a school district* to best take care of our students and make sure they were safe." After considering the matter, the board unanimously voted to deny the grievance, thus ratifying acts and omissions of subordinates, including Officers Weaver and Brunner and other school district personnel and staff.

51.     These events further harmed Ms. McMurry because they resulted in the termination of Ms. McMurry's employment with Midland ISD, even though the school district did not follow the Texas Education Code's procedures to terminate an educator's contract, depriving Ms. McMurry of her salary through the end of the school year. Additionally, these events interfered with Ms. McMurry's ability to get a new teaching job. Because the Texas State Board of Educator Certification learned of Ms. McMurry's arrest, the agency placed an investigative flag on Ms. McMurry's teaching certificate, preventing her from seeking a job in the teaching field with another school district. Ms. McMurry has not worked as a teacher since October 2018. This has further adversely impacted her ability to comply with the conditions of TEACH Grant assistance that she received in college requiring her to work in the teaching field for a minimum period of time after graduation. With the approach of her performance deadline, the grant will be converted into a loan that Ms. McMurry will be forced to pay back.

52.     The fallout from Ms. McMurry's trip to Kuwait finally culminated in a criminal trial in a district court in Midland County, Texas that started on January 6, 2020. The McMurrys were forced to spend substantial funds to hire counsel to defend Ms. McMurry through the criminal case. At the end of the trial on January 9, 2020, Ms. McMurry was promptly acquitted by a jury. Several months later, the Texas State Board of Educator Certification removed its investigatory flag on Ms. McMurry's teaching

certificate.

## VI.  <u>Count I</u>

### Violations of the Fourth Amendment of the U.S. Constitution

53.    Plaintiffs incorporate by reference all the above-related paragraphs with the same force and effect as if herein set forth

54.    Midland ISD, Weaver, and Brunner, acting under color of law and pursuant to the customs and policies of the school district, jointly and severally deprived Megan McMurry, Adam Seth McMurry, and J.M. of rights and privileges secured to them by the Fourth Amendment of the U.S. Constitution.

55.    The Fourth Amendment protects citizens from unreasonable searches and seizures. As described previously, Officer Weaver conducted a search of the McMurry apartment without a warrant and without the consent of J.M., much less that of an adult, thus invading the rights of J.M. and her parents.

56.    Moreover, the Fourth Amendment applies in the context of the removal of a child from a home. The seizure of a child is reasonable if it is pursuant to a court order, if it is supported by probable cause, or if it is justified by exigent circumstances to cause police officers to have reason to believe that life and limb are in immediate jeopardy. A seizure occurs when a reasonable person facing a show of authority believes she is not free to leave and her liberty of movement is restricted or restrained.

57.    As indicated in the facts beforehand, Officer Weaver and Officer Brunner falsely imprisoned J.M. willfully and without authority of law. None of the factors that would allow a law enforcement officer to take temporary custody of a child on an emergency basis under the Texas Family Code were present here. The two officers detained and transported J.M. without notifying her parents and without following any

instruction or mandate from CPS to do so. Apparently, the officers' chief aim was to manufacture an indictment against Ms. McMurry for abandonment and to incentivize CPS to take custody of her children.

58.     Midland ISD ratified the acts and omissions of the two police officers and of other school district personnel who aided them in allowing J.M.'s constitutional rights to be violated or by acquiescing to the police officer's conduct in their detention and interrogation of J.M. outside of her home. Furthermore, Midland ISD ratified the acts and omissions of the police officers through its high-ranking personnel who endorsed the officers' conduct through Ms. McMurry's grievance complaint and by their repeated defense of the police officers' actions to Ms. McMurry during the grievance process. When the Board of Trustees, the school district's highest lawmaking body, validated and ratified the police officers' conduct during a board meeting in June 2019 that heard Ms. McMurry's grievance complaint, the school district officially adopted and sanctioned the police officers' interactions with J.M., converting the conduct at issue into the official policy of the school district.

59.     In addition, the acts and omissions resulted from the official custom of the school district so as to fairly represent its policy. School district officials endorsed and validated the police officers' actions throughout this episode, from the assistant principal and principal of the Abell Junior High School, to the school district's director of secondary education, to the district's chief academic officer, and finally to the Board of Trustees. In effect, all continually assented to the conduct at issue and concluded that the school district's police officers could detain children and remove children from their homes outside the parameters allowed for custodial seizures of children under state law, including children not present on school grounds and children who are not even

students of the school district itself. They further failed to take steps to reign in Officer Weaver who defamed Ms. McMurry and invaded her privacy in the school district about this incident.

