**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
MIDLAND/ODESSA DIVISION**

| | | |
|---|---|---|
| **MEGAN MARIE MCMURRY and** | § | |
| **ADAM SETH MCMURRY, individually** | § | |
| **and as Next Friend of J.M.,** | § | |
| *Plaintiffs*, | § | |
| | § | |
| **v.** | § | **MO:20-CV-00242-DC** |
| | § | |
| **MIDLAND INDEPENDENT SCHOOL** | § | |
| **DISTRICT, ALEXANDRA WEAVER,** | § | |
| **and KEVIN BRUNNER,** | § | |
| *Defendants*. | § | |

## ORDER GRANTING IN PART OFFICERS' MOTIONS TO DISMISS

BEFORE THE COURT are the Motions to Dismiss First Amended Complaint filed by

Defendants Alexandra Weaver (Officer Weaver) and Kevin Brunner (Officer Brunner). (Docs.

10, 11). Plaintiffs Megan Marie McMurry (Ms. McMurry) and Adam Seth McMurry (Mr.

McMurry) (together, Plaintiffs), proceeding individually and as next friend of J.M., a minor

child, filed responses to each Motion. (Docs. 17, 18). Officers Brunner and Weaver filed a reply

to each response. (Docs. 21, 25). After due consideration, the Court **GRANTS IN PART** and

**DENIES IN PART** Officer Brunner's Motion to Dismiss (Doc. 10) and Officer Weaver's

Motion to Dismiss (Doc. 11).

## I.     BACKGROUND

This is a civil rights case arising from an alleged search and seizure executed by Officers

Brunner and Weaver of the Midland Independent School District (MISD) Police Department.

(*See* Doc. 8). The incident involved the Plaintiffs' children, who were twelve and fourteen years

old at the time. *Id.* The Court will set out the allegations upon which it relies in deciding the

instant Motions to Dismiss, accepting all well-pleaded facts in the First Amended Complaint as

true and viewing them in the light most favorable to Plaintiffs. *See Johnson v. Johnson*, 385 F.3d 503, 529 (5th Cir. 2004).

At the time of the incident, Plaintiffs resided on the third floor of an "upscale apartment building in Midland, Texas." *Id.* at 3. The apartment complex "was gated." *Id.* Moreover, the twelve-year-old child, C.M., was enrolled at Abell Junior High School (AJHS). *Id.* The fourteen-year-old child, J.M., was homeschooled online through K-12's Texas Virtual Academy run by the Hallsville Independent School District. *Id.* 3–4. Officer Weaver knew that J.M. was not a student at MISD, was homeschooled, and stayed home alone throughout the school year while Ms. McMurry was at work. *Id.* at 8.

Ms. McMurry worked for MISD as a special education behavior teacher between 2017 and 2018. *Id.* She specifically worked at AJHS. *Id.* In 2018, Mr. McMurry was in Kuwait and Syria, serving in the Mississippi Army National Guard. *Id.* at 3–4. Mr. McMurry remained involved in his children's daily care and regularly contacted them to discuss family business, schoolwork, and daily routines. *Id.*

During Mr. McMurry's deployment, Ms. McMurry planned to travel to Kuwait "to explore a job offer to teach at an international school in Kuwait." *Id.* at 4. Ms. McMurry informed AJHS about her travel plans; the staff also knew that Mr. McMurry was deployed. *Id.* at 5. Additionally, Ms. McMurry arranged for her neighbors, Gabriel (Mr. Vallejos) and Vanessa Vallejos (Ms. Vallejos) (together, the Vallejoses), with whom they socialized on occasion, to care for the two children in her absence. *Id.* She also arranged for several colleagues to drive C.M. to school while J.M. stayed at home completing her schoolwork. *Id.* The Vallejoses had full responsibility for the children, as had been the case on other occasions when Ms. McMurry went out of town. *Id.* The families agreed that the Vallejoses would take the

children to a football game one evening and go out to dinner a few times. *Id.* Plaintiffs advised their children that they could not have visitors while Ms. McMurry was out of the country and that Mr. McMurry would be available by phone while Ms. McMurry was on her flight. *Id.*

Ms. McMurry left Midland, Texas, to fly out from Dallas, Texas, on October 25, 2018. *Id.* That afternoon, after completing her studies, J.M. looked after the Vallejoses' son when he arrived home from school while the Vallejoses were still at work. *Id.* J.M. looked after the Vallejoses' son on several occasions before October 25. *Id.* Moreover, one of Ms. McMurry's colleagues (the school counselor) drove C.M. home from school. *Id.* Later in the evening, C.M. and J.M. agreed with the Vallejoses that they would stay in their apartment for the night rather than sleep on the Vallejoses' couch. *Id.*

On October 26, 2018, Officer Weaver, who was stationed at AJHS, was contacted by the school counselor to ask whether Officer Weaver could drive C.M. to school because she was feeling sick. *Id.* at 6. In response, Officer Weaver initiated an investigation into the children. *Id.* Officer Weaver prepared a police report misrepresenting the content of the communication from the school counselor to make it appear that the children would be left unattended all weekend. *Id.* Specifically, Officer Weaver indicated that the children were left home alone for the weekend. *Id.* C.M. was eventually driven to school by Ms. McMurry's teaching assistant, Ms. Nichola Bowers (Ms. Bowers). *Id.*

Officer Weaver contacted her supervisor, Officer Kevin Brunner (Officer Brunner), and informed him that she learned from the school counselor that Ms. McMurry left her children alone. *Id.* at 6–7. Officer Weaver told Officer Brunner that: Ms. McMurry was traveling to Kuwait for a job interview; Ms. McMurry worked as a teacher for MISD; the children were

fourteen and twelve years old; and she was asked to drive C.M. to school that morning.[1] (Doc. 10-1 at 4). Accordingly, Officer Brunner responded to AJHS. *Id.*

At AJHS, Officer Weaver informed Officer Brunner of his conversation with Ms. Bowers regarding Ms. McMurry's travel plans and the children's caregiving arrangements. *Id.* As a result, Officer Brunner met with Ms. Bowers himself. *Id.* at 5.

Ms. Bowers informed Officer Brunner that Ms. Vallejos, a tenant in the apartment complex where the Plaintiffs lived, checked on the children when Ms. Vallejos picked up her younger child, whom J.M. looked after while Ms. Vallejos worked. *Id.* Ms. Bowers confirmed that she drove C.M. to school that morning and that Ms. McMurry left her children unsupervised on more than one occasion. *Id.*

Officer Brunner also met with Jacqulyn Franco (Ms. Franco), a teacher at AJHS. *Id.* Ms. Franco provided Officer Brunner the same information as Ms. Bowers. *Id.* Ms. Franco added that another student asked her for a ride to the McMurry residence because she planned to stay overnight with J.M. *Id.* The student knew that J.M. and C.M. were home alone, and Ms. Franco believed that the student's parents thought Ms. McMurry would be home. *Id.*

After that, Officer Brunner decided to conduct a "welfare check" on J.M., prioritizing "the confirmation of [J.M.]'s safety over the continuance of the investigation." (Docs. 8 at 8; 10-1 at 5). Before arriving at the apartment complex, Officer Weaver contacted the Texas Department of Family and Protective Services (CPS) in Austin, Texas, to file a complaint against Ms. McMurry. (Doc. 8 at 9). At the apartment complex, the officers approached the apartment complex's assistant manager and requested that she knock on the door to the apartment. *Id.* at 7.

