UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
MIDLAND/ODESSA DIVISION

| | | |
|---|---|---|
| ALESIA JADE MCMURRY, MEGAN | § | |
| MARIE MCMURRY and ADAM SETH | § | |
| MCMURRY, | § | |
|     Plaintiffs | § | |
| v. | § | CIVIL ACTION NO. 7:20-cv-00242-DC |
| | § | |
| ALEXANDRA WEAVER and KEVIN | § | |
| BRUNNER, | § | |
|     Defendants | § | |

**PLAINTIFFS' RESPONSE TO DEFENDANT ALEXANDRA WEAVER'S
MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT**

Respectfully Submitted:

LAW OFFICE OF PETER BAGLEY PLLC

by: _/s/Peter F. Bagley_
    Peter F. Bagley
    Texas Bar No. 00783581
    peter@peterbagley.law
2304 W. Interstate 20, Suite 240
Arlington, Texas 76017
(817) 961-1010
(817) 961-1080 - Facsimile

ATTORNEY FOR PLAINTIFFS

<u>**CERTIFICATE OF SERVICE**</u>

By my signature below, I hereby certify that a true copy of the above and foregoing pleading was served on all attorneys of record via electronic service on this 23RD day of April, 2024.

    _/s/ Peter F. Bagley_
    Peter F. Bagley

Plaintiffs Alesia Jade McMurry, Megan Marie McMurry, and Adam Seth McMurry, ("Plaintiffs") file their Response to Defendant Alexandra Weaver's Motion for Summary Judgment, and in support thereof, Plaintiffs respectfully show the Court the following:

## I. Introduction

The claims of this action stem from an investigation conducted by Defendants Alexandra Weaver and Kevin Brunner, former police officers[1] with Midland Independent School District (MISD), into child abandonment on October 26, 2018 that led to a search of Plaintiffs' residence and the removal of Adam and Megan McMurry's teenage daughter from the home before the officers contacted the daughter's parents, caretakers, or any other person with direct knowledge of facts about the children's caretaking. It is beyond dispute that Defendants seized J.M.,[2] even if temporarily, and that this seizure interfered with the rights of Mr. and Ms. McMurry of custody and control of their child. In response, Defendant Weaver rehashes arguments previously made by both her and Officer Brunner to concoct a scene of urgency to justify her actions. But in fact, the officers did not have an objectively reasonable basis to believe a crisis existed which required them to act in the moment and in the manner that they did. For the reasons below, Ms. Weaver's arguments fail, and her Motion for Summary Judgment should be denied.

---

[1] Ms. Weaver is no longer a licensed police officer. AW Depo 13 [11-13-23] (App. 024). Unless otherwise indicated herein, the citations to her deposition will be for the deposition taken Nov. 14, 2023.

[2] For clarity, Plaintiffs will refer to Alesia Jade McMurry in this Response as J.M. to differentiate her from Megan McMurry. For brevity, parties and witnesses will be referred to by initials in the footnotes.

## II. Background Facts

In 2018, Megan and Adam McMurry lived in a gated apartment complex with their two children, J.M. and C.M., who were ages 14 and 12.[3] Megan McMurry worked at MISD's Abell Junior High School as a special education behavior teacher.[4] C.M. attended the school district, but J.M. was homeschooled through a virtual academy and typically spent her daytime hours in the apartment alone doing her online instruction while Ms. McMurry was at work.[5]

In early 2018, Adam McMurry was deployed to Kuwait and later to Syria while serving in the National Guard.[6] Mr. McMurry's post enabled him to maintain daily contact with his family by text, email, and Facetime.[7] In late October 2018, Ms. McMurry left to travel to Kuwait to explore a teaching opportunity there where the McMurrys had once lived in the hope of living closer to Mr. McMurry who could visit them during his deployment leave.[8]

Ms. McMurry notified school personnel about her trip, and she arranged for the children to be cared for by Vanessa and Gabriel Vallejos, neighbors who lived in the same apartment complex.[9] The neighbors agreed to take full responsibility for the children in Ms. McMurry's absence and they planned to take the children out to eat a few times as well as a football game, among other

---

[3] MM Aff. ¶1 (App. 007).
[4] *Id.*, ¶2 (App. 007).
[5] *Id.*
[6] *Id.*
[7] *Id.*; SM Aff. ¶2 (Adam Seth McMurry will be referred to as SM) (App. 013).
[8] MM Aff. ¶4 (App. 008).
[9] *Id.*

things.[10] Ms. McMurry also had lined up two school district employees, including school counselor Tracy Rickerson f/k/a Tracy Pradon who lived across the street, to handle transporting C.M. back and forth to school on the school days around the weekend of her five-day absence.[11] Like her husband, Ms. McMurry intended to remain in contact with her children during her absence except when she would be unavailable during her travel time by air.[12]

On October 26, 2018, the day after Ms. McMurry left, Ms. Rickerson called in sick and texted Defendant Weaver, who knew Ms. McMurry.[13] She asked if she could bring C.M. to school (knowing Ms. Weaver also lived near the McMurrys).[14] This prompted Ms. Weaver to open an investigation into child abandonment.[15] She claimed that Ms. Rickerson told her by text that the children were "left alone" that weekend, although Ms. Weaver has no copy of this digital communication.[16] Ms. Rickerson, on the other hand, denies that she ever told Ms. Weaver that Ms. McMurry left the children home alone and she contends that she only sent a text asking if Ms. Weaver could drive C.M. to school, never insinuating the children lacked any supervision.[17] Ms. Weaver's police report shows that she spoke to an administrator who told her that the

---

[10] *Id.*, ¶5; VV Trial Testimony 163-64 (App. 265-66).

[11] MM Aff. ¶7 (App. 008-09); JM Depo 30 (App. 135).

[12] MM Aff., ¶8 (App. 009).

[13] TR Aff. ¶4 (App. 019-20).

