# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## MIDLAND/ODESSA DIVISION

| | | |
|---|---|---|
| **MEGAN MARIE MCMURRY, INDIVIDUALLY AND AS NEXT FRIEND OF J.M.; ADAM SETH MCMURRY, INDIVIDUALLY AND AS NEXT FRIEND OF J.M.; AND ALESIA JADE MCMURRY,** *Plaintiffs,* | § § § § § § § § § § | **MO:20-CV-00242-DC** |
| **v.** | § § | |
| **ALEXANDRA WEAVER, KEVIN BRUNNER,** *Defendants.* | § § § | |

## ORDER

Two Midland Independent School District ("MISD") police officers left school grounds to investigate the welfare of a 14-year-old girl who they knew was homeschooled and thus not a student within MISD. Within a minute of arriving at the family's apartment, the girl was directed to change into warmer clothes and leave the family apartment with the officers. While the girl was changing, one of the officers searched the apartment for food. The officers then transported the girl from the family apartment to another location. Should these officers be immune from being sued?

## BACKGROUND[1]

In October 2018, Megan McMurry lived in a gated apartment complex in Midland, Texas with her 14-year-old daughter ("JM") and 12-year-old son ("CM"). JM was homeschooled online, and CM attended Abell Junior High. Mrs. McMurry worked for Abell

---

[1] The facts for the following timeline of events are taken from Defendants' motions (Docs. 85, 90), the exhibits filed under seal at Doc. 103-1 and Doc. 106-1 (e.g., trial transcripts, police reports, etc.), and the body camera footage provided by USB to the Court. The Court did not, however, consider the affidavits from Megan McMurry, Adam Seth McMurry, JM, and Tracy Rickerson for this order.

as a teacher, while her husband, Adam Seth McMurry, was deployed to the Middle East with the National Guard. Through modern technology, Mr. McMurry could regularly communicate with the family back home, but being that far apart had its stressors. Thus, Mrs. McMurry began exploring job opportunities in the Middle East

As part of her efforts, Mrs. McMurry scheduled a five-day trip (Thursday to Tuesday) to Kuwait to investigate a teaching opportunity. A few days before departing, Mrs. McMurry arranged for a neighbor, Vanessa Vallejos, to check in on JM and CM while she was gone. This sort of arrangement was not new; JM often babysat Mrs. Vallejos's young son, and Mrs. Vallejos was regularly tasked with checking on JM and CM when Mrs. McMurry was out of town. Mrs. McMurry also arranged for coworkers to take CM to school on the two school days she would be gone. So in sum, on October 25th, with caretaking plans made and the family apartment stocked with food, Mrs. McMurry left for Kuwait.

Mrs. McMurry's preparations, however, lasted less than a day.

## I.    The fateful day: October 26, 2018.

### A.  6:56 a.m.

Defendant Alexandra Weaver, an MISD police officer, received a text from a counselor at Abell. The counselor text-messaged Officer Weaver that she (the counselor) was scheduled to take CM to school today but had fallen ill. The counselor requested that Officer Weaver bring CM to school instead. Officer Weaver didn't drive CM to school as another Abell employee made sure CM got there. But because Officer Weaver knew Mrs. McMurry was out of the country pursuing a job opportunity—Mrs. McMurry had sent an email to all Abell campus employees including Officer Weaver a few days earlier—Officer

Weaver became concerned that JM and CM had been left without adult supervision, and Officer Weaver informed her supervisor, Defendant Kevin Brunner, of her concerns.

## B. 8:59 a.m.

At Abell, Officers Weaver and Brunner met with three of Mrs. McMurry's coworkers, who confirmed that Mrs. McMurry was traveling for a job interview, CM was at school, and that a neighbor—with whom the children were familiar because JM babysat the neighbor's young son—was checking on JM and CM. These coworkers also confirmed that JM was being homeschooled. Despite that confirmation, Officer Weaver filed a complaint against Mrs. McMurry with the Texas Department of Family and Protective Services ("CPS"). Not waiting for CPS, both officers decided to travel to the McMurry family apartment to conduct a welfare check on JM.

## C. 10:04 a.m.

Officers Weaver and Brunner arrived at the McMurrys' family apartment. After answering the door, JM confirmed that her mother was overseas and that their neighbor "Vanessa" was checking in on her and CM. In fact, JM told Officer Brunner that Mrs. Vallejos had checked on her that morning, even offering Mrs. Vallejos's phone number for the officers to call. Brushing off this information, and less than a minute after JM answered the door, Officer Brunner directed JM to put on warmer clothes so she could leave the apartment with them. JM complied, also allowing Officer Weaver to accompany her back into the family apartment. Inside the family apartment, Officer Weaver told JM not to contact her mother, and, while JM changed clothes in her room, Officer Weaver looked around the living room and kitchen, peeking into the pantry and opening the refrigerator and

freezer doors. Officer Weaver's body camera footage reveals no signs of a dangerous or abusive environment or any other exigent circumstances.

### D. 10:09 a.m.

Officers Weaver and Brunner took JM from the family apartment to the apartment complex's conference room for further questioning. JM asked to call her father but was not allowed to do so. After around 15 minutes of questioning, both officers drove to Abell with JM in the backseat of their police car. Officer Brunner instructed JM not to respond to her father's attempts to contact her and "recommended" JM not text or call Mrs. Vallejos. Around this time, Officer Brunner called CPS to tell them he was taking the children to Abell.