60.    The acts and omissions complained of were a moving force of the violations against Megan McMurry, Adam McMurry, and J.M. with the policy and custom of the school district operating as the direct cause of their harm. The policy and custom mentioned above was unconstitutional on its face. Assuming it could be characterized as facially innocuous, then the policy or custom was promulgated with deliberate indifference to the known or obvious consequences that violations of federally-protected rights would result since it was reasonably foreseeable that there was a risk for the school district to allow its police officers to operate with impunity and that their actions might bring harm to J.M. and others. Midland ISD acquiesced to and rationalized the misconduct of its police officers and formally authorized it when Ms. McMurry complained about it through the grievance process. Further, the school district failed to take steps to rectify Ms. Weaver's defamation of Ms. McMurry and the invasion of her privacy.

61.    Midland ISD is further liable to Plaintiffs on the basis of supervisory liability. Midland ISD failed to properly supervise or train its police officers and that its lack of training and supervision resulted in the police officers' failure to understand their powers as peace officers, their professional duties to diligently investigate complaints, and their duty to accurately report and not misrepresent information they collect in connection with criminal investigations. Also, the school district's lack of training resulted in Officer Weaver gratuitously disclosing information about a pending investigation to others before indictment. Upon information and belief, the police

officers at issue have been the subject of other complaints by parents with students enrolled in the school district casting doubt on their understanding of their professional responsibilities as police officers for the school district. The need for more training and supervision was obvious, and the school district's failure to properly train or supervise its personnel made it likely that the police officers would ultimately intrude on the rights of parents, students, and others, such as in this case.

62.     Plaintiffs contend that Defendants' violation of their Fourth Amendment rights have caused them economic damages, medical costs, out-of-pocket attorneys' fees, and mental anguish damages for which they now sue. Because Defendants acted recklessly and with callous indifference to the federally-protected rights of others, Plaintiffs further seek to recover punitive damages. Finally, Plaintiffs seek to recover their attorneys' fees pursuant to 42 U.S.C. § 1988.

## VII. <u>Count II</u>

### Violations of the Fourteenth Amendment of the U.S. Constitution

63.     Plaintiffs incorporate by reference all the above-related paragraphs with the same force and effect as if herein set forth.

64.     Midland ISD, Weaver, and Brunner, acting under color of law and pursuant to the customs and policies of the school district, jointly and severally deprived Megan McMurry and Adam Seth McMurry of rights and privileges secured to them by the Fourteenth Amendment of the U.S. Constitution.

65.     The right of family integrity has been recognized as a fundamental liberty interest protected by the Fourteenth Amendment, which applies to all family members, including parents and children. The Amendment guards against government interference with such interests, and it requires that the government provide procedural

due process before making a decision to infringe on a person's life, liberty, or property interest.

66.     Given that the police officers did not have reasonable cause to believe J.M. was in imminent danger of physical or sexual abuse, then no exigent circumstances existed to justify their temporary detention of her for protection.

67.     Accordingly, Officer Weaver and Officer Brunner encroached upon the McMurry's substantive due process against interference with their right to family integrity. The officers impinged upon the parents' interests in making decisions regarding the care of their children, and they interfered with the family members' interest in remaining together as a family unit.  The officers had no compelling interest to warrant the removal of J.M. from the McMurry home. They did not ask CPS to step in to take over their initial investigation. Assuming the officers had cause to believe J.M.'s caretaking situation needed to be scrutinized, they did not employ the least restrictive means to undertake their investigation. They ordered J.M. out of the house, interrogated her in an apartment office, and then transported her to a school where she was not enrolled as a student for further interrogation and held her there for hours.

68.     Moreover, the police officers and school district personnel failed to provide the McMurrys with any of the procedural due process protections that would normally apply to state removal of a child, such as notice, full hearing, the right to legal counsel, and the presence of a neutral official presiding over the hearing. Indeed, the two police officers prohibited J.M. from contacting Mr. McMurry during her detention and he was left to wonder for several hours what crisis beset his daughter after she told him that police had just arrived at their apartment. They also stopped her from communicating with her neighbors who were their caretakers for that weekend. The

officers distorted information that they acquired during their investigation and neglected to ask witnesses with personal knowledge important questions to clarify the caretaking arrangements. Early on, they had made up their minds that Ms. McMurry had abandoned the children and continued to seek information that might support their preordained conclusions. All in all, Officer Weaver and Officer Brunner arbitrarily and unfairly deprived the McMurrys of their right to familial integrity.