---

1. The Court will consider Officer Brunner's affidavit "as an aid to evaluating the pleadings," seeing as Plaintiffs rely on the affidavit. *See Bosarge v. Miss. Bureau of Narcotics*, 796 F.3d 435, 440 (5th Cir. 2015); *see also* (Doc. 8 at 10, 16, 18). However, the affidavit will "not control to the extent that [it] conflicts with [Plaintiffs'] allegations." *See Bosarge*, 796 F.3d at 440. Accordingly, Plaintiffs' objection to the Court's consideration of the affidavit is overruled.

J.M. opened the door. *Id.* Among other things, J.M. indicated that Ms. Vallejos had last checked on her and C.M. at 7:30 a.m. that day. (*See id.*; *see also* Doc. 10-1 at 5). Officer Brunner informed J.M. that they would take her to another location to talk and asked her to change into warmer clothes. (Doc. 8 at 7). J.M. began to cry but complied with the officers' requests. *Id.*

Officer Weaver followed J.M. into the apartment with J.M.'s permission. (Doc. 10-1 at 5). While J.M. changed her clothes in the bedroom, J.M. saw Officer Weaver search the apartment, opening cabinets, drawers, and the refrigerator. (Doc. 8 at 9). At no point did Officer Weaver request consent to search. *Id.* J.M. sent Mr. McMurry a text message saying, "Dad, I'm scared. The police are here." *Id.* When Officer Weaver and J.M. returned to the door, Officer Weaver told Officer Brunner that the front door remained unlocked. (Doc. 10-1 at 5).

The officers escorted J.M. to the apartment complex's main office, where she was interviewed in a conference room. (Doc. 8 at 9). While the officers questioned J.M., Mr. McMurry tried to call J.M. by Facetime multiple times and sent her text messages asking why he could not Facetime her. *Id.* The officers ordered J.M. not to answer Mr. McMurry's calls or texts. *Id.* The officers also prohibited J.M. from contacting Mr. McMurry and answering a phone call from Ms. Vallejos. *Id.* at 10.

During the officers' interview with J.M., she informed them that Ms. McMurry went to Kuwait on a job interview and that she had last spoken to Ms. McMurry at roughly 6:00 or 7:00 p.m. the night before. (Doc. 10-1 at 5). She also advised them of Ms. McMurry's specific travel plans and that the reason she and C.M. stayed behind was that Ms. McMurry did not want C.M. to miss school. *Id.* J.M. confirmed that she looks after the Vallejos' child every day until approximately 6:30 p.m. when Ms. Vallejos picks him up from Plaintiffs' apartment. *Id.* Before visiting them the morning of October 26, Ms. Vallejos had last checked on J.M. and C.M. when

she picked up her child the previous evening. *Id.* J.M. also informed the officers that Ms. McMurry drove for Uber from 7:00 p.m. to 2:00 a.m., but had recently gotten home around midnight. *Id.* Officer Brunner decided to transport J.M. to AJHS to continue his investigation. *Id.*

Before leaving the apartment complex, Officer Brunner contacted the local CPS office after confirming with CPS Agent Gilberto Villareal (Officer Villareal) that the situation necessitated CPS involvement. (Docs. 8 at 9; 10-1 at 5). One of the officers informed CPS that Ms. McMurry left her children home alone, that her neighbor periodically checked on the children, and that the children did not go to school on October 26.[2] *Id.* at 9–10. J.M. was transported to AJHS in the backseat of a patrol unit. *Id.* At AJHS, J.M. was placed in an office while the officers spoke with the Vallejoses. *Id.* at 12.

Officer Brunner contacted Ms. Vallejos by telephone and informed her that he had to speak with her because J.M. and C.M. were home alone and that leaving the children home alone is a criminal offense. *Id.* Ms. Vallejos indicated that she had last seen the children the previous evening while the children were walking the dog, not the morning of October 26 like J.M. had advised the officers. (Doc. 10-1 at 6). After confirming Ms. Vallejos preferred to speak in person, Officer Brunner asked Ms. Vallejos to meet him at AJHS. (Doc. 8 at 10).

When Mr. and Ms. Vallejos arrived at AJHS, Officer Brunner did not question Ms. Vallejos regarding the caretaking arrangements for the children. *Id.* Instead, Officer Brunner clarified that Ms. Vallejos was not the target of the investigation. *Id.*

Mr. Vallejos confirmed that the last time he and Ms. Vallejos saw J.M. and C.M. was the previous evening. (Doc. 10-1 at 6). Mr. Vallejos also advised the officers that: Ms. McMurry would return the following Tuesday; he and his wife watched C.M. and J.M. when Ms. McMurry

---

2. Plaintiffs allege the latter statement was false because the officers knew C.M. was driven to AJHS that morning and that J.M. was homeschooled. (Doc. 8 at 9–10).

traveled to El Paso to visit her husband on a separate occasion; the children stayed in their apartment because they wanted to sleep in their own beds; and his younger child would be left with J.M. while he and his wife worked on Saturday. *Id.*

After the interview with the Vallejoses, the Vallejoses were placed in the same room as J.M., and Ms. Vallejos was allowed to Facetime Mr. McMurry so that J.M. could speak with him. (Docs. 8 at 12; 10-1 at 6). Mr. McMurry asked to speak with one of the officers, but neither officer wanted to talk with him. (Doc. 8 at 12).

Meanwhile, the officers interviewed C.M. (Doc. 10-1 at 6). C.M. confirmed that the last time the Vallejoses checked on him and J.M. was the previous evening. *Id.* C.M. advised that J.M. was responsible for preparing food. *Id.* Ms. McMurry told the children to contact Ms. Vallejos in case of an emergency. *Id.* C.M. further noted that Ms. McMurry had left town without taking him or J.M. on two prior occasions. *Id.* C.M. confirmed J.M.'s assertion that Ms. McMurry drove for Uber at night. *Id.*

After CPS conducted an investigation, including a call with Ms. McMurry, they closed the case promptly, finding no abuse or neglect. (Doc. 8 at 13–14). The CPS investigator informed the parties that the children could leave with Ms. Vallejos that same day. *Id.* at 14.

At approximately 5:00 p.m. on October 26, Ms. McMurry called Officer Brunner inquiring about the events that transpired that morning and afternoon. (Doc. 10-1 at 6). The parties agreed to meet in person on October 31. *Id.*

After the CPS investigation was closed, the officers interviewed the school counselor, who had driven C.M. home from school on October 25. (Doc. 8 at 13–14). The officers coached the counselor to answer questions in a way that negatively impacted Ms. McMurry. *Id.* When Ms. McMurry returned from Kuwait on October 30, the officers contacted her to obtain her

statement. *Id.* At that time, Ms. McMurry realized the officers wanted to pursue abandonment charges against her. *Id.*

Officer Brunner did not hear from Ms. McMurry on October 31, and the e-mails the officer sent Ms. McMurry went unanswered. (Doc. 10-1 at 6). On November 5, Officer Brunner attempted to contact Ms. McMurry by telephone; however, Ms. McMurry answered the call and quickly hung up. *Id.* After several attempts, Officer Brunner was unable to schedule a meeting with Ms. McMurry. *Id.*

After the incident, Ms. McMurry and J.M. experienced sleeplessness, depression, anxiety, and disruption in their daily routines. (Doc. 8 at 14–15). Plaintiffs' marriage also suffered, prompting them to attend therapy from November 2018 through mid-2020. *Id.* J.M. became fearful and distrustful of law enforcement. *Id.* Mr. McMurry experienced anger and frustration with his inability to be with his family during his mission in Kuwait. *Id.*

Officer Weaver spoke of the criminal investigation with other employees at MISD who were not involved in the investigation before charges were filed against Ms. McMurry. *Id.* The officer informed other employees that Ms. McMurry had abandoned her children, that it was difficult to set up a meeting with Ms. McMurry, that the officers were going to press charges against Ms. McMurry, and that Ms. McMurry would be going to jail. *Id.* Ms. McMurry complained about Officer Weaver to MISD, and, after an investigation, Officer Weaver was assigned to a different school campus within MISD. *Id.* Ms. McMurry also found out that Officer Weaver spoke of the events relevant to the criminal investigation with other AJHS employees who were not a part of the investigation. *Id.*

During this time, C.M. was asked by other children whether his mother would be arrested and whether she had abandoned him, making him uncomfortable and prompting C.M. to ask his parents to remove him from school. *Id.* at 16.