[14] *Id.*

[15] AW Police Report (App. 399). A person commits the offense of abandonment if, while having care or custody of a child younger than 15, he intentionally abandons the child in any place under circumstances that expose the child to an unreasonable risk of harm. Tex. Penal Code § 22.041(b). "Abandon" means to leave a child in a place without providing reasonable and necessary care for the child under circumstances which no reasonable, similarly situated adult would leave a child of that age and ability. *Id.* at § 22.041(a).

[16] AW Police Report (App. 399); AW Depo 48 (App. 053).

[17] TR Aff. ¶5 (App. 020).

children were in fact staying with neighbors in Ms. McMurry's absence.[18] Ms. Weaver also testified that she called Ms. Rickerson later in the day to get more details about the caretaking situation, but she did not mention this in her police report.[19] She also said that Ms. Rickerson wanted to remain anonymous in reporting this matter to her.[20] On the other hand, Ms. Rickerson denies that she spoke to Ms. Weaver a second time on this date to discuss the children or that she had asked for anonymity.[21]

After Ms. Weaver contacted Lieutenant Brunner, her supervisor, about the matter, the two of them interviewed a teacher's aide at the school district about the children's care who said she had overheard that the neighbors were "checking" on the children.[22] The aide told the officers that she had already taken C.M. to school that morning and that J.M. was homeschooled.[23] The officers also spoke to another teacher who said she had heard that neighbors were "checking" on the children.[24] Neither knew any specific information about the scope of the care.[25] Ms. Weaver used her bodycam device to record these conversations in accordance with MISD policy,[26] but she did not record the

---

[18] AW Police Report (App. 399).
[19] AW Depo 40-47 (App. 045-52).
[20] AW Depo 96 (App. 065).
[21] TR Aff. ¶6 (App. 020).
[22] AW Police Report (App. 399); KB Probable Cause Affidavits (App. 406, 413); Video 1 (Trx. 4) (App. 306); Video 2 (Trx. 5) (App. 325) (Police body camera videos & transcripts. See PB Affidavit, App. 002). The aide also told the officers that Ms. McMurry "had it all [the childcare] taken care of is what my understanding." Video 1 (Trx. 3) (App. 305). The aide also opined about the Kuwait trip, "So I don't know if it's really to check it out [the Kuwait job] or to just to take advantage of free travel and stuff." Video 2 (Trx. 4) (App. 324).
[23] Video 2 (Trx. 3, 9) (App. 323, 329); KB Probable Cause Affidavit (App. 406).
[24] In response to the officers' questions, the teacher said three times, "I have no clue." Video 3 (Trx. 2-3, 5) (App. 336-37, 339).
[25] Videos 1-3.
[26] MISD Bodycam Policy (App. 441-44).

conversation with the administrator who said the children were staying with neighbors or the alleged subsequent "call" to Ms. Rickerson.[27]

Despite C.M.'s presence in school that morning, the officers chose not to question C.M. to learn more about the caretaking arrangements before going to the McMurry residence.[28] Further, they did not try to reach the parents or the neighbors by phone or even call J.M. to ask if she might be at risk.[29] Even though J.M. was not a MISD student,[30] the officers drove to the McMurry apartment complex to conduct a welfare check and arrived there at 9:43 a.m. on October 26, 2018, approximately three hours after Ms. Weaver first received the alleged text message from Ms. Rickerson that concerned her.[31]

After reaching the McMurry residence, the officers prompted an apartment community employee to knock on the door which J.M. answered after seeing her through the door peephole.[32] Then, the officers showed themselves dressed in their police uniforms and started asking questions.[33] J.M. said that she saw Vanessa Vallejos that morning.[34] Without asking J.M. for any details about the caretaking arrangements, Officer Brunner asked J.M., who was wearing pajamas, to change into warmer clothing to go to a different location and J.M.

---

[27] AW Depo 54-55, 91-93 (App. 054-55, 062-64).
[28] AW Depo 72-73 (App. 056-57); KB Depo 141 (App. 102).
[29] *Id.;* KB Depo 143 (App. 103).
[30] Mr. Brunner agreed that it was unusual for him to conduct a welfare check of a non-MISD student. KB Depo 47 (App. 089).
[31] AW Police Report (App. 398); KB Depo 140 (App. 101).
[32] JM Depo 77 (App 145).
[33] *Id.*; KB Depo 150 (App. 104).
[34] Video 4 (Trx. 2) (App. 345); JM Depo 29-30 (App. 134-35).

immediately told them that she was "scared."[35] Weaver entered the apartment while J.M. changed. Weaver began to search the apartment,[36] telling J.M., "[W]e might just take you to Abell [C.M.'s school] to hang out for a little bit."[37] She further told J.M., "[W]e don't want you to worry your mom unnecessarily, so don't text her for now."[38] Still in the apartment, Ms. Weaver said, "We're just going to take you to Abell for a little bit because we can't leave you home alone right now."[39] Ms. Weaver's police report fails to indicate J.M. exhibited any physical or mental distress or that the McMurry apartment presented any signs of danger.[40]

Not knowing that she could refuse the officer's directives, J.M. complied and left the apartment after changing.[41] The officers took J.M. to the apartment office where they questioned her.[42] In the office, J.M. offered to give the two officers her father's phone number, but they did not take it, nor did they ever call him in connection with this matter.[43] During the conversation, J.M. indicated that she and C.M. had spent the previous night in their own apartment.[44] At some point, Mr. Brunner said, "What's going to happen is that

---

[35] JM Depo 77-78 (App. 145-46); Video 4 (Trx. 3) (App. 347) (She is seen crying in the bodycam video.)
[36] JM Depo 78, 81, 149-50 (App. 146, 148, 152-53).
[37] Video 4 (Trx. 4) (App. 348); AW Depo 21 (App. 038).
[38] Video 4 (Trx. 5) (App. 349).
[39] *Id.* (Trx. 7) (App. 351).
[40] AW Depo 73 (App. 057); AW Police Report (App. 399).
[41] JM Depo 23-25, 80, 116 (App. 130-32, 147, 151).
[42] *Id.* at 45 (App. 137); AW Depo 74 (App. 058); KB Depo 91 (App. 093).
[43] Video 5 (Trx. 8) (App. 364); AW Depo 25-26 (App. 039-40).
[44] J.M. testified that she and Ms. Vallejos discussed the sleeping arrangements the previous night and she told Ms. Vallejos she and her brother would be more comfortable sleeping in their apartment as it would be easier to take care of the dogs, and Ms. Vallejos agreed. JM Depo 58-59, 103 (App. 143-44, 149).