### E. 10:40 a.m.

At the school, Officer Brunner placed JM in a private office. Mrs. Vallejos and her husband arrived and spoke with Officer Brunner, confirming again that they were checking on the children in Mrs. McMurry's absence and stating that they had last seen the children the night before. Mrs. Vallejos was then allowed to see JM and Facetime Mr. McMurry with her. By that afternoon, CPS had verified many of the same facts Officers Weaver and Brunner had confirmed hours earlier—and concluded that the situation did not meet the criteria for abuse or neglect. As a result of their investigation, CPS sent JM and CM home with Mrs. Vallejos and her husband.

## II.     The aftermath.

That roller-coaster-of-a-day could have been the end of it. But it was not. Even after CPS's findings, Officer Brunner continued a criminal investigation into Mrs. McMurry. In

November 2018, while this investigation was ongoing, Officer Weaver spoke about a pending investigation in front of other Abell employees. Whether Officer Weaver mentioned Mrs. McMurry by name or divulged any identifiable details is disputed. And by December, Officer Brunner had filed two probable cause affidavits to arrest and charge Mrs. McMurry with abandoning or endangering her children. In January 2020, a jury acquitted Mrs. McMurry of all charges.

After the acquittal, JM, Mr. McMurry, and Mrs. McMurry ("Plaintiffs") sued Officers Weaver and Brunner ("Defendants") for violating their constitutional rights under the Fourth and Fourteenth Amendments. Mrs. McMurry also individually sued Officer Weaver for invasion of privacy.

At the motion to dismiss stage, this Court held that neither officer was entitled to qualified immunity for (1) JM's claim that both officers violated her Fourth Amendment right to be free from unreasonable seizures, (2) Mr. and Mrs. McMurry's ("McMurrys") claim that both officers violated their rights to procedural due process under the Fourteenth Amendment by taking JM from their home, and (3) the McMurrys' claim that Officer Weaver violated their Fourth Amendment rights to be free from unreasonable searches. Likewise, the Court held that Mrs. McMurry's invasion of privacy claim could proceed.[2]

Officer Brunner appealed this Court's denial of qualified immunity and the Fifth Circuit affirmed, holding that JM's clearly established Fourth Amendment right and the McMurrys' Fourteenth Amendment rights to procedural due process were violated.[3]

---

[2] Doc. 38.

[3] *McMurry v. Brunner*, No. 21-50888, 2022 WL 17493708, *4 (5th Cir. Dec. 7, 2022), *cert. denied*, 143 S. Ct. 2567, 216 L. Ed. 2d 1184 (2023). Officer Weaver did not appeal.

Defendants now move for summary judgment on all remaining claims, reasserting their entitlement to qualified immunity.

## LEGAL STANDARD

The purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses.[4] Summary judgment is proper under Rule 56(a) of the Federal Rules of Civil Procedure "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A dispute about a material fact is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[5] Substantive law identifies which facts are material.[6] The trial court "must resolve all reasonable doubts in favor of the party opposing the motion for summary judgment."[7]

The party seeking summary judgment bears the initial burden of informing the court of its motion and identifying "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" that demonstrate the absence of a genuine issue of material fact.[8] If the movant bears the burden of proof on a claim or defense for which it is moving for summary judgment, it must come forward with evidence that establishes "beyond peradventure *all* of the essential elements of the claim or defense."[9]

---

[4] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

[5] *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986).

[6] *Id.*

[7] *Casey Enters., Inc. v. Am. Hardware Mut. Ins. Co.*, 655 F.2d 598, 602 (5th Cir. 1981).

[8] Fed. R. Civ. P. 56(c)(1)(A); *Celotex*, 477 U.S. at 323.

[9] *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986).

When the nonmovant bears the burden of proof, the movant may discharge the burden by showing that no evidence supports the nonmovant's case.[10]

Once the movant has carried its burden, the nonmovant must "respond to the motion for summary judgment by setting forth particular facts indicating there is a genuine issue for trial."[11] A nonmovant must present affirmative evidence to defeat a properly supported motion for summary judgment.[12] Mere denials of material facts, unsworn allegations, or arguments and assertions in briefs or legal memoranda will not suffice to carry this burden. Rather, the Court requires "significant probative evidence" from the nonmovant to dismiss a request for summary judgment.[13] The Court must consider all the evidence but "refrain from making any credibility determinations or weighing the evidence."[14]

## DISCUSSION

As the case now sits, four claims remain:[15]

(1) JM's claim for unlawful seizure against both officers in violation of her Fourth Amendment rights as incorporated by the Fourteenth Amendment ("unlawful seizure claim"),

(2) the McMurrys' procedural-due process claim against both officers under the Fourteenth Amendment ("Due Process claim"),

(3) the McMurrys' claim for unlawful search against Officer Weaver ("unlawful search claim"), and

---

[10] *Celotex*, 477 U.S. at 325; *Byers v. Dall. Morning News, Inc.*, 209 F.3d 419, 424 (5th Cir. 2000).

[11] *Byers*, 209 F.3d at 424 (citing *Anderson*, 477 U.S. at 248–49).

[12] *Anderson*, 477 U.S. at 257.