69.     Midland ISD ratified the acts and omissions of the two police officers and of other school district personnel who aided them in allowing J.M.'s constitutional rights to be violated or by acquiescing to the police officer's conduct in their detention and interrogation of J.M. outside of her home. Furthermore, Midland ISD ratified the acts and omissions of the police officers through its high-ranking personnel who endorsed the officers' conduct through Ms. McMurry's grievance complaint and by their repeated defense of the police officers' actions to Ms. McMurry during the grievance process. When the Board of Trustees, the school district's highest lawmaking body, validated and ratified the police officers' conduct during a board meeting in June 2019 that heard Ms. McMurry's grievance complaint, the school district officially adopted and sanctioned the police officers' interactions with J.M., converting the conduct at issue into the official policy of the school district.

70.     In addition, the acts and omissions resulted from the official custom of the school district so as to fairly represent its policy. School district officials endorsed and validated the police officers' actions throughout this episode, from the assistant principal and principal of the Abell Junior High School, to the school district's director of secondary education, to the district's chief academic officer, and finally to the Board of Trustees. In effect, all continually assented to the conduct at issue and concluded that

the school district's police officers could detain children and remove children from their homes outside the parameters allowed for custodial seizures of children under state law, including children not present on school grounds and children who are not even students of the school district itself. Making matters worse, they failed to take steps to reign in Officer Weaver who defamed Ms. McMurry and invaded her privacy in the school district.

71.     The acts and omissions complained of were a moving force of the violations against Megan McMurry, Adam McMurry, and J.M. with the policy and custom of the school district operating as the direct cause of their harm. The policy and custom mentioned above was unconstitutional on its face. Assuming it could be characterized as facially innocuous, then the policy or custom was promulgated with deliberate indifference to the known or obvious consequences that violations of federally-protected rights would result since it was reasonably foreseeable that there was a risk for the school district to allow its police officers to operate with impunity and that their actions might bring harm to J.M. and others. Midland ISD acquiesced to and rationalized the misconduct of its police officers and formally authorized it when Ms. McMurry complained about it through the grievance process. Further, the school district failed to take steps to rectify Ms. Weaver's defamation of Ms. McMurry and the invasion of her privacy.

72.     Midland ISD is further liable to Plaintiffs on the basis of supervisory liability. Midland ISD failed to properly supervise or train its police officers and that its lack of training and supervision resulted in the police officers' failure to understand their powers as peace officers, their professional duties to diligently investigate complaints, and their duty to accurately report and not misrepresent information they

collect in connection with criminal investigations. Also, the school district's lack of training resulted in Officer Weaver gratuitously disclosing information about a pending investigation to others before indictment. Upon information and belief, the police officers at issue have been the subject of other complaints by parents with students enrolled in the school district casting doubt on their understanding of their professional responsibilities as police officers for the school district. The need for more training and supervision was obvious, and the school district's failure to properly train or supervise its personnel made it likely that the police officers would ultimately intrude on the rights of parents, students, and others, such as in this case.

73.    Plaintiffs contend that Defendants' violation of their Fourteenth Amendment rights have caused them economic damages, medical costs, out-of-pocket attorneys' fees, and mental anguish damages for which they now sue. Because Defendants acted recklessly and with callous indifference to the federally-protected rights of others, Plaintiffs further seek to recover punitive damages. Finally, Plaintiffs seek to recover their attorneys' fees pursuant to 42 U.S.C. § 1988.

## VIII. <u>Count III</u>

### Breach of Contract/Lack of Due Process under the Texas Education Code and the Fourteenth Amendment of the U.S. Constitution (By Megan McMurry Against Midland ISD)

74.    Plaintiffs incorporate by reference all the above-related paragraphs with the same force and effect as if herein set forth.

75.    By virtue of her contract of employment with Midland ISD, Ms. McMurry had a property right in her contract of employment through the end of the term of the 2018 to 2019 school year. The Fourteenth Amendment prohibits the deprivation of property rights without due process of law.