Officer Brunner filed a probable cause affidavit on December 4, 2018, to obtain an arrest warrant for Ms. McMurry. *Id.* at 18. Ms. McMurry turned herself into the Midland County Jail on December 6, 2018; she remained in jail for nineteen hours before Midland County Jail staff processed her bail bond. *Id.* On January 6, 2020, Ms. McMurry had a jury trial for abandoning or endangering her children. *Id.* On January 9, 2020, Ms. McMurry was acquitted by a jury. *Id.*

On October 16, 2020, Plaintiffs filed the instant lawsuit under 42 U.S.C. § 1983 against MISD, Officer Weaver, and Officer Brunner. (Doc. 1). In their First Amended Complaint, Plaintiffs allege Defendants violated Plaintiffs' rights and privileges secured by the Fourth Amendment and the Fourteenth Amendment.[3] (Doc. 8 at 20–27). Finally, Ms. McMurry raises defamation and invasion of privacy claims against Officer Weaver. *Id.* at 30–31.

Officers Brunner and Weaver filed Motions to Dismiss on December 9, 2020, and December 11, 2020, respectively. (Docs. 10, 11). The Motions were fully briefed on January 4, 2021. (*See* Docs. 18, 17, 21, 25).

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) provides for dismissal of a complaint for "failure to state a claim upon which relief can be granted." When considering a Rule 12(b)(6) motion, a court must "accept the complaint's well-pleaded facts as true and view them in the light most favorable to the plaintiff." *See Johnson*, 385 F.3d at 529. Further, the court does not look beyond the face of the complaint to determine whether the plaintiff states a claim under

---

3. Ms. McMurry also raises a breach of contract and lack of due process claim against MISD under the Texas Education Code and the Fourteenth Amendment. (Doc. 8 at 28–29). This claim is not relevant to the instant Motions.

Rule 12(b)(6). *See Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999). However, a district court may consider documents attached to a motion to dismiss if they are referred to in the complaint and are central to the plaintiff's claim. *See Scanlan v. Tex. A&M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003). "[P]laintiffs must allege facts to support the elements of the cause of action in order to make out a valid claim." *See Hale v. King*, 642 F.3d 492, 498 (5th Cir. 2011). The court need not accept as true "conclusory allegations, unwarranted factual inferences, or legal conclusions." *See Ferrar v. Chevron Corp.*, 484 F.3d 776, 780 (5th Cir. 2007).

To survive a motion to dismiss under Rule 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 570 (2007)); *see also DeMoss v. Crain*, 636 F.3d 145, 152 (5th Cir. 2011). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Plausibility requires more than "a sheer possibility that a defendant has acted unlawfully." *Id.* Likewise, threadbare recitals of a cause of action's elements supported by conclusory statements will not survive a motion to dismiss. *Id.* Factual allegations must raise a right to relief above the speculative level. *Twombly*, 550 U.S. at 555. A plaintiff's failure to meet the specific pleading requirements should not automatically or inflexibly result in the dismissal of the complaint with prejudice to re-filing. *Hart v. Bayer Corp.*, 199 F.3d 239, 247 n.6 (5th Cir. 2000).

## III.   DISCUSSION

Both officers raise the qualified immunity defense as to the § 1983 claims. (Docs. 10 at 8–19; 11 at 5–14). Officer Brunner also raises Texas statutory immunity as a defense. (*See* Doc.

10). Officer Weaver raises Texas statutory immunity as a defense only as to the state-law claims filed against her. (*See* Doc. 11). The Court will first consider the qualified immunity issue.

### A.  Qualified Immunity

"Government officials who perform discretionary functions are entitled to the defense of qualified immunity, which shields them from suit as well as liability for civil damages, if their conduct does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Bradyn S. v. Waxahachie Indep. Sch. Dist.*, 407 F. Supp. 3d 612, 622 (N.D. Tex. 2019) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity is an affirmative defense that must be pled. *Id.* (citing *Gomez v. Toledo*, 446 U.S. 635, 640 (1980)). Officers Weaver and Brunner raised the defense in the Motions to Dismiss. (Docs. 10, 11).

After a defendant asserts qualified immunity, the burden shifts to the plaintiff to "rebut this defense by establishing that the official's allegedly wrongful conduct violated clearly established law." *See Pierce v. Smith*, 117 F.3d 866, 871–72 (5th Cir. 1997) (quoting *Salas v. Carpenter*, 980 F.2d 299, 306 (5th Cir. 1992)). The Fifth Circuit does not require that "an official demonstrate that he did not violate clearly established federal rights." *Id.* (citing *Salas*, 980 F.2d at 306). That burden is solely on the plaintiff. *Id.*

Courts apply a two-part inquiry when deciding whether an officer is entitled to qualified immunity. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The court must decide "whether the facts alleged or shown are sufficient to make out a violation of a constitutional or federal statutory right." *Id.* If there was no violation, no further inquiry is necessary. *Id.* However, if the plaintiff sufficiently pleads a constitutional violation, the court must then decide "whether the right at issue was clearly established at the time of the government official's alleged misconduct."

*Bradyn S.*, 407 F. Supp. 3d at 622–23 (citing *Saucier*, 544 U.S. at 201). Under *Pearson v. Callahan*, district courts may exercise their discretion "in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." 555 U.S. 223, 236 (2009). The second prong of the two-part inquiry involves two questions. *See Bradyn S.*, 407 F. Supp. 3d at 623 (citations omitted). The first inquiry is "whether the allegedly violated constitutional right[] [was] clearly established at the time of the incident." *Id.* (citations omitted) (alterations in original). If so, the second inquiry is "whether the conduct of the defendant[] [official] was objectively unreasonable in light of that then clearly established law." *Id.* (citations omitted) (alterations in original).

When considering a qualified immunity defense at the pleading stage, the Court must answer two questions. *Romero v. Brown*, 937 F.3d 514, 519 (5th Cir. 2019). "First, does the complaint allege a constitutional violation?" *Id.* "If so, was the violation clearly established so that the government official would have known she was violating the law?" *Id.*

### 1. Officer Brunner

In count one, J.M. alleges Officer Brunner violated her Fourth Amendment right to be free from an unreasonable seizure when he and Officer Weaver removed her from her parents' home without notifying her parents and without a directive from CPS.[4] (Doc. 8 at 22). In count two, Plaintiffs allege Officer Brunner encroached upon Plaintiffs' substantive due process against interference with their right to family integrity when they temporarily detained J.M. *Id.* at

---

4. It is not clear whether Mr. and Ms. McMurry raise a Fourth Amendment claim for unlawful seizure based on J.M.'s removal from her parents' home. (*See* Doc. 8). However, to the extent that they do, the claim is dismissed because the right to be free from unreasonable seizure under the Fourth Amendment is a personal right which may not be vicariously asserted. *See, e.g.*, they *Kalmus v. Zimmermann*, No. 1:15-CV-316-RP, 2016 WL 6462297, at *8 (W.D. Tex. Nov. 1, 2016) (dismissing parents' Fourth Amendment claim based on the alleged unlawful seizure of their minor child) (citing *Alderman v. United States*, 394 U.S. 165, 174 (1969)).