we're going to need to take you to Abell with us," whereupon J.M. started crying again.[45] Then, he mentioned that there is an "age requirement" in Texas that "you haven't met," suggesting J.M. might have committed a crime.[46] A minute later, he reiterated again that J.M. would be going to Abell.[47] J.M. was taken out of the conference room and an employee helped take J.M. to a bathroom to help her calm down because she was "emotional."[48] J.M. asked the officers if she could use her phone to call her father, but she was told no.[49]

After speaking to J.M. in the office, Officer Brunner proceeded to call Vanessa Vallejos. Without asking her any questions about the caretaking arrangements,[50] he immediately told her she was "not being looked at . . as a participant in a criminal act."[51] When she proposed to meet him at his location, Mr. Brunner instructed her to meet the officers at Abell.[52] After the call, Mr. Brunner said to J.M. that they were going to Abell.[53]

At some point during these events, J.M. began to surreptitiously send her father some texts, telling him that the police had arrived and that she was "scared,"[54] while he texted back asking why he could not "Facetime audio" her.[55] Mr. McMurry felt stressed and anxious about not being able to verbally speak

---

[45] Video 5 (Trx. 13) (App. 369).
[46] *Id.* (Trx. 14) (App. 370).
[47] *Id.* (Trx. 15) (App. 370).
[48] JM Depo 45-46 (App. 137-38).
[49] *Id.* KB Depo 165-67 (App. 109-11).
[50] KB Depo 163 (App. 108).
[51] Video 6 (Trx. 3) (App. 377).
[52] *Id.* (Trx. 4) (App. 378).
[53] JM Depo 47 (App. 139).
[54] SM Aff. ¶4 (App. 014).
[55] *Id.*

to J.M. for several hours on this date.[56] Had she been allowed to contact her father, J.M. said that she would have kept him on the phone during the whole time while these events were unfolding.[57]

Although Officer Brunner later wrote in probable cause affidavits that he decided to transport J.M. to Abell so she would not be alone and so that the officers could continue the investigation,[58] in fact the decision to transport J.M. to Abell was a joint decision that the two officers made together.[59] The two officers then placed J.M. in a police car to take her to the school some six miles away.[60] On his radio to dispatch, Mr. Brunner said he was transporting a "juvenile female from this location *back* to Abell."[61] On the ride to school, J.M. was again instructed not to use her phone when Ms. Vallejos attempted to call and also when Mr. McMurry texted her.[62]

At Abell, the officers interviewed C.M. and Mr. and Ms. Vallejos.[63] Eventually, the officers let J.M. call Mr. McMurry directly, which she was allowed to do before anyone from the Texas Department of Family and Protective

---

[56] *Id.;* SM Depo. 121-23; 191-92, 233 (App. 163-68).

[57] JM Depo 166 (App. 155); JM Depo 45-46 (App. 136-37).

[58] The PC Affidavit also called this move a "convenience factor." (App. 406.) Mr. Brunner told J.M. in the car that the officers were in a "fact-finding mission" (indicating they took action without knowing all the relevant facts). Video 7 (Trx. 4) (App. 387).

[59] AW Depo 11, 14, 35-37 (App. 032-33, 042-44). But in her motion, Ms. Weaver claims she "acquiesced" to Mr. Brunner's decision-making. MSJ, at p.5. On the other hand, Mr. Brunner said Ms. Weaver was the "primary" officer involved in the investigation and that he was only there to "help." KB Depo 121 (App. 100).

[60] JM Aff. ¶1, 3 (App. 016-17).

[61] Video 7 (Trx. 2-3) (App. 385-86).

[62] Video 7 (Trx. 3, 6) (App. 386, 389). Mr. Brunner again said, "Like I said, there is no text messaging." When J.M. said that her father had texted her to see if she was okay, Brunner told her, "I'll let you visit him once we get to Abell." (Trx. 7) (App. 390).

[63] AW Police Report (App. 400).

Services ("CPS") arrived at the school to talk to her.[64] Even though Ms. Weaver argues that one of the main reasons for transporting J.M. to Abell was to question her further there along with C.M.,[65] the officers never asked J.M. any additional questions at the junior high.[66]

Earlier that morning, Officer Brunner had called a CPS special investigator about this matter who then contacted Cindy Diaz, the CPS supervisor for Midland County, and relayed to her that Mr. Brunner had told him that *both* children had not gone to school that day and that he would be transporting *both of them* back to Abell.[67] CPS records show this call came at 9:39 a.m., shortly before the officers reached the McMurry residence and had the ability to assess the situation at the residence.[68] Ms. Diaz was later able to speak to Ms. McMurry and Ms. Rickerson who said Ms. McMurry arranged for neighbors to care for the children.[69] The special investigator arrived at the school to talk to Mr. and Ms. Vallejos.[70] After he confirmed the caretaking arrangements with Mr. and Ms. Vallejos, Ms. Diaz closed the investigation and notified the special investigator by phone of this fact while he was at Abell.[71] The police officers then let the children leave Abell with Mr. and Ms. Vallejos.[72]

---

[64] JM Depo 54, 56-57 (App. 140-42). JM Aff. ¶4 (App. 017). However, Mr. Brunner said in his affidavit he wanted to prevent J.M. from talking to her father before she was questioned by CPS to protect the "integrity" of its investigation. KB MSJ (Ex. A, ¶8).

[65] MSJ, p.11.

[66] JM Aff. ¶4 (App. 017).

[67] CPS Report (App. 419). KB Depo 86-87 (App. 090-91).

[68] Investigator Villarreal testified that Mr. Brunner was in an office somewhere when he first called and that Mr. Brunner told him that he "he was on his way to check on the children . . . ." GV Depo 8-9 (App. 178-79).