[13] *In re Mun. Bond Reporting Antitrust Litig.*, 672 F.2d 436, 440 (5th Cir. 1982) (quoting *Ferguson v. Nat'l Broad. Co.*, 584 F.2d 111, 114 (5th Cir. 1978)).

[14] *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007).

[15] *McMurry v. Brunner*, No. 21-50888, 2022 WL 17493708, *6 (5th Cir. Dec. 7, 2022) (Oldham, J., concurring).

(4) Mrs. McMurry's claim for invasion of privacy against Officer Weaver under Texas law.

The first three claims are advanced under 42 U.S.C. § 1983, which gives any United States citizen the power to seek money damages against state or local officials if those government officials violated the citizen's statutory or constitutional rights. In a suit against officials in their personal capacity, "it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right."[16] The official may, however, assert that they are immune to suit through the doctrine of qualified immunity, which is exactly what both officers assert here.[17] Thus, the threshold question in this case is whether the doctrine of qualified immunity shields both officers from Plaintiffs' three claims under Section 1983.

## I.    Are Defendants entitled to qualified immunity for Plaintiffs' Section 1983 claims.

Put simply, "[t]he doctrine of qualified immunity shields government officials acting within their discretionary authority from liability when their conduct does not violate clearly established statutory or constitutional law of which a reasonable person would have known."[18] Qualified immunity "*is an immunity from suit*," meaning if qualified immunity applies to a claim, that claim cannot proceed under Section 1983.[19] Yet qualified immunity is not a foregone conclusion. Indeed, a government official will not be entitled to qualified immunity if the aggrieved plaintiff can prove two prongs: "(1) that the official violated a

---

[16] *Kentucky v. Graham*, 473 U.S. 159, 166 (1985).

[17] *Id.*

[18] *Wallace v. County of Comal*, 400 F.3d 284, 289 (5th Cir. 2005).

[19] *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct."[20]

The Court pauses to note there appears to be uncertainty in the case law on whether courts must *always* analyze these two prongs separately for each defendant rather than collectively. For sure, there are many Fifth Circuit cases reasoning that courts must analyze each defendant's action separately no matter what.[21] But there are also Fifth Circuit cases saying the opposite. For example, in *Amador v. Vasquez*, the Fifth Circuit reasoned "[b]ecause it is alleged that the officers acted in unison, we need not separately address the qualified immunity analysis for each officer."[22] And to make it even less clear, only a few months later, a judge from the unanimous panel in *Amador* wrote, "[t]o the extent that [the Fifth Circuit's opinion in *Darden v. City of Fort Worth*] could be read as suggesting that collective analysis is appropriate for defendants acting in unison, we don't read it that way."[23]

In any event, the Court will start with the claims against both officers, analyzing their entitlement to qualified immunity collectively because (1) Plaintiffs allege both officers acted

---

[20] *McLin v. Ard*, 866 F.3d 682, 689 (5th Cir. 2017) (internal quotations omitted). The Court points out here that Defendants' motions cite many cases from the Texas Court of Criminal Appeals for their "clearly established law." *E.g.*, Doc. 85 at 7. But cases from that court do not "clearly establish" any law here. For example, Judge Oldham's concurrence from the appeal earlier in this case provides analysis that only the United States Supreme Court can clearly establish law for qualified immunity purposes. *McMurry v. Brunner*, No. 21-50888, 2022 WL 17493708, *7 (5th Cir. Dec. 7, 2022) (Oldham, J., concurring); *cf.* Federal Judicial Center, Martin A. Schwartz, *Section 1983 Litigation* 147 (3rd ed. 2014). ("Normally, a controlling precedent of the Supreme Court, the particular circuit, or the highest court in the state is necessary to clearly establish federal law.") (citing *Lane v. Franks*, 189 L. Ed. 2d 312 (2014); *Plumhoff v. Rickard*, 134 S. Ct. 2012 (2014); *Wilson v. Layne*, 526 U.S. 603 (1999)). In any event, the point is that cases from the Texas Court of Criminal Appeals are not persuasive for the required "clearly established" analysis here.
[21] *See, e.g., Pratt v. Harris Cnty., Tex.*, 822 F.3d 174, 181 (5th Cir. 2016) ("We must also assess the reasonableness of each defendant's actions separately, even if those defendants acted in unison.").
[22] 961 F.3d 721, 727 n.5 (5th Cir. 2020) (citing *Darden v. City of Fort Worth, Texas*, 880 F.3d 722, 731 (5th Cir. 2018).
[23] *Joseph on behalf of Est. of Joseph v. Bartlett*, 981 F.3d 319, 325 n.7 (5th Cir. 2020) (Willett, J.)

in unison,[24] (2) both officers acted collaboratively,[25] and (3) the Fifth Circuit in *Gates v. Texas Department of Protective and Regulatory Services*—the Fifth Circuit's foundational child removal case—analyzed the defendants' entitlement to qualified immunity by dividing the defendants into two collective groups.[26]

### A. Are Defendants entitled to qualified immunity for JM's unlawful seizure claim?

The Court starts with JM's unlawful seizure claim against both officers.