76.     Because Midland ISD failed to pay Ms. McMurry and provide her with the fringe benefits of her employment for the duration of the school year, it breached its contract with Ms. McMurry in prematurely ending the term of her employment. Though Midland ISD took the position that it had ended Ms. McMurry's employment in October 2018, the school district continued to issue directives to Ms. McMurry after this period of time and pay her the same salary and benefits as before, and it assured her that her job position would resume after it concluded its investigation into the accusation of abandonment of children. Because of the reinstated employment contract, Midland ISD could have only discharged Ms. McMurry on the basis of good cause or financial exigency as required by chapter 21 of the Texas Education Code. However, the school district did not follow these procedures to discharge Ms. McMurry, and it simply stopped paying Ms. McMurry her salary and benefits after 2018. Midland ISD further failed to provide Ms. McMurry with procedural due process rights to excuse the early termination of her employment, such as the right of notice and an opportunity to be heard in a pre-termination hearing pursuant to chapter 21 of the Texas Education Code and the Fourteenth Amendment.

77.     Plaintiff Megan McMurry now sues Midland ISD for her economic damages, and she sues to recover her attorneys' fees pursuant to Tex. Civ. Prac. & Rem. Code § 38.001 and 42 U.S.C. § 1988.

## IX. <u>Count IV</u>

### Defamation and Invasion of Privacy
### (By Megan McMurry Against Alexandra Weaver)

78.     Plaintiffs incorporate by reference all the above-related paragraphs with the same force and effect as if herein set forth.

79.    Officer Weaver made defamatory statements about Ms. McMurry to fellow co-workers at Abell Junior High School. She impugned the integrity and character of Ms. McMurry, which exposed her to contempt, ridicule, and financial injury. Ms. McMurry suffered damages as a result. Therefore, Officer Weaver is liable to Ms. McMurry for defamation.

80.    Officer Weaver is also liable to Ms. McMurry for invasion of privacy because Officer Weaver went around and openly discussed the fact there was a pending investigation into Ms. McMurry to others. While the fact of an investigation might have been true, Officer Weaver caused unreasonable publicity to be given to the private life of Ms. McMurry when there was no legitimate public concern to reveal the same, as this occurred before Ms. McMurry's criminal indictment. Officer Weaver's conduct likely violated confidentiality laws to protect the identity of minors found in federal law and in Tex. Fam. Code § 58.008. Ms. Weaver's discussions about the investigation occurred without Ms. McMurry's knowledge or consent and in violation of her right of privacy. The disclosure of such confidential and highly personal information was offensive to any person of ordinary sensibilities, and Ms. McMurry suffered damages as a result.

81.    A state cause of action for defamation is actionable under section 1983 when it connected to and reasonably related to an infringement of another right. As described above, Officer Weaver violated Ms. McMurry's right against unreasonable searches and right to family integrity in this incident, and she invaded Ms. McMurry's personal privacy.

82.    Because Officer's Weaver's defamatory statements and invasion of privacy did not relate to her performance of duties requiring the exercise of judgment or discretion, then she is not shielded by Texas' statutory immunity for school district

employees as she unmistakably acted outside the scope of her regular duties in committing the intentional torts.

83.     Plaintiff Megan McMurry contends that Officer Weaver's commission of defamation and invasion of privacy have caused her damages for which she now sues. Because Defendant Weaver acted recklessly and with callous indifference, Ms. McMurry further seeks to recover punitive damages. Finally, Ms. McMurry seeks to recover her attorneys' fees pursuant to 42 U.S.C. § 1988.

## X. <u>Demand for Jury Trial</u>

84.     Pursuant to Fed. R. of Civ. P. 38, Plaintiffs demand a jury trial for all issues in this matter.

## <u>PRAYER</u>

WHEREFORE, Plaintiffs pray that Defendants Midland Independent School District, Alexandra Weaver, and Kevin Brunner be cited to appear and answer and that, upon final trial, the Court enter judgment granting Plaintiffs the following relief against Defendants, jointly and severally:

1. Actual damages;

2. Punitive damages;

3. Plaintiffs' reasonable and necessary attorneys' fees and expenses incurred in pursuing this claim together with conditional awards of additional attorneys' fees in the event of the filing post-verdict motions and/or appeals;

4. Prejudgment interest as allowed by law;

5. All costs of court;

6. Post-judgment interest as allowed by law; and

7. Such other and further relief, at law or in equity, to which Plaintiffs may show themselves to be justly entitled.

Respectfully submitted,

BLUMBERG BAGLEY PLLC

by:  _/s/ Peter F. Bagley_
   Peter F. Bagley
   Texas Bar No. 00783581
2304 W. Interstate 20, Ste. 190
Arlington, Texas 76017
(817) 277-1500
Facsimile (817) 277-1170
peter@blumbergbagley.com

ATTORNEY FOR PLAINTIFFS