25. Plaintiffs also argue the officer failed to provide Plaintiffs with "any of the procedural due process protections that would normally apply to state removal of a child . . . ." *Id.* at 25–26.

### a. Alleged Fourth Amendment Violation

J.M. alleges that removing her from her parents' home was an unreasonable seizure because there was no indication that the conditions of the home were "precarious or that [she and C.M.] were physically harmed or distressed or that they were deprived of any resources." (Doc. 17 at 17). J.M. argues that Officer Brunner failed to inquire about the degree of the caretakers' role in supervising and managing the children in Ms. McMurry's absence. *Id.* J.M. also notes that CPS did not direct officer Brunner to remove her from the home. *Id.*

Officer Brunner responds that he was acting under Texas Family Code § 262.104, which allows law enforcement to take possession of a child without a court order. (Doc. 10 at 11) (citing Tex. Fam. Code § 262.104(a)(1) and (2)).

J.M.'s claim against Officer Brunner for a Fourth Amendment violation is based solely on the officers' removal of J.M. from her parents' apartment. (Doc. 8 at 22 ¶ 59). The Fourth Amendment protects a child's right to be free from unreasonable seizure. *See Wooley v. City of Baton Rouge*, 211 F.3d 913, 925 (5th Cir. 2000). The Court will first consider whether J.M. has pleaded with sufficient specificity that a constitutional violation occurred. *See Backe*, 691 F.3d at 648 (citations omitted).

### (i)     *Alleged Constitutional Violation*

A seizure occurs "only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). The Court opines that a fourteen-year-old would not have felt free to leave while being questioned by law enforcement officers outside the presence

of their parents. *See J.D.B. v. North Carolina*, 564 U.S. 261, 264–65 (2011) ("It is beyond dispute that children will often feel bound to submit to police questioning when an adult in the same circumstances would feel free to leave."); *Gates v. Tex. Dep't of Protective & Regul. Servs.*, 537 F.3d 404, 431 (5th Cir. 2008) (finding little doubt that the children were seized when they were removed from their school by state actors). Further, Officer Brunner does not dispute that J.M. was seized when he and Officer Weaver removed her from the apartment to interview her in the apartment complex's front office. (*See* Doc. 10). Accordingly, J.M. has pleaded sufficient facts to establish she was seized.

To constitute a constitutional violation, however, the seizure must have been unreasonable. *See Ohio v. Robinette*, 519 U.S. 33, 39 (1996) (quoting *Florida v. Jimeno*, 500 U.S. 248, 250 (1991)). The reasonableness of a seizure is assessed by balancing "the nature and quality of the intrusion on the individual's Fourth Amendment interest against the importance of the governmental interest that justify the intrusion." *Gates*, 537 F.3d at 429 (citing *United States v. Place*, 462 U.S. 696, 703 (1983)). A child cannot be removed from their home without "a court order, parental consent, or exigent circumstances." *Id.* Officer Brunner does not argue that he had a court order or parental consent. (*See* Doc. 10). "Exigent circumstances in this context means that, based on the totality of the circumstances, there is reasonable cause to believe that the child is in imminent danger of physical or sexual abuse if he remains in his home." *Gates*, 537 F.3d at 429; *see also Smith v. Tex. Dep't of Fam. & Protective Servs. CPS*, No. 05:08-CA-940-XR, 2009 WL 2998202, at *10 (W.D. Tex. Sept. 15, 2009) (citation omitted).

In 2009, the Fifth Circuit adopted the *Gates* standard to fit child endangerment investigations. *See Wernecke v. Garcia*, 591 F.3d 386, 398 (5th Cir. 2009). In child endangerment investigations, courts must consider the time available "to obtain a court order, the

risk that a parent might flee with the child, the availability of less extreme solutions, and any harm to the child that might arise from the removal." *Id.* Further, the Fifth Circuit reviews "the nature of the danger facing the child (its severity, duration, frequency, and imminence), the strength of the evidence supporting immediate removal, and the presence or absence of parental supervision." *Id.*

When the officers removed J.M. from her parents' home, based on Officer Brunner's affidavit, Officer Brunner was only aware of the following facts. (Doc. 10-1 at 4–5). First, Ms. McMurry was out of the country. *Id.* Second, J.M. and C.M. stayed in Midland, Texas, in Plaintiffs' apartment alone. *Id.* Third, J.M. was tasked with babysitting another child. *Id.* Fourth, the child J.M. was babysitting belonged to another tenant in Plaintiffs' apartment complex. *Id.* Fifth, Ms. McMurry arranged for the tenant to check on J.M. and C.M. when she picked up her own child from Plaintiffs' apartment. *Id.* Sixth, Ms. Bowers had taken C.M. to school that morning. *Id.* Seventh, Ms. McMurry left her children unsupervised on previous occasions. *Id.* Eighth, another student asked a teacher for a ride to Plaintiffs' apartment because she planned on staying the night with J.M. *Id.* Ninth, the student knew Ms. McMurry was not home, and the student's parents believed Ms. McMurry would be home. *Id.* Tenth, Ms. Vallejos had last checked on the children at 7:30 a.m. *Id.* Eleventh, the door to the apartment remained unlocked. *Id.* Finally, J.M. was homeschooled and stayed home alone throughout the school year while Ms. McMurry worked at AJHS.[5] (Doc. 8 at 8). Officer Brunner "decided to [take J.M.] to the common area of the apartment complex to continue the interview[,]" removing J.M. from her parents' home. (Doc. 10-1 at 4–5). Later, J.M. was taken from the apartment complex to AJHS. *Id.*

---

5. In general, "police officers may act on the basis of information known by their colleagues in conducting searches and seizures." *Gates*, 537 F.3d at 430–31 (citations omitted).

Few facts weigh toward the reasonableness of the removal—the absence of parental supervision for some days, several MISD employees corroborated that Ms. McMurry went out of town and left her children home alone, and Ms. McMurry had previously left her children home alone.[6]   Most facts weigh against finding the seizure reasonable—the officers arrived at the apartment early in the morning and obtaining a court order would have been possible, there was no risk of flight because Ms. McMurry was out of the country, the home was in a gated community, J.M. was not deprived of basic needs, J.M. was fourteen years old,[7] there was no immediate threat to J.M.'s life or limb, and it does not appear that the officers explored a less extreme solution. Further, Officer Weaver knew that J.M. was homeschooled and stayed home alone during the school year while Ms. McMurry taught at AJHS. Thus, it does not appear that the need for removal was urgent.

Considering the totality of the circumstances and evaluating the facts in light of the "flexible inquiry" required by *Gates*, no reasonable person would believe J.M. was in immediate danger to justify the seizure.[8] The Court rules J.M. has pleaded sufficient facts to state a constitutional violation.