[69] CD Trial Testimony at 38-39 (App. 224-25).

[70] GV Trial Testimony at 52 (App. 242).

[71] *Id.*

[72] KB MSJ (KB Affidavit, Ex. A, ¶10).

Though Ms. Weaver contends that CPS "agreed" for J.M. to be taken to Abell as if there were some coordination between CPS and the officers, the special investigator later testified in deposition that he was not involved with the officers' decision-making about their handling of J.M.'s seizure, that Mr. Brunner told him they were taking J.M. to Abell which is why the investigator went there, that he had no authority over the officers and no ability to give them instructions, that the officer's action to take J.M. to Abell did not assist him in any way, and that he did not interview the children at Abell or anywhere else.[73]

After Ms. McMurry's plane landed in Kuwait on this date and she learned about what had happened, Ms. McMurry called Ms. Weaver who told Ms. McMurry the officers had removed J.M. from an "endangered situation" and that *they* needed to take J.M. to Abell, which was a "safe place."[74] Ms. McMurry further called Officer Brunner, but he did not ask her any questions about the caretaking arrangements.[75]

---

[73] GV Depo. 9 (App. 179); GV Trial Testimony at 55 (App. 245). He further said that he has no memory of telling Officer Brunner that he "agreed" with his decision to take J.M. to Abell. GV Depo 10 (App. 180). On the other hand, Mr. Brunner claimed in the PC Affidavit that the special investigator indicated that there was a "good possibility" that CPS would be taking custody of the children (App. 406), but Mr. Villarreal's deposition testimony and the testimony of other CPS officials in Ms. McMurry's criminal trial do not remotely suggest there was a chance of CPS conservatorship of the children. By contrast, CPS treated this matter as a non-emergency preliminary investigation. GV Depo 9, 11-12, 14-16, 18-22, 28 (App. 179, 181-82, 184-86, 188-92, 198). GV Trial Testimony at 55, 57-58 (App. 245, 247-48); CD Trial Testimony at 34-35 (App. 220-21). State law requires that social worker make "reasonable efforts" to prevent the removal of a child from a home by weighing the child's "health and safety" needs. Tex. Fam. Code § 262.001(b).

[74] MM Aff. ¶11 (App. 010).

[75] *Id.*

The police officers continued their investigation into Ms. McMurry, yet they never contacted Mr. McMurry on or after October 26, 2018,[76] nor did they investigate Mr. and Ms. Vallejos for neglect.[77] Several days after the incident, Officer Weaver interviewed Ms. Rickerson, but did not ask her any specific questions about the caretaking arrangements, but mainly inquired about Ms. McMurry's character.[78] Before the recorded interview got started, Ms. Weaver prompted Ms. Rickerson to be duplicitous and say she lacked knowledge about Ms. McMurry's childcare arrangements before Ms. McMurry left on her trip.[79]

Afterward, Officer Brunner never contacted CPS to get any information about its investigation of the children.[80] On December 4, 2018, he filed probable cause affidavits to obtain two arrest warrants for Ms. McMurry for the crime of abandoning her children.[81] Ms. McMurry turned herself into the Midland County Jail where she remained in detention for 19 hours until her release on bond.[82] In January 2020, Ms. Weaver served as the prosecution's chief witness at Ms. McMurry's criminal trial and testified that she served as the lead officer in the investigation.[83] Her testimony there makes clear that her concern about J.M. and C.M. staying in the apartment was due to a fear of possible danger in the

---

[76] SM Aff. ¶5 (App. 014); AW Depo 26, 141 (App. 039-40, 083) (Ms. Weaver conceded that she lacked knowledge of Mr. McMurry's involvement in the caretaking arrangement, yet in her police report, she indicated that "*both* parents had knowledge of the arrangement" of their "plan . . . for the children to be left alone.") (App. 400).
[77] AW Depo 141 (App. 083).
[78] TR Aff. ¶9 (App. 020).
[79] TR Aff. ¶8; AW Depo 102-06 (App. 066-70).
[80] KB Depo 88, 107-08 (App. 092, 098-99).
[81] KB Probable Cause Affidavits (App. 404-15).
[82] MM Aff. ¶15 (App. 011).
[83] AW Trial Testimony at 200-01 (App. 209-10).

*future*, expressing generalized concerns about what might happen if there had been a fire, assault, abduction, or fall down the stairs.[84] After the close of evidence, a jury quickly acquitted Ms. McMurry of the charges.[85]

### III. Argument

**Response to Part 1 Regarding Plaintiffs' Fourth Amendment Claims**

Ms. Weaver first argues she is entitled to summary judgment based on qualified immunity because her search of the McMurry's residence was not unreasonable, she did not violate clearly established law, and she did not seize J.M., yet her evidence fails to show she is entitled to judgment as a matter of law or that no genuine issue of material fact exists.

This portion of her motion is replete with misstatements of fact. She claims J.M. never "revoked" the consent to search the apartment. To be clear, J.M. gave no consent to Ms. Weaver to conduct a search, period,[86] and Ms. Weaver does not cite any evidence to support this misleading claim. At most, J.M. yielded when Mr. Brunner asked if Ms. Weaver could enter.[87] Meanwhile, it is undisputed Ms. Weaver had no warrant or probable cause to support a search of the premises.[88] Likewise, a search is unreasonable if no exigent circumstances

---

[84] AW Trial Testimony at 138 (App. 207).

[85] MM Aff. ¶15 (App. 011).

[86] JM Depo 149-150 (App. 152-53). J.M. testified that while she was changing her clothes to exit the apartment, she heard some cabinets being shut. ("I was questioning why she [Ms. Weaver] was going through our stuff in my head.") JM Depo 81 (App. 148). Ms. Weaver contends she only looked in the refrigerator, freezer, and an open pantry. AW Depo 76 (App. 060).

[87] JM Depo 80 (App. 147) ("[Brunner] said that if—Weaver could come in and I just said uh-huh because I didn't know that no was an answer. I didn't know my rights at the time. So she came in and I went to change clothes.").