*i.  Did Defendants violate JM's constitutional right to be free from unreasonable seizures?*

For the first prong, the Fourth Amendment, incorporated against the states through the Fourteenth Amendment, protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."[27] And under the Fourth Amendment, a person has been "seized" "only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."[28] Here, the seizure began within a minute of JM opening the door to the family apartment—Officer Bruner instructed JM to "go get some warm clothes on … then come

---

[24] *See* Doc. 72 at 19 ("As indicated in the facts beforehand, Officer Weaver and Officer Brunner falsely imprisoned Jade willfully and without authority of law."). The Court would also note in passing that many of the collectively/separately cases involve excessive force claims under the Fourth Amendment, where the misconduct would be more individualized rather than a situation—like the one here—where officers are acting as a team to remove a child from the family home. And Defendants' motions present similar recitations of facts and don't really seek to analyze actions individually.

[25] *E.g.* Doc. 103-1 at 35 (In Officer Weaver's deposition, when referring to her and Officer Brunner's actions she states, "I would say we collaborated during the whole thing, yes.").

[26] 537 F.3d 404, 427–31 (5th Cir. 2008) (dividing up the qualified immunity analysis into "TDPRS Employees" and "Fort Bend Employees"). The Fifth Circuit also just this year, in *Banks v. Herbrich*, analyzed the defendants' actions collectively in a child-seizure case. 90 F.4th 407, 413 (5th Cir. 2024) ("We first address the denial of qualified immunity as to DFPS agents Herbrich and Williams.").

[27] *See Mapp v. Ohio*, 367 U.S. 643, 655 (1961) (incorporating the Fourth Amendment against the States); U.S. CONST. amend. IV.

[28] *United States v. Mendenhall*, 446 U.S. 544, 554 (1980).

visit with me outside."[29] JM began complying, with Officer Weaver accompanying her into the family apartment. So the key question is, at the moment JM was leaving the family apartment, would a reasonable person standing in JM's shoes have believed they were free to leave?

Of course not. Although it goes unmentioned in Defendants' motions, the Fifth Circuit has already held *in this case* that JM was unlawfully seized "in violation of the Fourth Amendment as a reasonable fourteen-year-old would not have believed she was free to leave when an officer removed them from her home for questioning while instructing her not to respond to calls from her father."[30] Defendants' motions even confirm the facts underlying that holding.[31] So no, this was not "a consensual act of transportation"; JM was unlawfully seized in violation of her Fourth Amendment rights.[32]

> ii. *Was JM's constitutional right "clearly established" at the time she was removed from the family apartment?*

As for the second prong, the Fifth Circuit—again, *in this case*—stated that its "precedent in *Gates v. Texas Dep't of Protective & Regul. Servs* and *Wernecke v. Garcia* clearly established that an officer could not reasonably remove a child from their home absent court

---

[29] Officer Weaver's Body Camera – JM at Front Door, at 0:44–0:55. Although a transcript of Officer Weaver's body camera footage is found in Doc. 103-1 at 348, the Court cites the time stamp from video copies of the footage because the Court found the video better reflected what was being said.

[30] *McMurry v. Brunner*, No. 21-50888, 2022 WL 17493708, *2 (5th Cir. Dec. 7, 2022), *cert. denied*, 143 S. Ct. 2567 (2023) (citing. *Mendenhall*, 446 U.S. at 554 (1980); see also *J.D.B. v. North Carolina*, 564 U.S. 261, 271–77 (2011) (noting that a child's age must be considered in a Miranda custody analysis as children are more susceptible to outside pressure).

[31] *E.g.*, Doc. 90 at 6 ("J.M. asked to call her father, and Brunner said, 'No.'"). Officer Weaver's body cam footage also reveals that while in the family apartment, Officer Weaver also told JM not to contact her mother. *See* Officer Weaver's Body Camera – JM at Front Door, at 3:15–3:25.

[32] *Id.* at 15. ("Taking J.M. to Abell was never a seizure but was a consensual act of transportation").

order, parental consent, or exigent circumstances."[33] So because it's undisputed here that there was no court order or parental consent to remove JM from the family apartment, Defendants must rely on "exigent circumstances." Yet based on these facts, Defendants "cannot come close to establishing such an exigency."[34]

Like the Fifth Circuit reiterated only a few months ago in a child-seizure case, "[e]xigent circumstances in this context means that, based on the totality of the circumstances, there is reasonable cause to believe that the child is in imminent danger of physical or sexual abuse if he remains in his home."[35] Besides the fact that Defendants' motions reference "exigent" a mere three times altogether, also failing to address the exigent circumstances factors from *Gates* (so no real analysis on this key issue), there's no evidence showing JM was "in imminent danger of physical or sexual abuse." Indeed, the best Defendants can offer is at the time of the seizure, Defendants knew: (1) Mrs. McMurry was out of the country to look into a job possibility so her family could be closer to her husband while he was deployed to the Middle East, but (2) Mrs. McMurry had arranged for a neighbor in their gated apartment complex (Mrs. Vallejos) to check on the children daily, (3) Mrs. Vallejos had checked on JM that morning,[36] and (4) Officer Weaver's search of the family apartment while JM was changing clothes uncovered zero signs of danger, let alone

---

[33] *McMurry v. Brunner*, No. 21-50888, 2022 WL 17493708, *2 (5th Cir. Dec. 7, 2022), *cert. denied*, 143 S. Ct. 2567, 216 L. Ed. 2d 1184 (2023) (citing *Gates v. Texas Dep't of Protective & Regul. Servs*, 537 F.3d 404, 427–29 (5th Cir. 2008); *Wernecke v. Garcia*, 591 F.3d 386, 398 (5th Cir. 2009)).