The Court notes that the Fifth Circuit has found more severe circumstances fall short of exigent circumstances. *See Wernecke*, 591 F.3d at 398 (finding the presence of medications and

---

6. Notably, citing Second Circuit case law, the Fifth Circuit has suggested that "the mere possibility of danger is not enough." *Gates*, 537 F.3d at 427 (quoting *Tenenbaum v. Williams*, 193 F.3d 581, 593 (2d Cir. 1999)). Additionally, a sister district court has required state actors to "do more than demonstrate general concerns about [the child's] welfare." *Kalmus v. Zimmermann*, No. 1:15-CV-316-RP, 2016 WL 6462297, at *9 (W.D. Tex. Nov. 1, 2016).

7. J.M. was fourteen years old at the time, and she had a cell phone and access to adults. (Doc. 8 at 4). The Court notes that the children's age is critical. *See Pate v. Harbers*, No. 1:15-CA-375-SS, 2015 WL 4911407, at *7 (W.D. Tex. Aug. 17, 2015), *aff'd*, 667 F. App'x 487 (5th Cir. 2016) (finding the child's age "highly relevant to the exigency analysis because age heavily influences the nature of the danger facing the child").

8. Officer Brunner points to the issuance of an indictment by a grand jury for abandoning or endangering a child and argues that the indictment establishes, as a matter of law, that there was probable cause to believe that J.M. and C.M. were placed in imminent danger of death, bodily injury, or physical or mental impairment. (Doc. 10 at 12–13). However, the grand jury's indictment was premised on an investigation that occurred, in part, after the decision to remove J.M. from the home was made and executed. Accordingly, it is not relevant to the Court's inquiry in relation to the instant Motion.

syringes in the home, in child-proof containers, and under parental supervision, does not rise to the level of exigency).

For thoroughness, the Court acknowledges Officer Brunner's argument that he believed J.M. faced an immediate danger to her physical health or safety. (Doc. 10 at 11–12). And that § 262.104 of the Texas Family Code allows law enforcement to remove children from the home if the officer is aware of facts that "would lead a person of ordinary prudence and caution to believe that there is an immediate danger to the physical health or safety of the child." *Id.* (citing Tex. Fam. Code § 262.104(a)(1)). However, the Texas Family Code does not exempt law enforcement's actions from constitutional scrutiny, as the Fifth Circuit explained in *Gates.* 537 F.3d at 421–22. "A statutory command [to remove children in immediate danger] is not a license to ignore the Fourth Amendment . . . ." *Id.* (citing *Sibron v. New York*, 392 U.S. 40, 60 (1968)). Moreover, the Texas statute provides a framework that, like exigent circumstances, requires immediate danger before law enforcement removes a child from the home. *See* Tex. Fam. Code § 262.104(a)(1). Texas law explains that "[r]emoving a child from his home and parents on an emergency basis . . . is an extreme measure that may be taken only when the circumstances indicate a danger to the physical health and welfare of the child." *In re Pate*, 407 S.W.3d 416, 419 (Tex. App.—Houston [14th Dist.] 2013, no pet.) (citations omitted). The need for the child's protection must be "so urgent that immediate removal from the home is necessary." *Id.*

In sum, J.M.'s claim for a violation of her right to be free from an unreasonable seizure against Officer Brunner survives the first prong of the qualified immunity analysis.

      (ii)     *Whether the Right was Clearly Established*

As to the second prong of the qualified immunity analysis, the Court must determine whether the right allegedly violated was clearly established at the time of the incident. *See Bradyn S.*, 407 F. Supp. 3d at 623. "The central purpose of the 'clearly established' inquiry is to determine whether 'prior decisions gave reasonable warning that the conduct at issue violates constitutional rights.'" *See Pate v. Harbers*, No. 1:15-CA-375-SS, 2015 WL 4911407, at *8 (W.D. Tex. Aug. 17, 2015), *aff'd*, 667 F. App'x 487 (5th Cir. 2016) (quoting *Kinney v. Weaver*, 367 F.3d 337, 350 (5th Cir. 2004)). However, the "clearly established" inquiry must be considered "in light of the specific context of the case, not as a broad general proposition." *Id.* (citing *Gates*, 537 F.3d at 429). Therefore, the Court must consider whether the law put Officer Brunner on notice that his conduct violated the Fourth Amendment. *See id.*

It is clear that law enforcement officers cannot remove a child without a court order or parental consent unless exigent circumstances exist. *See id.* The rule is violated unless there is immediate danger to the child. *See Gates*, 537 F.3d at 428–29. Although J.M. does not point to a case applying the standard to an identical factual scenario, alleged child abandonment, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). However, there must be "sufficient indicia that the conduct in question was illegal." *See Lytle v. Bexar Cnty., Tex.*, 560 F.3d 404, 410 (5th Cir. 2009) (citing *Freeman v. Gore*, 483 F.3d 404, 415 (5th Cir. 2007)). Relevant to this case, the *Gates* decision unequivocally "articulated a standard for determining when some evidence of danger rises to the level of an emergency justifying immediate removal." *Wernecke*, 591 F.3d at 400. In the instant case, the alleged facts do not indicate J.M. was in immediate danger. Instead, Plaintiffs plead that J.M. was a capable and mature fourteen-year-old and that the apartment was safe. (*See* Doc. 8). The fact that the fourteen-year-old would have stayed

home alone does not create such an urgency that J.M. needed to be removed before a court order could be obtained.

Also relevant is the Fifth Circuit's *Wernecke* decision in 2009, which incorporates the parent's absence or presence as a factor to be considered in deciding exigent circumstances. Thus, although the Fifth Circuit has not evaluated whether a fourteen-year-old child is in immediate danger when she is home alone, it has provided a standard that contemplates these factual circumstances. Thus, there were sufficient indicia that Officer Brunner's actions were illegal.

The Court holds Officer Brunner's actions were objectively unreasonable considering the clearly established law.

In sum, at this time, Officer Brunner is not entitled to qualified immunity on J.M.'s unlawful seizure claim.

#### b.  Alleged Fourteenth Amendment Violation

Plaintiffs argue Officer Brunner violated Plaintiffs' right to family integrity when he detained J.M., a right that the Fourteenth Amendment protects. (Doc. 8 at 24–25). Plaintiffs allege a violation of both their procedural and substantive due process. *Id.*

(i)   *Substantive Due Process*

"The constitutional right to family integrity was well established in 1992." *Morris v. Dearborne*, 181 F.3d 657, 671 (5th Cir. 1999). Specifically, "a parent's custody and control of her children is a fundamental liberty interest, the government may violate substantive due process when it takes away that right." *Romero*, 937 F.3d at 519 (citations omitted). The right is not absolute. *See McCullough v. Herron*, 838 F. App'x 837, 842 (5th Cir. 2020). The state also

has an interest in protecting the health, safety, and welfare of children. *Id.* (citing *Morris*, 181 F.3d at 669; *Wooley*, 211 F.3d at 924).

The Fifth Circuit created a test to determine "whether the conduct of state actors violated the constitution by analyzing claims of state interference with the right to family integrity 'by placing them, on a case-by-case basis, along a continuum between the state's clear interest in protecting children and a family's clear interest in privacy.'" *Id.* (quoting *Morris*, 181 F.3d at 671). Therefore, the Court must determine whether Officer Brunner's "individual actions were arbitrary or conscience shocking on the continuum between private and state interests." *Id.* If the interests of the state and the family overlap, "the right to family integrity is considered too 'nebulous' to find a clearly established violation." *Romero*, 937 F.3d at 520 (quoting *Morris*, 181 F.3d at 671). However, if it is clear that the state's interest is "negligible" and "the family privacy right is well developed in jurisprudence . . . qualified immunity is not a defense." *Id.* (quoting *Morris*, 181 F.3d at 671). Accordingly, overcoming qualified immunity on a family integrity claim is dependent on "the degree of fit between the facts of [the] case and [the Fifth Circuit's] prior opinions." *Id.* (citations omitted) (internal quotation marks omitted).