[88] It is not clear from Weaver's brief, but she makes a subordinate argument that there was probable cause to search the apartment and seize J.M., even though officers were acting with little information about the matter at this juncture. At any rate, if there was "probable cause" to

exist to justify the search.[89] On this basis, Ms. Weaver's search was presumptively unreasonable under the clearly established law that existed at this time.

Next, Ms. Weaver argues that J.M. was not removed, but rather had a "consensual encounter" with police and that J.M. went to the apartment office and then Abell willingly so that officers could continue their investigation.[90] But that is not how J.M. remembered it. J.M. said that she was frightened by the officers' arrival at the apartment.[91] J.M. was instructed to change her clothing to exit the apartment, Officer Weaver searched the apartment, while in the apartment, Officer Weaver told J.M. twice that they would be talking her to Abell, the officers instructed her not to use her phone, the officers asked J.M. about her mother, causing J.M. to think she was in some kind of trouble, and Mr. Brunner suggested to J.M. that she had not met an unspecified "legal requirement" about "age."[92] J.M. did not know she could refuse the officers' directives and she testified that she had been raised by her parents to respect authority, that she did not know her rights on this occasion, and that she went

---

warrant belief that Ms. McMurry had committed a crime (which there was not, as a jury later determined), that would not have served as the probable cause to support a search or seizure.

[89] *United States v. Gomez-Moreno*, 479 F.3d 350, 354 (5th Cir. 2007).

[90] Ms. Weaver acknowledges that J.M. did not consent to the removal but claims that J.M. "agreed." AW Depo 15 (App. 034). However, the bodycam video shows no declaration of consent. After being told of the removal to Abell, J.M. exclaims, "I'm so scared." Video 5 (Trx. 15) (App. 371).

[91] JM Aff. ¶3 (App. 017); JM Depo 28 (App. 133) ("I was extremely scared to be—to be with two cops.").

[92] Video 5 (Trx. 14) (App. 370).

to the office and later Abell only because she had acquiesced to the officers' directives.[93]

A seizure occurs when, in view of the circumstances surrounding the incident, a reasonable person would have believed he was not free to leave.[94] Texas law also recognizes that detention occurs when, in the absence of physical force, a person submits to an assertion of authority.[95] A submission to authority is exactly what happened here to J.M., a tearful and frightened 14-year-old wanting to talk to her father and whose day was turned upside down by the officers' actions.

Likewise, Ms. Weaver contends no clearly established law differentiates between the transportation of a child and removal.[96] But by definition, every act of removal of a child from a home involves some form of transportation. Even if the officers only intended to temporarily detain J.M. at the apartment office and later at Abell, they still detained her all the same. Indeed, Officer Brunner said in his probable cause affidavits that the detention was for convenience because of the "good possibility" that CPS would take conservatorship of the children.[97] In any event, the case law was abundantly clear at this time that children may

---

[93] JM Depo 22-25, 116, 149-51 (App. 129-32, 151-54).
[94] *United States v. Mendenhall,* 466 U.S. 544, 554 (1980); *J.D.B. v. North Carolina,* 564 U.S. 261, 264-65 (2011) (indicating that children often feel bound to submit to police questioning); *United States v. Wright,* 57 F.4th 524, 530 (5th Cir. 2023) (a seizure occurs when an officer manifests an intent to restrain through force or a show of authority); *United States v. Garcia,* 56 F.3d 418, 422 (2nd Cir. 1995) (in weighing consent, consider if it is the product an individual's free and unconstrained choice instead of a submission to authority).
[95] *Furr v. State,* 499 S.W.3d 872, 877-78 (Tex. Crim. App. 2016).
[96] In her deposition, Weaver took pains to call it a "relocation" as compared to a "removal." AW Depo 14-20 (App. 033-36).
[97] KB Probable Cause Affidavits (App. 406); AW Depo 28 (App. 041).

not be removed from a home absent exigent circumstances, the ground relied upon by the officers here.[98] Alternatively, the officers' actions would have been unlawful even without a body of established precedent because of the egregious facts and lack of exigency.[99]

Casting this matter as an emergency detention, Ms. Weaver contends that there were troubling issues about the caretaking arrangement: That Mr. and Ms. Vallejos had no key to the McMurry's apartment, that they had no power of attorney for medical decisions, that they had "no written legal authority" over the children, that the caretakers could not speak to MISD about C.M.'s educational matters, and that Ms. McMurry left no written "care plan."[100] However, it is obvious that the officers would have learned this information, if true, *after* the search and seizure had already occurred.[101] In any event, Ms. Weaver

---

[98] *Gates v. Texas Dep't of Protective and Regul. Servs.*, 537 F.3d 404 (5th Cir. 2008); *Wernecke v. Garcia*, 591 F.3d 386 (5th Cir. 2009); *Wooley v. Baton Rouge*, 211 F.3d 913 (5th Cir. 2000). Cf. *Orellana v. Terrebonne Parish*, 2019 WL 6036711 (E.D. La. Nov. 14, 2019) (a post-2018 decision where a district court held that officers improperly removed a child from a school to take the child to a CPS office for questioning without exigent circumstances). Clearly-established state law also proscribes this action without a reasonable belief that there was "an *immediate* danger to the physical health or safety of the child." Tex. Fam. Code § 262.104.

[99] *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 8 (2021); *Taylor v. Riojas*, 592 U.S. 7, 9 (2020). See also *Williams v. Kaufman*, 352 F.3d 994, 1003 (5th Cir. 2003) (a prior decision does not have to be fundamentally similar to the factual situation at hand, but may still give reasonable warning that certain conduct will violate constitutional rights).

[100] MSJ, p.4 (Dkt. #85).