[34] *Id.*, *10 (Oldham, J., concurring).

[35] *Banks v. Herbrich*, 90 F.4th 407, 413 (5th Cir. 2024).

[36] *E.g.*, Doc. 90 at 4.
Although Officers Weaver and Brunner later learned that Mrs. Vallejos had not checked on JM since the prior evening, this was not known to them when they removed JM from the apartment. Both officers were acting under the belief that Mrs. Vallejos last checked on JM that morning.

imminent danger.[37] Under these exact facts, the Fifth Circuit held JM's subsequent removal from the family apartment "was an unreasonable seizure that violated her clearly established Fourth Amendment right."[38] This Court sees no reason to disagree.

Compare the facts here with those present in *Gates* or *Banks*. In *Gates*, for example, "there were allegations of recent (same day) physical abuse, corroborated by several of the children in the home."[39] Or take the circumstances in *Banks*, where there were anonymous allegations about the mother's drug abuse.[40] Those facts are not even in the same ballpark as the ones present here. In short, Defendants are still not entitled to qualified immunity for JM's unlawful seizure claim.

### B. Are Defendants entitled to qualified immunity for the parents' Due Process claim?

The next claim against both officers is the McMurrys' claim that the unlawful seizure of JM violated their procedural due process rights under the Fourteenth Amendment as parents.

> *i. Did Defendants violate the McMurrrys' constitutional rights under the Fourteenth Amendment?*

The Fourteenth Amendment provides that no State may "deprive any person of life, liberty, or property, without due process of law."[41] "The Supreme Court has held that parents have a 'fundamental liberty interest in the care, custody, and management of their

---

[37] Officer Weaver looked into an open pantry and opened the refrigerator and freezer doors. Doc. 90 at 5 n.24.
[38] *McMurry*, 2022 WL 17493708, *3.
[39] *Banks*, 90 F.4th at 413. (citing *Gates*, 537 F.3d at 430).
[40] *Id.* at 410.
[41] U.S. CONST. amend. XIV, § 1.

child.'"[42] So before a parent may be deprived of those things, "some sort of procedural due process is necessary."[43]

Likewise, "the same misconduct that supports a child's Fourth Amendment claim can also support a parent's Fourteenth Amendment claim to their due process right to be free from interference with the care, custody, and management of their children."[44]. In fact, when the parents' Fourteenth Amendment claims arise from the same facts as their child's unlawful seizure claim, courts in the Fifth Circuit use the same rule: "A child cannot be removed 'without a court order or exigent circumstances.'"[45]

Again, there was no court order giving Defendants authority to remove JM—although there appears to have been plenty of time to attempt to obtain one. And this Court has already concluded above that there are no facts revealing exigent circumstances requiring JM's removal. Yet Defendants still argue there was "consent." For example, Officer Brunner cites *Gates* to argue that "[i]n a pre-deprivation procedural due process claim, a child cannot be removed or seized without a court order, *consent*, probable cause, or exigent circumstances."[46] Thus, according to Officer Brunner, because JM "consented," JM's parents were not deprived of procedural due process.[47]

But that argument—in what the Court believes is an honest mistake and not a purposeful misstatement of law in the hopes that the Court wouldn't notice—drops the modifier "parental" that appears before the word "consent" in *Gates*. That's quite the

---

[42] *Gates*, 537 F.3d at 434 (quoting *Santosky v. Kramer*, 455 U.S. 745, 753, (1982) (cleaned up).
[43] *Id.*
[44] *McMurry*, 2022 WL 17493708, *4 (citing *Romero v. Brown*, 937 F.3d 514, 521–23 (5th Cir. 2019)).
[45] *Romero*, 937 F.3d at 521 (quoting *Gates*, 537 F.3d at 434).
[46] Doc. 90 at 16 (emphasis in original).
[47] *Id.*

material omission. So unless JM is simultaneously both parent and child (unlikely), her supposed "consent" would not qualify as "parental consent."[48] Or do Defendants believe that they could have received consent from anyone—"Anyone? Anyone?"— and satisfied due process?[49]

In sum, JM was following her parents' instruction to continue her homeschooling in the family apartment during school hours. Defendants then overruled that parental instruction by unlawfully removing JM without a court order or exigent circumstances. Thus, Defendants "obviously deprived the McMurrys of their liberty interest" in the care, custody, and management of their child.[50]

> ### ii. Were the McMurrys' constitutional rights "clearly established" at the time JM was removed from the family apartment?

The answer to the second prong is also yes. "*Gates* placed officials 'on notice that they violate procedural due process when they remove children without a court order or exigent circumstances.'"[51] "The McMurrys also did not receive the process they were due. In fact, they received no process whatsoever. No ex parte court order, no warrant, no notice, no hearing. Nothing. Surely, the McMurrys had a right to at least some predeprivation process before their child was snatched from their home."[52] If only. Defendants are therefore not entitled to qualified immunity for the McMurrys' Due Process claim.

---

[48] It's also worth pointing out that "consent" does not appear to be part of the rule for parents' Fourteenth Amendment claims in child removal cases. *See Romero*, 937 F.3d at 521 ("The rule is this: A child cannot be removed 'without a court order or exigent circumstances.'") (quoting *Gates*, 537 F.3d at 434). The Court engaged with this argument then, simply to point out the trickiness (or honest mistake) of dropping the "parental" modifier used in *Gates*.