The Court rules that the fit is lacking in this case. Specifically, there is no Fifth Circuit caselaw involving an investigation into child abandonment, and the Plaintiffs do not cite any. *See Romero*, 937 F.3d at 521 (noting the state's interest in preventing child abuse was attenuated but recognizing the state's interest in protecting children). Further, here, the temporary removal lasted only several hours. (*See* Doc. 8). The Fifth Circuit has found "clear violations of substantive due process only when the removal measured in months or years." *Romero*, 937 F.3d at 521 (citations omitted). For example, the Fifth Circuit held that a one-day removal was a "less substantial interference with the right to control a child's upbringing than [] far lengthier

removals." *Id.* (citing *Hodorowski v. Ray*, 844 F.2d 1210, 1217 (5th Cir. 1988)). This fact further confirms that this case falls in the nebulous zone of the substantive due process continuum.

The Court finds qualified immunity protects Officer Brunner from the Plaintiffs' substantive due process claim.

(ii)     *Procedural Due Process*

Before a parent is deprived of their liberty interest in the custody and management of their children, procedural due process must be provided. *See Romero*, 937 F.3d at 521–22 (citing *Santosky v. Kramer*, 455 U.S. 745, 753–54 (1972); *Stanley v. Illinois*, 405 U.S. 645, 658 (1972); *Gates*, 537 F.3d at 435). State actors must follow specific procedures that, at a minimum, include providing notice and an opportunity to be heard in a meaningful time and manner. *Id.* Further, "unlike the fuzzy continuum that governs substantive due process in this area, there are bright lines when it comes to the procedural safeguards." *Id.*

As noted in relation to J.M.'s Fourth Amendment claim, children cannot be removed from the home without a court order, parental consent, or exigent circumstances. *Gates*, 537 F.3d at 434. The Fifth Circuit equates "the procedures required under the Fourteenth Amendment with those required under the Fourth Amendment for searches and seizures related to child [endangerment] investigations." *Id.* (quoting *Doe v. Kearney*, 329 F.3d 1286, 1299 (11th Cir. 2003)).

Officer Brunner did not have a court order to remove J.M. from the home. (*See* Docs. 8, 10-1). Additionally, as previously noted, there was no reason to believe that J.M. faced immediate danger if she was not "immediately removed." Further, immediately returning J.M. to Ms. Vallejos, whom Ms. McMurry charged with the care of her children, "lends further support

to a procedural due process claim under the clearly established *Gates* standard." *Romero*, 937 F.3d at 522.

In sum, because the First Amended Complaint plausibly alleges that Officer Brunner violated Plaintiffs' procedural due process and that the right was clearly established such that Officer Brunner was aware that his conduct was illegal, said claim against Officer Brunner survives the Motion to Dismiss.

### 2.  Officer Weaver

In count one, Plaintiffs allege Officer Weaver entered the apartment and conducted a search without a warrant or consent. (Doc. 8 at 21). J.M. also alleges that Officer Weaver violated her Fourth Amendment right to be free from an unreasonable seizure when he and Officer Brunner "seized" her. *Id.* at 22. In count two, Plaintiffs allege Officer Weaver encroached upon Plaintiffs' substantive due process against interference with their right to family integrity when he and Officer Brunner temporarily detained J.M. *Id.* at 25–26. Finally, Plaintiffs claim Officer Weaver failed to provide Plaintiffs with "any of the procedural due process protections that would normally apply to state removal of a child . . . ." *Id.* at 25–26.

Plaintiffs' § 1983 claims against Officer Weaver are premised on the same allegations against Officer Brunner, except for the unlawful entry and search claim. (*See* Doc. 8). Accordingly, J.M.'s § 1983 claim for illegal seizure[9] and Plaintiffs' claim for violation of their procedural due process[10] survive Officer Weaver's Motion to Dismiss for the same reasons they

---

9. Officer Weaver's argument regarding J.M.'s seizure focuses on the alleged danger J.M. faced being home alone. (Doc. 11 at 9–10). However, Officer Weaver does not argue that the danger was immediate such that J.M.'s removal from the home was necessary without a court order. *Id.* Further, as previously explained in this Order, the officers' reliance on the grand jury indictment against Ms. McMurry is misplaced.

10. Officer Weaver argues she had a duty to report suspected neglect. (Doc. 11 at 7). And that she acted in accordance with the law when she reported suspected neglect. *Id.* at 8. However, that duty is not relevant to J.M.'s seizure. Moreover, although Plaintiffs include Officer Weaver's alleged misrepresentations to various parties, including CPS, Plaintiffs do not raise a § 1983 claim based on Officer Weaver's report of neglect. (*See* Doc. 8 at 21–

overcome Officer Brunner's Motion to Dismiss. Likewise, Plaintiffs' § 1983 claim for violation of their substantive due process does not pierce Officer Weaver's immunity.

The only § 1983 claim remaining against Officer Weaver is based on the alleged illegal entry and search. The Court will conduct the two-prong inquiry to determine whether the remaining § 1983 claim pierces Officer Weaver's qualified immunity.

The Fourth Amendment protects against unreasonable searches. *Wernecke*, 591 F.3d at 398. In assessing the reasonableness of a search, the Court must "balance 'the nature and quality of the intrusion on the individual's Fourth Amendment interest against the importance of the governmental interest alleged to justify the intrusion.'" *Id.* (quoting *Wooley*, 211 F.3d at 925). "Warrantless searches of a person's home are presumptively unreasonable unless the person consents, or unless probable cause and exigent circumstances justify the search." *United States v. Gomez-Moreno*, 479 F.3d 350, 354 (5th Cir. 2007) (citing *United States v. Jones*, 239 F.3d 716, 719 (5th Cir. 2001)). Further, there is a "special need" exception that applies in few instances. *Gates*, 537 F.3d at 420 (citing *Roe v. Tex. Dep't of Protective & Regulatory Servs.*, 299 F.3d 395, 404 (5th Cir. 2002)).

In the instant case, it is undisputed that the officers did not have a warrant to enter and search the apartment. Plaintiffs plead that the officers did not ask J.M. for consent to talk to her, "nor did they make clear she could refuse their entry into the apartment door . . . ." (Doc. 8 at 8). Further, Plaintiffs plead that "Officer Weaver followed J.M. in the apartment" and that Officer Weaver began to search the apartment, opening "cabinets, drawers, and the refrigerator . . . without J.M.'s consent." *Id.* at 9. Officer Brunner's affidavit indicates that J.M. permitted Officer Weaver to escort her inside the apartment. (Doc. 10-1 at 5).

---

31) (listing and explaining the basis of their claims). Thus, the Court will not address arguments related to Officer Weaver's alleged misrepresentations.

The Court will first consider Officer Weaver's entry into the apartment.[11]

### a. The Entry

Plaintiffs do not plead that J.M. did not consent to Officer Weaver's entry. (Doc. 8 at 8–9). Instead, they merely allege that she was not advised that she could refuse their entry into the apartment. *Id.* at 8 ¶24. Officer Brunner's affidavit indicates Officer Weaver followed J.M. into the apartment with J.M.'s permission. (Doc. 10-1 at 5). Because the affidavit does not contradict the First Amended Complaint, the Court may consider it "as an aid to evaluating the pleadings." *Bosarge v. Miss. Bureau of Narcotics*, 796 F.3d 435, 440 (5th Cir. 2015).