[101] In actuality, Mr. and Ms. Vallejos had electronic access to the Smart Lock system of the McMurry's apartment. MM Aff. ¶6 (App. 008). Ms. Weaver's requirement that the McMurrys have written, legal plans in place before giving their children over to the care of friends would surely come as a surprise to many people in Texas who sometimes entrust their children to the care of others. Both parents intended to remain in contact with their children and Mr. and Ms. Vallejos during Ms. McMurry's absence and were capable of conferring with the school or any authorities about their children if necessary (except for Ms. McMurry when she would be unavailable in flight during her journey). MM Aff. ¶8 (App. 009); SM Aff. ¶3 (App. 013-14).

acknowledged that "[i]f the conditions [of a given environment] were *not unsafe*, I agree that it would not be proper to remove them [the children]."[102]

Ms. Weaver distorts the facts when she claims that CPS later decided "to release the children to the Vallejoses,"[103] as if the agency set up a care plan for them. Nothing could be further from the truth. Ms. Diaz decided to terminate the investigation and notified the investigator on the scene at Abell.[104] As the children were never in the custody of CPS, the agency would have had no reason to "release" them since they were only under the temporary control of the two officers.[105]

Finally, Ms. Weaver argues that the special needs doctrine shields her from liability in this case. However, the doctrine applies only to specific situations falling outside of the scope of general law enforcement, none of which apply here.[106] In any event, Weaver never raised this doctrine as an affirmative defense in her pleadings.[107]

## Response to Part 2 Regarding Plaintiffs' Fourteenth Amendment Claims

In her next argument, Ms. Weaver contends that she has qualified immunity against Plaintiffs' Fourteenth Amendment claim and that she did not violate the McMurrys' rights of family integrity, but for the reasons below, her arguments are unpersuasive.

---

[102] AW Depo [11-13-23] 33-34 (App. 025-26).
[103] MSJ, p.12, n.63 (Dkt. #85).
[104] CD Trial Testimony at 34-35, 46 (App. 220-21, 232).
[105] In testifying about the matter, the special investigator said, "We never had a case, sir. There was no case to close." GV Depo 16 (App. 186).
[106] *Gates*, 537 F.3d at 423-24.
[107] AW's First Am. Answer (Dkt. #22) (App. 499-510).

The right to family integrity has been deemed an essential basic civil right considered more precious than property rights.[108] The law is well-settled and beyond doubt that the unlawful seizure of a child implicates due process rights under the Fourteenth Amendment.[109] The procedures required under the Fourteenth Amendment are identical to those required under the Fourth Amendment in connection with the removal of children..[110] In this instance, Plaintiffs maintain that the police officers interfered with their right of custody and control of the daily activities and decision-making about J.M. even if conducted via remote means and through Mr. and Ms. Vallejos as the children's temporary caretakers. That Mr. and Ms. McMurry were not physically present in Texas at this moment did not mean they lacked the ability to direct, guide, and manage the caretaking of their children.[111]

Ms. Weaver confuses several themes about the Plaintiffs' position in this section of her motion. Plaintiffs have never challenged the right of officers to conduct a welfare check or that officers have a right to investigate a matter brought to their attention. What the officers should not have done here was to take action to remove J.M. and interfere with the Plaintiffs' parental rights

---

[108] *Troxel v. Granville*, 530 U.S. 57, 65 (2000).

[109] *Wooley v. City of Baton Rouge,* 211 F.3d 913, 922 (5th Cir. 2000); *Morris v. Dearborne*, 181 F.3d 657, 667 (5th Cir. 1999).

[110] *Gates*, 537 F.3d at 434; *Romero v. Brown*, 937 F.3d 514, 523 (5th Cir. 2019).

[111] Though Ms. Weaver indicates the right of family integrity relates to the right of family members remaining together, she implies on page 16 of her brief that the right is not germane to family members who are temporarily separated, which is not true. The right has been described as the freedom to raise one's children, maintain the integrity of the family unit, and be free from state interference. *Marks v. Hudson*, 933 F.3d 481, 485 (5th Cir. 2019). In terms of family togetherness, it is worth nothing that Mr. Brunner was attempting to move J.M. away from the home to facilitate CPS' alleged plans to take conservatorship of the children (which, of course, CPS was never going to do here).

without exigency and while acting on only the most threadbare of information about possible lack of care.

Though Ms. Weaver argues that she is protected by qualified immunity because Ms. McMurry had "abandoned" her children to go overseas, she glosses over the fact a jury acquitted Ms. McMurry of this crime, and Ms. McMurry has consistently maintained that she entrusted her children to the care of neighbors who assumed full responsibility of the children, which was confirmed by the testimony of Mr. and Ms. Vallejos at Ms. McMurry's criminal trial.[112]

Ms. Weaver's statement about the law of qualified immunity in the context of child welfare workers who exercise the temporary removal of children is inapplicable and does not shield her here. Curiously, while Ms. Weaver refers to the district court decision of *Hall v. Dixon*, No. H-09-2611, 2010 WL 3909515 (S.D. Tex. Sept. 30, 2010), in support of her argument in footnote 85, she omits the court's discussion about how the law concerning the right to family integrity differs when examining the conduct of state actors who are *not* social workers, where the trial court noted, "[The Fifth Circuit] has found violations of clearly established law only when state employees who are not social workers have acted to separate children from their families without evidence of harm to the child." *Id.* at *23. Therefore, Ms. Weaver's reliance on *Hall* is misplaced.

Ms. Weaver posits what might have happened if they had left J.M. alone in the apartment and what danger might have ensued without removal.[113] What

---

[112] VV Trial Testimony at 161-64 (App. 263-66); G Vallejos Trial Testimony at 183 (App. 290).
[113] In deposition, Ms. Weaver indicated that she has left her own teenage child home alone for at least four hours at a time. AW Depo 86 (App. 061).

would have been apparent to other reasonable officers (but seemingly lost on the two Defendants) is that they had other options at their disposal: They could have let J.M. contact Mr. McMurry so that they could speak with him about the caretaking arrangements, they could have asked J.M. for Ms. Vallejos' number before taking her out of the apartment, they could have asked about the caretaking arrangements with Ms. Vallejos before going to Abell, they could have asked Ms. Vallejos to leave work to go to the apartment to supervise J.M. while they investigated the matter, they could have reached M.M. after her flight landed in Kuwait a few hours later to inquire about the arrangements, they could have returned to the school without J.M. to ask C.M. about the caretaking arrangements (or better yet, ask him about these things before they left the school to go to the McMurry residence), they could have waited for CPS to arrive at the apartment to assess the situation, they could have let CPS handle the matter and let it initiate a proceeding to obtain a court order for temporary possession, if necessary, they could have turned the matter to Midland Police Department given that J.M. was not a MISD student, or one of the officers could have stayed by the McMurry's residence or in the apartment office while the other continued to investigate the matter. Instead, the two chose the most extreme and traumatizing measure possible in a child removal case.