[49] FERRIS BUELLER'S DAY OFF (Paramount Pictures 1986).

[50] *McMurry*, 2022 WL 17493708, *10 (Oldham, J., concurring).

[51] *Id.*, *4 (quoting *Romero*, 937 F.3d at 523).

[52] *Id.*, *10 (Oldham, J., concurring).

**C. Is Officer Weaver entitled to qualified immunity for the McMurrys' unlawful search claim?**

The last Section 1983 claim is the McMurrys' assertion that Officer Weaver's search of the family apartment—checking the refrigerator and freezer while moving around the family apartment—was unlawful in violation of their Fourth Amendment rights.[53]

> *i. Did Defendants violate the McMurrrys' constitutional rights under the Fourth Amendment?*

As stated above, the Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."[54] When there's no warrant authorizing a search, the search is "presumptively unreasonable unless the person consents, or unless probable cause and exigent circumstances justify the search."[55] Officer Weaver makes two arguments that her search was not unreasonable: (1) JM consented to the search, and (2) her search falls under the "special needs" doctrine.[56]

For Officer Weaver's first argument, a warrant for a search is not required if the government official "receives: (i) consent; (ii) that is voluntarily given; (iii) by someone with actual or apparent authority; and (iv) the search does not exceed the scope of the consent."[57] Yet the Court has reviewed the footage from Officer Weaver's body camera for the entire time she was in the family apartment and there is nothing that sounds or looks like JM giving

---

[53] There's no claim for unlawful entry remaining in this case. Doc. 38 at 25.
[54] *See Mapp v. Ohio*, 367 U.S. 643, 655 (1961) (incorporating the Fourth Amendment against the States).
[55] *Wernecke v. Garcia*, 591 F.3d 386, 393 (5th Cir. 2009).
[56] Doc. 85 at 13–14.
[57] *United States v. Staggers*, 961 F.3d 745, 757 (5th Cir. 2020).

Officer Weaver consent to search anything in the apartment.[58] So the Court assumes that Officer Weaver's belief is that JM's consent to her entry also provided consent to search the apartment.

But the idea that the scope of JM's earlier "consent" to entry can be construed as consenting to Officer Weaver's search is ridiculous based on the following back-and-forth as seen on Officer Weaver's body camera footage:[59]

> OFFICER BRUNNER:    "Also, do you mind if she [referring to Officer Weaver] comes in the house with you?"
>
> JM:    Mm-hmm.

That's it. So the Court finds it hard to believe that JM's "Mm-hmm," followed by her bursting into tears and saying "I'm scared" also gave Officer Weaver free rein to search the family apartment.[60]

Officer Weaver's second argument is that there was a "special need" that justified her warrantless search. Under this exception to the warrant or probable cause requirement, when there's a "special need" for the search, courts judge the lawfulness of a search by "'the standard of reasonableness under all of the circumstances' instead of a probable cause or reasonable suspicion standard."[61] But this claimed "special need" for the search "must be divorced from the purpose of general law enforcement."[62] Here, Officer Weaver claims the "special need" necessitating her search was that "the McMurry children were left home alone

---

[58] Officer Weaver's Body Camera – JM at Front Door, at 1:03–4:50.

[59] *Id.* at 0:44–0:54.

[60] *Id.*

[61] *Gates v. Texas Dep't of Protective & Regul. Servs.*, 537 F.3d 404, 423 (5th Cir. 2008) (quoting *Roe v. Texas Dep't of Protective & Regul. Servs.*, 299 F.3d 395, 404 (5th Cir. 2002)).

[62] *Id.* (citing *Ferguson v. City of Charleston*, 532 U.S. 67, 79 (2001)).

for several days while their parents were overseas."[63] That argument is not convincing for three reasons.

First, the "special needs" doctrine does even apply in this context. For example, in *Gates*, the Fifth Circuit held that law enforcement officers investigating allegations of child abuse alongside social workers "was not separate from general law enforcement," and thus the "special needs" doctrine did not apply.[64] And if the doctrine wasn't even applicable in a case involving officers investigating child abuse allegations, how could it apply here? Officer Weaver, of course, doesn't explain.

Second, even assuming the doctrine applied, there's no real explanation why Officer Weaver's "knowledge" would create a "special need" justifying a warrantless search. Officer Weaver does cite various reasons why the children could "potentially" be in danger, like the McMurrys didn't give anyone "power of attorney" to care for the children or nobody had the ability to authorize emergency medical care.[65] Yet the Court sees no evidence showing Officer Weaver knew any of that *at the time* of the search.

Indeed, as noted above, when Officer Weaver entered the family apartment, she knew that (1) Mrs. McMurry was out of the country to check out a job closer to Mr. McMurry, (2) Mrs. McMurry had arranged for Mrs. Vallejos to check on the children daily, and (3) Mrs. Vallejos had checked on the children only two hours earlier. And then moments later, while standing in the family apartment, Officer Weaver could see a pantry

---

[63] Doc. 85 at 14.

[64] *Gates*, 537 F.3d at 424.