The pleadings indicate that Officer Weaver had J.M.'s consent to enter the apartment. Accordingly, the Court finds no constitutional violation when Officer Weaver entered Plaintiffs' home with J.M.'s permission. Further, Plaintiffs do not argue that J.M. could not consent to Officer Weaver's entry into the apartment.

However, even if they had, under Texas law, there is no "per se rule that children, may or may not, consent to entry into a residence." *Green v. State*, No. 02-10-00082-CR, 2011 WL 3426278, at *3 (Tex. App.—Fort Worth Aug. 4, 2011, pet. ref'd) (citing *Limon v. State*, 340 S.W.3d 753, 756 (Tex. Crim. App. 2011)). Further, Plaintiffs do not point to Fifth Circuit case law establishing that minors cannot consent to an officer's entry into the home when a parent is not present. Neither was the Court able to locate case law on the topic, either from the Fifth

---

11. Count one does not assert a Fourth Amendment claim against Officer Brunner in relation to Officer Weaver's conduct—entering and searching the home. (Doc. 8 at 21–24). Rather, in paragraph fifty-six, Plaintiffs generally allege that the officers and MISD violated their Fourth Amendment rights. *Id.* at 21. In paragraph fifty-seven, Plaintiffs specifically claim Officer Weaver conducted an illegal search. *Id.* In paragraphs fifty-eight and fifty-nine, Plaintiffs specifically claim both officers unlawfully seized J.M. *Id.* at 21–22. Paragraphs sixty, sixty-one, sixty-two, and sixty-three concern MISD's actions and alleged fault. *Id.* at 22–23. Finally, paragraph sixty-four concerns damages. *Id.* at 24. At no point do Plaintiffs argue Officer Brunner "sanctioned" Officer Weaver's conduct as they appear to claim in their briefing. Thus, to the extent Plaintiffs raise a claim against Officer Brunner for Officer Weaver's search, the claim is dismissed.

Circuit or the Supreme Court.[12] Accordingly, the Court rules that it was not clearly established that J.M. could not consent to Officer Weaver's entry.

Plaintiffs' § 1983 claim based on the entry does not overcome Officer Weaver's qualified immunity.

### b.  The Search

Plaintiffs also plead Officer Weaver did not have consent to search the home. (Doc. 8 at 8–9). Specifically, Plaintiffs allege that Officer Weaver searched the apartment "without J.M.'s consent." *Id.* at 9.

The Fourth Amendment guarantees that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend IV. "Warrantless searches of a person's home are presumptively unreasonable unless the person consents, or unless probable cause and exigent circumstances justify the search." *Gates*, 537 F.3d at 420 (citation omitted). "[I]dentical [F]ourth [A]mendment standards apply in both the criminal and civil contexts." *Wooley*, 211 F.3d at 925. Deciding whether a search is reasonable requires that the Court balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Id.*

---

12. The Court located other circuit court cases discussing the issue. The Sixth Circuit held that a search conducted with the consent of the defendant's children (who were fourteen, twelve, and ten years old at the time) was valid. *See United States v. Clutter*, 914 F.2d 775, 778 (6th Cir. 1990). The Eleventh Circuit held that a nine-year-old child had authority to consent to her guardian ad litem's entry into her grandparent's home and that the child's age was not relevant, relying on *Matlock*, a Supreme Court case. *See Lenz v. Winburn*, 51 F.3d 1540 (11th Cir. 1995). The Tenth Circuit upheld the constitutionality of a search conducted with the permission of the defendant's fourteen-year-old daughter. *See United States v. Gutierrez-Hermosillo*, 142 F.3d 1225, 1231 (10th Cir. 1998). *But see United States v. Sanchez*, 608 F.3d 685, 693 (10th Cir. 2010) (Lucero, J., concurring) (arguing that *Matlock* supports finding that, in many situations, "a minor child in a parent's home lacks both actual and apparent authority" to consent to a search). However, these cases are not relevant because, when considering qualified immunity, the right must be "well developed in jurisprudence from [the Fifth Circuit] and the Supreme Court[.]" *Romero*, 937 F.3d at 520.

Plaintiffs sufficiently plead that Officer Weaver engaged in a search when she entered Plaintiffs' home and looked inside cabinets, drawers, and the refrigerator. (Doc. 8 at 9). The search was not executed under a warrant. Accordingly, the Court must determine whether probable cause and exigent circumstances justified the search. *See Gates*, 537 F.3d at 420.

Exigent circumstances exist during a hot pursuit, "when there is a genuine risk that officers or innocent bystanders will be endangered," or when there is a possibility that evidence will be destroyed. *See United States v. Menchaca–Castruita*, 587 F.3d 283, 289 (5th Cir. 2009); *see also United States v. Albarado*, 555 F. App'x 353, 356 (5th Cir. 2014) (per curiam). The state actors must have reason to believe that "life or limb is in immediate jeopardy" and that intrusion is reasonably necessary to ease that threat. *Wernecke*, 591 F.3d at 400 (citing *Roe*, 299 F.3d at 407); *see also Gates*, 537 F.3d at 421 (quoting *Good v. Dauphin Cnty. Soc. Servs. for Child. & Youth*, 891 F.2d 1087, 1094 (3d Cir. 1989)). The facts alleged do not establish, as a matter of law, the existence of exigent circumstances sufficient to justify a warrantless search, however minor the intrusion. At the time Officer Weaver conducted the search, the officers were already in the process of removing J.M. from the home. Thus, it is not relevant whether Officer Weaver executed the search to investigate the conditions of the home to ensure J.M.'s safety. Further, the pleaded facts indicate there was sufficient time to obtain a warrant to investigate and pursue criminal charges against Ms. McMurry for child abandonment or endangerment. Finally, there is no indication that there was a threat that evidence would be destroyed if the officers waited for a search warrant, nor that J.M.'s or the officers' life or limb was in immediate danger.

Officer Weaver argues that searching the home to confirm J.M. had adequate food was not unreasonable. However, Officer Weaver does not cite case law suggesting police officers can search a home for that purpose without a court order or authorization. (Doc. 11 at 11). Moreover,

"[r]egardless of what Texas law may authorize, entry into a house . . . must satisfy Fourth Amendment standards." *Gates*, 537 F.3d at 422. To the extent that Officer Weaver raises the "special needs" exception to investigate possible child abuse, the Court notes that it is clearly established that the exception does not apply in this context. *See id.* at 424–25 (noting the social worker's visit to the home to investigate possible child abuse was not separate from general law enforcement; thus, the special needs doctrine could not justify a Fourth Amendment violation).

For these reasons, the Court holds that Plaintiffs have pleaded sufficient facts to establish a constitutional violation based on the illegal search. Further, Plaintiffs' right to be free from unreasonable searches, in these circumstances, was clearly established such that it was unreasonable for Officer Weaver to believe that she was not violating the law. Accordingly, Officer Weaver's Motion to Dismiss Plaintiffs' § 1983 claim for the alleged illegal search is denied.

### B.  Other Defenses

#### 1.  Officer Brunner

In a conclusory fashion, Officer Brunner argues he is entitled to statutory immunity under § 262.003 of the Texas Family Code and immunity for professional school district employees. (Doc. 10 at 18–19). Both defenses are based on Texas statutes. However, "state law cannot provide immunity for claims asserted under federal law." *Alonzo v. San Antonio Police Dep't Headquarters*, No. 5-17-CV-0913-FB-RBF, 2018 WL 9875252, at *8 (W.D. Tex. June 14, 2018), *report and recommendation adopted*, No. 05:17-CA-913-FB-RBF, 2018 WL 9877856 (W.D. Tex. Aug. 2, 2018). Accordingly, Texas statutes conferring immunity do not bar J.M.'s and Plaintiffs' § 1983 claims against Officer Brunner.