**Response to Part 3 Regarding Ms. McMurry's Invasion of Privacy Claim**

In the next section of her motion, Ms. Weaver challenges Ms. McMurry's cause of action for invasion of privacy. The common law in Texas has adopted a definition of invasion of privacy guided by Prosser, Law of Torts, and Restatement

(Second) of Torts.[114] Invasion of privacy occurs when: (1) publicity is given to matters concerning a person's private life; (2) the matter publicized is not of legitimate public concern; (3) and the publication of those matters would be highly offensive to a reasonable person of ordinary sensibilities.[115]

In this instance, Ms. McMurry sues Ms. Weaver directly for announcing to Ms. McMurry's work colleagues and friends on November 7, 2018 in a front office open to the public at Abell Junior High School that Ms. McMurry, who was mentioned by name, was the subject of a criminal investigation. [116] Specifically, Ms. Weaver discussed a phone call she received from Ms. McMurry's attorney, expressing frustration about setting up a meeting with Ms. McMurry or her attorney.[117] She told others that Ms. McMurry had "abandoned" her children, that the officers were going to issue an arrest warrant for her, and that she was going to jail, all of which happened one month before the probable cause affidavit were filed against her.[118] When Ms. McMurry heard of this, she was embarrassed and shocked by the disclosure and she complained to the MISD administration.[119] Her principal apologized for any breach of "confidentiality."[120] The disclosure prompted an investigation led by Officer Brunner while Ms.

[114] *Johnson v. Sawyer*, 47 F.3d 716, 732 (5th Cir. 1996).
[115] *Indus. Foundation of the South v. Tex. Indus. Accident Bd.*, 540 S.W.2d 668, 682-85 (Tex. 1976).
[116] MM Aff. ¶13 (App. 010-11); CL Aff. ¶3 (App. 449-50); AW Depo 117-127 (App. 071-81). (Ms. Weaver denies mentioning Ms. McMurry by name).
[117] *Id.*
[118] *Id.*
[119] MM Aff. ¶14 (App. 011).
[120] MISD Email (App. 463).

Weaver was assigned to a different campus.[121] Ms. Weaver told Mr. Brunner in an internal memo, "I agree that I should not have said anything at all."[122] The law is clear that disclosing that a person is the subject of a criminal investigation is an example of an unwarranted invasion of privacy.[123]

Ms. Weaver seeks to undercut the cause of action with several arguments. One, she contends that the publicity requirement of invasion of privacy must involve more than a communication to a "small group of persons."[124] While Texas law has not defined the magnitude of publicity for purposes of invasion of privacy, it appears to be something between a "small group" and the "public at large."[125] Other jurisdictions that have examined Prosser, Law of Torts, and/or the Restatement (Second) of Torts have applied an adaptable publicity requirement that depends on the unique circumstances of cases. For example, an Illinois appellate court recognized that disclosure of private information might

---

[121] KB Memorandum (App. 454-56); AW Depo 128 (App. 082); KB Depo 214 (App. 122). Although Mr. Brunner conducted his investigation into the complaint against Ms. Weaver on November 8, 2018, he did not complete his memorandum to the MISD Chief of Police until December 12, 2018 following his filing the probable cause affidavits.

[122] AW Memorandum (App. 459).

[123] See, e.g., *Halloran v. Veterans Admin.*, 874 F.2d 315, 320 (5th Cir. 1989); *Nation Magazine, Wash. Bureau v. Customs Serv.,* 71 F.3d 885, 894 (D.C. Cir. 1995). Relatedly, the Texas Public Information Act prohibits disclosure of criminal investigatory records from disclosure to the public. Tex. Gov't Code § 552.108.

[124] *Indus. Foundation*, 540 S.W.2d at 684-85. Ms. Weaver's memorandum identifies at least seven people in the office. AW Memorandum (App. 459).

[125] Does the "public at large" factor (*Indus. Foundation*, 540 S.W.2d at 683-84) mean that the information at issue only become known to the audience hearing the information, the wider school campus, the school district at large, the City of Midland, Texas, or something else? An expansive reading of this requirement would suggest that the public disclosure requirement could only be met by a party that is a media outlet or using a media outlet or a commercial enterprise in the business of supplying information to the public. In *Garcia v. City of Laredo, Tex.*, No. 5:10-cv-30, 2011 WL 9559236, at *8 (S.D. Tex. Sept. 1, 2011), the trial court noted that three persons were not enough. But posting a sign in a shop window saying someone owes money to a creditor is an invasion of privacy even though the number of persons who might see sign is unknown. See Restatement (Second) of Torts § 652D (1977), cmt. a.

be impactful to a specific audience even if it is limited in number, indicating that disclosure of private facts may be damaging when made to a "particular public such as fellow employees, club members, church members, family, or neighbors, if the person were not a public figure."[126]  Therefore, the plaintiff's relationship to the "public" to whom information is disclosed may define the scope of the publicity.[127] Also, publicity might be met when the communication is made to so many people that the matter is substantially certain to become one of "public knowledge" (though this is something again undefined by the case law).[128] Here, Ms. McMurry had a relationship with her co-workers and friends who overheard the information in the front office of Abell. Further, the rumors of arrest began to swirl around Abell, reaching the point where C.M. felt uncomfortable at school and no longer wanted to attend MISD.[129]

Ms. Weaver also maintains that her statements are protected because they relate to a criminal matter or were already publicly known. However, Ms. McMurry was not charged with a crime until a month later. Similarly, Ms. McMurry had only discussed the investigation itself with her family or lawyers.[130] Meanwhile, Ms. McMurry is not a public figure, and this matter did not appear