[65] *Id.*

stocked with food.[66] Yet even all that didn't deter Officer Weaver from conducting her search.[67]

Lastly, courts should "view entanglement with law enforcement suspiciously" under the "special needs" doctrine.[68] There's no question Officer Weaver was law enforcement looking into suspected child abandonment. And Mrs. McMurry was subsequently indicted for that very crime. So if Officer Weaver truly believed the children had been abandoned, it is difficult to see how her search was not being used "to generate evidence for law enforcement purposes, which is "an approach inconsistent with the Fourth Amendment."[69] Indeed, it would be foolish to think that if Officer Weaver failed to find any food in the family apartment, that fact would not have been levied against Mrs. McMurry in her criminal prosecution.

In sum, Officer Weaver searched the family apartment without consent, probable cause, exigent circumstances, or any "special need." Accordingly, Officer Weaver's search violated the McMurrys' Fourth Amendment rights.

> ii. *Were the McMurrys' constitutional rights "clearly established" at the time of Officer Weaver's search?*

Yes—the right to be free from an unreasonable search under the Fourth Amendment was "clearly established" at the time of Officer Weaver's search.[70] So Officer Weaver is not entitled to qualified immunity for the McMurrys' unlawful search claim.[71]

---

[66] 103-1 at 327, 339
[67] Although JM did not know Officer Weaver had searched the refrigerator and freezer, JM even volunteered a few minutes later that Mrs. McMurry had left "a bunch of groceries" and that JM cooked. Doc. 103-1 at 353. Which makes it even more unbelievable that Mrs. McMurry was later prosecuted.
[68] *Gates*, 537 F.3d at 423 (cleaned up).
[69] *Ferguson*, 532 U.S.at 84.
[70] *See, e.g.*, *Wernecke v. Garcia*, 591 F.3d 386, 393 (5th Cir. 2009).

## II.     Should Mrs. McMurry's invasion of privacy claim survive?

The fourth and final claim is Mrs. McMurry's invasion of privacy claim against Officer Weaver. Specifically, Mrs. McMurry's allegation is that Officer Weaver openly told Mrs. McMurry's work colleagues that there was a pending criminal investigation into Mrs. McMurry for child abandonment, thus invading her privacy.[72]

Under Texas law, there are four distinct invasion of privacy torts.[73] To establish the relevant tort here—public disclosure of private facts—"the plaintiff must show (1) publicity was given to matters concerning his private life; (2) the publication of such matter would be highly offensive to a reasonable person of ordinary sensibilities; and (3) the matter publicized is not of legitimate public concern."[74] Officer Weaver's main defense is that there wasn't any "publicity given" because her statements about the potential investigation into Mrs. McMurry's were heard by at most six other people.[75] As stated by the Texas Supreme Court, "'[p]ublicity' requires communication to more than a small group of persons; the matter

---

[71] The Court also notes that, although Officer Weaver's actions were not at issue in Officer Brunner's previous appeal, Judge Oldham's concurrence repeatedly refers to Officer Weaver's search of the family apartment "unconstitutional," "unlawful," or "illegal." *See McMurry*, 2022 WL 17493708, *6, *11 (Oldham, J., concurring) (reasoning that "Brunner's colleague (Weaver) performed an unlawful search of the apartment," that "Weaver performed an illegal search in front of her supervisor," and that "Weaver found nothing out of the ordinary during this unconstitutional search").

[72] Doc. 72 at 21–22.

[73] *Moore v. Big Picture Co.*, 828 F.2d 270, 272 (5th Cir. 1987) (citing RESTATEMENT (SECOND) OF TORTS, § 652A (1977) (outlining (a) unreasonable intrusion upon the seclusion of another, (b) appropriation of the other's name or likeness, (c) unreasonable publicity given to the other's private life, and (d) publicity that unreasonably places the other in a false light before the public)).

[74] *Lowe v. Hearst Communications, Inc.*, 487 F.3d 246, 250 (5th Cir. 2007) (applying Texas law).

[75] Doc. 85 at 18. Officer Weaver's Memorandum about the incident mentions six people, with Officer Weaver herself as the seventh person in the room. *See* Doc. 106-1 at 462. This is also assuming Mrs. McMurry was identifiable from Officer Weaver's statements.

must be communicated to the public at large, such that the matter becomes one of public knowledge."[76]

Mrs. McMurry doesn't appear to dispute that Officer Weaver divulged the pending criminal investigation to at most six people.[77] Mrs. McMurry does, however, counter that "a small group of persons" is ill-defined in Texas law, which means this Court should look to other jurisdictions for the unique circumstances here. In other words, a group of six people could constitute more than "a small group of persons." This Court disagrees.

For one thing, the Fifth Circuit has stated that the Restatement is the "definitive source of guidance in cases involving invasion of the right of privacy" under Texas law.[78] And the Restatement (Second) of Torts provides excellent insight into this issue. For example, comment (a) for the tort of publicity given to private life defines "publicity" to mean that the information is communicated to either (1) "the public at large," or (2) "so many persons that the matter must be regarded as substantially certain to become one of public knowledge."[79]

Here, Officer Weaver communicated the information to six people, not the "public at large." So the key question is whether these six people constituted "so many persons" that it was "substantially certain" knowledge of the pending investigation would become "public knowledge." This Court doesn't think so. Public knowledge is "[k]nowledge that is open or available to all people to acquire, use, and share."[80] And there is no evidence showing how