#### 2.  Officer Weaver

Ms. McMurry raises defamation and invasion of privacy claims against Officer Weaver. (Doc. 8 at 30–31). Officer Weaver asserts that she is immune from Ms. McMurry's state law claims. (Doc. 11 at 13–18).

### a. Defamation

A defamation claim has three elements: "(1) the publication of a false statement of fact to a third party, (2) that was defamatory concerning the plaintiff, (3) with the requisite degree of fault, and (4) damages, in some cases." *In re Lipsky*, 460 S.W.3d 579, 593 (Tex. 2015) (citations omitted). "A private individual need only prove negligence," not actual malice. *Id.* (citing *WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998)).

In count four, Ms. McMurry generally pleads that "Officer Weaver made defamatory statements about [her] to fellow co-workers," that Officer Weaver "impugned the integrity and character of Ms. McMurry, which exposed her to contempt, ridicule, and financial injury, and that she "suffered damages as a result." (Doc. 8 at 30 –31). These allegations alone are not sufficient to state a defamation claim.

Ms. McMurry also pleads that Officer Weaver "gossiped about the criminal investigation with other employees . . . even though Ms. McMurry had not been charged with a crime." *Id.* at 15. Officer Weaver informed other MISD employees that "Ms. McMurry had 'abandoned' her children, that she was tired of the difficulty in setting up a meeting with Ms. McMurry," and that the officers were going to press charges against Ms. McMurry. *Id.* Officer Weaver also told other employees that Ms. McMurry would be going to jail. *Id.* Ms. McMurry pleads that Officer Weaver's conversation with other MISD employees was not related to Officer Weaver's investigation into Ms. McMurry and had no connection to her duties as an officer. *Id.*

Although Ms. McMurry pleads that Officer Weaver "engaged in idle gossip," she does not allege that the statements Officer Weaver made were false, a necessary element of a defamation claim. *In re Lipsky*, 460 S.W.3d at 593. Accordingly, the Court grants Officer Weaver's Motion to Dismiss the defamation claim against her.

### b. Invasion of Privacy

An invasion of privacy claim has two elements: "(1) the defendant intentionally intruded on the plaintiff's solitude, seclusion, or private affairs; and (2) the intrusion would be highly offensive to a reasonable person." *Beaumont v. Basham*, 205 S.W.3d 608, 614 (Tex. App.—Waco 2006, pet. denied) (citing *Valenzuela v. Aquino*, 853 S.W.2d 512, 513 (Tex. 1993); *Russell v. Am. Real Estate Corp.*, 89 S.W.3d 204, 212 (Tex. App.—Corpus Christi 2002, no pet.); *Clayton v. Wisener*, 190 S.W.3d 685, 696 (Tex. App.—Tyler 2005, pet. denied)).

As noted above in relation to the defamation claim, Ms. McMurry pleads that Officer Weaver divulged some details of the criminal investigation into Ms. McMurry to other employees. (Doc. 8 at 15–16, 30–31). These factual allegations are sufficient to establish an invasion of privacy cause of action at the pleading stage. *See, e.g.*, *Halloran v. Veterans Admin.*, 874 F.2d 315, 320 (5th Cir. 1989) ("There can be no clearer example of an unwarranted invasion of privacy than to release to the public that another individual was the subject of [a criminal] investigation.").

Officer Weaver argues she is entitled to official immunity. (Doc. 11 at 14–15). "Texas law grants official immunity to an officer who was (1) performing discretionary duties; (2) in good faith; and (3) while acting within the scope of his authority." *Little v. Rutledge*, No. 1:05-CA-509 LY, 2008 WL 11413484, at *6 (W.D. Tex. Jan. 14, 2008), *report and recommendation approved*, No. 1: 05-CA-509-LY, 2008 WL 11413498 (W.D. Tex. Feb. 5, 2008). Officer Weaver

bears the burden of establishing official immunity as it is an affirmative defense. *See Kassen v. Hatley*, 887 S.W.2d 4, 8 (Tex. 1994) (discussing official immunity in Texas). In this case, it is impossible to determine whether Officer Weaver is entitled to official immunity at the pleading stage.

At this time, the Court must take Ms. McMurry's well-pleaded facts as true.[13] Ms. McMurry pleads that Officer Weaver divulged information concerning the criminal investigation into Ms. McMurry's alleged abandonment of her children to other MISD employees who were not involved or relevant to the criminal investigation. According to the pleadings, Officer Weaver was not acting within the scope of her authority when she gossiped with other MISD employees concerning the criminal investigation. The Court finds official immunity does not warrant dismissal of Ms. McMurry's invasion of privacy claim at this time.

Officer Weaver also moves to dismiss the invasion of privacy claim, raising professional immunity as a defense. (Doc. 11 at 15–16).

School employees are afforded professional immunity "for any act that is incident to or within the scope of the duties of the employee's position of employment and that involves the exercise of judgment or discretion on the part of the employee." Tex. Educ. Code § 22.0511(a). As noted above, the facts in the First Amendment Complaint indicate that Officer Weaver was not acting within the scope of her duties as an MISD police officer when she divulged private information concerning the investigation of Ms. McMurry. Accordingly, professional immunity does not support dismissing the invasion of privacy claim against Officer Weaver.

For these reasons, Officer Weaver's Motion to Dismiss the invasion of privacy claim is denied.

---

13. Accordingly, the Court does not consider Officer Weaver's argument that she was speaking with MISD employees as part of her investigation. (Doc. 21 at 5–6).

## IV.   CONCLUSION

Based on the above discussion, the Court **GRANTS IN PART** and **DENIES IN PART**

Officer Weaver's Motion to Dismiss (Doc. 11) and Officer Brunner's Motion to Dismiss.

(Doc. 10).

The Court **DISMISSES WITH PREJUDICE** the following claims:

1) Plaintiffs' claim for violation of the Fourth Amendment premised on Officer Weaver's entry into Plaintiffs' home against Officer Weaver.
2) Plaintiffs' Fourth Amendment claim premised on Officer Weaver entering and searching Plaintiffs' home against Officer Brunner.
3) Plaintiffs' Fourth Amendment claim premised on J.M.'s seizure against both officers, to the extent that they raised such claim.
4) Plaintiffs' claim for violation of Plaintiffs' substantive due process against both officers.
5) Ms. McMurry's defamation claim against Officer Weaver.

Accordingly, the following claims remain:

1) Plaintiffs' claim for violation of the Fourth Amendment premised on Officer Weaver's search of the home against Officer Weaver.
2) J.M.'s claim for violation of the Fourth Amendment premised on the seizure against both officers.
3) Plaintiffs' claim for violation of Plaintiffs' procedural due process against both officers.
4) Ms. McMurry's claim for invasion of privacy against Officer Weaver.

The Court further **DENIES** Plaintiffs' request to amend the First Amended Complaint as

futile.

The Court finally **OVERRULES** Plaintiffs' objection to the affidavit attached to Officer Brunner's Motion to Dismiss.

It is so **ORDERED**.

SIGNED this 3rd day of September, 2021.

_____
DAVID  COUNTS
UNITED STATES DISTRICT JUDGE