---

[126] *Miller v. Motorola, Inc.*, 560 N.E.2d 900 (Ill Ct. App. 1990).
[127] *Id.* at 980. See also *Pachowitz v. Ledoux*, 666 N.W.2d 88, 96 (Wis. Ct. App. 2003); *Kurczaba v. Pollock*, 742 N.E.2d 425, 435 (Ill. App. Ct. 2000); *Kinsey v. Macur*, 107 Cal. App. 3d 265, 272 (1980) (letter accusing plaintiff of crimes that was sent to about twenty persons implicates invasion of privacy).
[128] *Gonnering v. Blue Cross and Blue Shield of Texas*, 420 F. Supp. 2d 660, 667 (W.D. Tex. 2006); *Beaumont v. Brown*, 257 N.W.2d 522, 530 (Mich. 1977), *overruled on other grounds*, 565 N.W.2d 650 (Mich. 1997) (letter to one person could serve as "publication" if circumstances would tend to support the view that the letter would go to more than the addressee).
[129] CM Aff. ¶5 (App. 446-47); SM Depo 38-39 (App. 161-62).
[130] MM Aff. ¶14 (App. 011).

in the news until after she was acquitted of all criminal charges by a jury.[131] Although she is an educator, the alleged crime at issue occurred during a work leave and did not take place in a school environment.[132] Lastly, Ms. Weaver contends that truth protects her from the claim. Though a jury determined that Ms. McMurry did not "abandon" her children, truth is nevertheless not a defense to the claim of invasion of privacy.[133]

Next, Ms. Weaver further argues that the cause of action is barred by the statutory immunity found for school district personnel in Tex. Educ. Code § 22.0511. Under this law, a professional employee of a school district is not personally liable for acts "incident to or within the scope of the duties of the employee's position" and that involve "the exercise of judgment or discretion." However, Officer Weaver's conduct did not implicate the immunity afforded by this law because she engaged in idle gossip that was not part of the exercise or discretion of her position and that even violated school district policy.[134] The statute does not protect employees from misconduct unrelated to their professional duties.[135]

---

[131] *Id.*

[132] MM Aff. ¶4 (App. 011).

[133] *Doe v. United States,* 83 F. Supp. 2d 833, 841-42 (S.D. Tex. 2000).

[134] Under MISD's employee handbook, employees shall "maintain confidentiality in all matters relating to students and coworkers." App. 452.

[135] See, e.g., *Gonzalez v. Ison-Newsome,* 68 S.W.3d 2, 6 (Tex. App.—Dallas 1999), *pet. dism'd w.o.j.*, 73 S.W.3d 178 (Tex. 2001) (denying summary judgment for school district on the basis of professional school employee immunity where fact issue was raised as to whether administrators were acting within the scope of their duties when they allegedly defamed school superintendent).

**Response to Part 4 Regarding Ms. Weaver's Tort Claims Act Defense**

Finally, Ms. Weaver contends that Ms. McMurry's tort claim against her should be dismissed because of section 101.106 of the Texas Tort Claims Act (the TTCA). The TTCA provides a limited waiver of immunity for state law claims against Texas government entities.[136] When a party sues under the TTCA, the party must elect between suing the governmental entity itself or the individual employee when both are accused of liability involving "the same subject matter" at hand.[137]

But this statute is inapplicable. First, the TTCA does not apply to a claim arising out of an intentional tort.[138] Second, Ms. McMurry never sued both Ms. Weaver and the school district under a theory of vicarious liability for the same conduct. In fact, Ms. McMurry has argued all along that Officer Weaver acted outside the scope of her professional duties when she committed the tort of invasion of privacy.[139] In addition, Ms. Weaver never raised this as an affirmative defense in her pleadings.[140] For these reasons, section 101.106 is wholly inapplicable and has no bearing on Ms. McMurry's claims.

### IV. Conclusion

The facts plainly show that the police officers' fears about lack of supervision were speculative and based on unreliable and limited information, that the officers drove to the McMurry's residence with the plan to remove J.M.

---

[136] Tex. Civ. Prac. & Rem. Code § 101.021.
[137] *Id.*, § 101.016(a)-(b); *Bustillos v. El Paso County Hosp. Dist.,* 891 F.3d 214, 223 (5th Cir. 2018).
[138] Tex. Civ. Prac. & Rem. Code § 101.057(2).
[139] Plaintiffs' First Am. Complaint, Count IV, para. 84 (Dkt. #8) (App. 496).
[140] AW's First Am. Answer (Dkt. #22) (App. 499-510).

from the home before talking to persons with personal knowledge of the caretaking arrangements, that the officers acted rashly to conduct a warrantless search and/or seizure of a child, that the officers acted without notifying J.M.'s parents, that the officers impeded J.M.'s ability to reach her parents or her caretakers, that the officers' fears about danger were mere concerns about the possibility of future danger, that J.M.'s removal to Abell did not assist the officers in furthering their investigation, and that they undertook their actions without exigency in violation of Plaintiffs' constitutional rights. As noted by the Fifth Circuit Court of Appeals, the Due Process Clause does not permit the state or one of its officers to infringe on the rights of parents to make child-rearing decisions "simply because a state judge [or officer] believes a better decision could be made."[141] For all of the reasons described above, Plaintiffs ask that the Court deny Ms. Weaver's Motion for Summary Judgment and grant them any and all other relief to which they may be justly entitled.

Respectfully Submitted:

LAW OFFICE OF PETER BAGLEY PLLC

by: _/s/Peter F. Bagley_
    Peter F. Bagley
    Texas Bar No. 00783581
    peter@peterbagley.law
2304 W. Interstate 20, Suite 240
Arlington, Texas 76017
(817) 961-1010
(817) 961-1080 - Facsimile

ATTORNEY FOR PLAINTIFFS

---

[141] *McMurry v. Brunner*, No. 21-50888, 2022 WL 17493708, at *11 (5th Cir. Dec. 7, 2022) (citing *Troxel v. Granville*, 530 U.S. 57 (2000)).