---

[76] *Indus. Found. of the S. v. Tex. Indus. Acc. Bd.*, 540 S.W.2d 668, 683–84 (Tex. 1976) (adopting elements and definitions from the RESTATEMENT (SECOND) OF TORTS, § 652A (1977)).
[77] Doc. 107 at 21 n.124.
[78] *Moore v. Big Picture Co.*, 828 F.2d 270, 272 (5th Cir.1987).
[79] RESTATEMENT (SECOND) OF TORTS, § 652A cmt. a (1977).
[80] *Public Knowledge*, Black's Law Dictionary 1043 (Bryan A. Garner ed., 11th ed. 2019).

knowledge of the pending investigation by six other people—three teachers, a front desk clerk, an attendance clerk, and a secretary—made it "substantially certain" such knowledge would become "open and available to all people."[81]

What's more, courts interpreting Texas law within the Fifth Circuit are in accord with this reasoning. For example, a court in the Eastern District of Texas held that an employer-created list of employees who had excessive absences from work, which then "become known to many of the [other] employees," did not qualify as "publicity" for an invasion of privacy claim because it was not known by the general public.[82] Or take the Fifth Circuit's reasoning in *Moore v. Big Picture Co.* that publicity means "widespread dissemination."[83] Likewise, in *Moore*, the court held that a "maximum of eight persons" was an insufficient number to establish "publicity" for an invasion of privacy claim.[84] Thus, Officer Weaver's statements about a pending investigation to six other people, which she concedes were ill-advised and the Court agrees, didn't rise to the level of "publicity" required for a public disclosure of private facts claim.[85]

---

[81] Doc. 106-1 at 462. The Court does believe, however, that there would be a difference if the six people who Officer Weaver told about the pending investigation were reporters from various news outlets. That would, of course, make it "substantially certain" (at least more certain) that such information would reach the public because one could logically believe the reporters would report such news to the public.

[82] *See Dancy v. Fina Oil & Chem. Co.*, 3 F. Supp. 2d 737, 740 (E.D. Tex. 1997) ("In this case, the allegedly publicized facts, at worst, were made known to some workers in the refinery. The facts were not made known to the general public, nor were they made known to so many people that the matter must be considered substantially certain to become one of public knowledge.").

[83] *Moore*, 828 F.2d at 273. The *Moore* court was applying the definition of "publicity" to the related invasion of privacy tort of public portrayal in a false light.

[84] *Id.* at 274.

[85] Doc. 106-1 at 462.

So in short, Mrs. McMurry cannot establish the first element of her invasion of privacy claim, meaning this claim does not survive.[86]

### III. Punitive Damages.

Officer Brunner lastly moves for summary judgment on Plaintiffs' claims for punitive damages.[87] After a careful review of the record and the arguments presented, the Court is not convinced that Officer Brunner has met his burden of establishing that there is no genuine issue of material fact on Plaintiffs' claims for punitive damages. Thus, summary judgment on this issue should be denied.

### CONCLUSION

The Court finds it distasteful to review these facts and then entertain the argument that Mrs. McMurry is responsible for "separating the family."[88] Or that JM was "minimally inconvenienced" by her unlawful seizure.[89] Or that taking a crying 14-year-old girl away from her home without exigent circumstances, all while telling her *not* to contact her parents, was a simple "consensual act of transportation."[90] Put simply, "the facts here are particularly egregious:

> Weaver performed an illegal search in front of her supervisor (Brunner). And instead of settling for one constitutional violation (the search), [Defendants] went on to commit two more (unlawfully seizing JM and violating the McMurrys' due-process rights). And after taking custody of JM, Brunner prevented JM from talking to her father and the Vallejos for a significant amount of time. All while JM was crying and confused. Then CPS told [Defendants] that [their] safety concerns were baseless. And still, inexplicably, Brunner persisted and pushed for

---

[86] The Court does not analyze whether Officer Weaver was entitled to immunity for this claim because the claim should be dismissed on the merits.

[87] Doc. 90 at 18.

[88] Doc. 85 at 17

[89] *Id.* at 15.

[90] Doc. 90 at 15 ("Taking J.M. to Abell was never a seizure but was a consensual act of transportation").

criminal charges against Mrs. McMurry. Like CPS, a jury of Mrs. McMurry's peers squarely rejected Brunner's charges. But the damage was already done: Mrs. McMurry was already fired, was already prevented from teaching again, and had already spent 19 hours in jail."[91]

The Court need say nothing more; a jury of their peers deserves the last word.

It is therefore **ORDERED** that Officer Weaver's Motion for Summary Judgment be **GRANTED** in part and **DENIED** in part. (Doc. 85).

It is also **ORDERED** that Officer Brunner's Motion for Summary Judgment be **DENIED**. (Doc. 90).

It is also **ORDERED** that Officer Weaver's Motion to Strike (Doc. 112) and Plaintiffs' Motion for Leave (Doc. 116) be **DENIED** as **MOOT**.[92]

It is so **ORDERED**.

SIGNED this 18th day of June, 2024.

DAVID COUNTS
UNITED STATES DISTRICT JUDGE

---

[91] *McMurry*, 2022 WL 17493708, *11 (Oldham, J., concurring).
[92] Officer Weaver's Motion to Strike sought to strike the affidavits from Mrs. McMurry, Mr. McMurry, JM, and Tracy Rickerson. As stated at the outset, the Court did not consider those affidavits in its decision, making the request now moot. Likewise, the Court found that the other admissible evidence attached to the briefing or filed under seal was sufficient for the Court to make its decision. Therefore, it was not necessary to consider a supplemental response from Plaintiffs.