IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
MIDLAND/ODESSA DIVISION

| | | |
|---|---|---|
| ALESIA JADE MCMURRY, MEGAN MARIE MCMURRY and ADAM SETH MCMURRY, | § § § § | |
| Plaintiffs | § | |
| v. | § | CIVIL ACTION NO. 7:20-cv-00242-DC |
| | § | |
| ALEXANDRA WEAVER and KEVIN BRUNNER, | § § | |
| Defendants | § | |

---

**PLAINTIFFS' MOTION FOR NEW TRIAL (PHASE II)**

---

Plaintiffs Alesia Jade McMurry, Megan Marie McMurry and Adam Seth McMurry ("Plaintiffs") file this Motion for New Trial pursuant to Federal Rule of Civil Procedure 59, and would respectfully show the following:

I. Introduction

A motion for new trial may be filed at any time no later than 28 days after the entry of a judgment. Fed. R. Civ. P. 59. A new trial is proper where a jury verdict results from passion or prejudice. *Westbrook v. Gen. Tire & Rubber Co.*, 754 F.2d 1233, 1241 (5th Cir. 1985). A court has discretion to grant a new trial where it is necessary to prevent an injustice. *In re Isbell Records, Inc.*, 774 F.3d 859, 872 (5th Cir. 2014). Under Federal Rule of Civil Procedure 59(a)(1), courts may grant new trials on all or some issues.

Plaintiffs move for a new trial of Phase II of the trial on the basis of the closing statements of Defendant Weaver's counsel, who raised prejudicial arguments about Defendants' resources to invoke juror sympathy, referred to facts not in evidence,

Plaintiffs' Motion for New Trial                                                                 Page 1

misrepresented the law regarding the enforceability of judgments, and violated the Court's limine ruling, implying that Defendants lacked the backing of an indemnifying party such as an insurance company or their former employer, Midland Independent School District, and suggesting that Plaintiffs made a non-existent settlement demand in the present case. The Court's limine rulings also limited Plaintiffs' ability to present probative evidence that goes to damages in Phase II. Collectively, these things affected the jury's damages calculation and require a new trial under Federal Rule of Civil Procedure 59.

## II. Jury Argument

Closing argument statements may warrant a new trial when it irreparably prejudices a jury verdict. *Clapper v. Am. Realty Investors, Inc.*, 95 F.4th 309, 313 (5th Cir. 2024). A jury verdict may be irreparably prejudiced in several ways. *Id*. One example is to argue the existence of material facts that are false or lacking support in the record. *Id*.; *Alaniz v. Zamora-Quezada*, 591 F.3d 761, 778 (5th Cir. 2009); *Edwards v. Sears, Roebuck and Co.*, 512 F.2d 276, 286 (5th Cir. 1975).

In this instance, Defendant Weaver's counsel made statements that are false and lacking in support in the record by suggesting that Defendants' retirement accounts and their children's retirement accounts and college funds that they were building up for their children were placed at risk by a judgment in this case. Exhibit 1, p. 52.[1] This was obviously intended to invoke juror sympathy and reduce the amount of any award the jury might award Plaintiffs. Not only were these statements factually unsupported, but they also explicitly

---

[1] Counsel said, "Whatever your verdict is will affect [Defendants'] children. . . . It's coming out of their savings for their children, if they have savings for their children. It's coming out of their kids' 401K. It's coming out of – or their 401K. Maybe their child's 529 plan or whatever. They're trying to save up for their kids to go to college."

misrepresented Texas law as federal courts apply state homestead exemptions to judgment enforcement. See Fed. R. Civ. P. 69(a); Tex. Prop. Code § 42.0021 (the Texas statute exempting retirement plans and 529 plans from attachment by creditors). Counsel's false statement about the governing law inevitably distorted the jury's damage analysis in its verdict which was based on nonexistent legal consequences.

Similarly, Defendant Weaver's counsel suggested that because Midland Independent School District is not a party, that Defendants were exposed to a money damage award without the backing of an indemnifying party.[2] However, this is utterly false because Defendants themselves indicated in their disclosures made early on in this case that they were protected by the Texas Association of School Boards Risk Management Fund through Midland Independent School District. See Exhibit 2. Suggesting insurance coverage to a jury can be prejudicial. See *Socony Mobil Oil Co. v. Taylor,* 388 F.2d 586, (5th Cir. 1967); *Roy v. Employers Mut. Cas. Co.*, 368 F.2d 902 (5th Cir. 1966) (statement [asking jurors not to punish insurance premium payers] can be inherently and incurably prejudicial). In the same vein, suggesting that Defendants lacked insurance coverage through their employer is equally prejudicial. See further Fed. R. Evid. 411. By portraying Defendants as personally exposed to financial ruin, counsel created a false impression designed to suppress the jury's damages award.

Another example of an improper argument is one that appeals to sympathy that seeks to influence the jury based on irrelevant financial considerations rather than the merits of the

---

[2] Counsel said, "This isn't [Plaintiffs] suing Midland Independent School District, where they say oh, we have a fund balance, and we can pay it. This isn't the suing a police department that the Government says well, we've got money. We can tax and pay for it. They're suing these two individuals."

case by referencing the financial disparity of the parties. *Draper v. Airco, Inc.,* 580 F.2d 91, 95 (3rd Cir. 1978); *Williams v. McDermott In'tl Inc.,* No. 2:20-CV-00277, 2022 WL 1664552, at *2 (W.D. La. May 25, 2022). While no evidence of Defendants' financial resources was offered in this case, Defendant Weaver's counsel implied that Defendants' financial resources were limited because a damage award put their very retirement accounts and their children's college funds at risk, hence seeking to appeal to the sympathy of jurors and to minimize the final award in the jury verdict.

Counsel's remarks further violated the Court's limine rulings in this case. The Court granted Defendant Brunner's Limine Request No. 4 prohibiting "[a]ny statement that compares or contrasts the wealth of . . . Defendant . . . or which injects the concept of 'the big insurance company" in the case.' " (Doc. #210.) Defense counsel violated the rulings by making statements that touch on Defendants' wealth (or lack thereof) and insurance coverage (or lack thereof). Counsel made yet another statement that violated the Court's ruling on Plaintiffs' Limine Request No. 1 prohibiting evidence or comments of offers of settlement (Doc. #159) when he said that Plaintiffs were "asking for over a million dollars." Exhibit 1, p. 51. This statement improperly suggested that Plaintiffs made such a demand in the instant case because he did not point out that the demand that he referenced only applied during Megan McMurry's grievance proceeding against Midland ISD, which was a separate proceeding altogether.

In yet another improper argument, defense counsel claimed that Ms. McMurry was able to teach the entire time her teaching certificate was flagged, that all she needed to do was to apply for a job, and that she could have worked in any community in Texas because

the state is "desperate for teachers." Exhibit 1, p. 49. These statements again are examples of assertions of material facts that are false or lack any support in the evidence.

A new trial may be granted if the closing argument affects the substantial right of the parties by seriously prejudicing a party's right to a fair trial. *Edwards*, 512 F.2d at 286. Improper statements must be examined collectively and in the context of the trial at issue. *Clapper*, 95 F.4th at 314. If the tactics used during trial, taken together, tarnish the badge of evenhandedness and fairness that marks the judicial system, then a new trial is warranted.[3] *Id.*

A prevailing party may move for a new trial on the basis that a closing argument impacted the amount that a jury awarded the plaintiff. See, e.g., *Hall v. Freese*, 735 F.2d 956, 961 (5th Cir. 1984) (new trial warranted in a personal injury case due to an inadequate award given to plaintiff in light of defense counsel's prejudicial closing argument remarks). Compare *Brownlee v. United Fidelity Life Ins. Co.*, 117 F.R.D. 383, 390 (S.D. Miss. 1987) (negative statements made by plaintiff's counsel about the insurance industry appeared to inflame the jury and affected its finding of damages, warranting a new trial).

A new trial should be granted here even though Plaintiffs are the prevailing parties. Defense counsel's misstatements of law and fact, attempts to appeal to juror sympathy, and disregard of the court's limine order very likely resulted in a smaller money damage award than what would have been otherwise awarded without them. The verdict indicates that the jury was prejudiced by these remarks considering the overwhelming evidence of liability,

---

[3] Among the tactics used by Defendants' counsel was to complain about the fairness of the trial, about Megan McMurry's behavior (sometimes without specificity), and about Ms. McMurry supposedly taking too long to retrieve witnesses from outside the courtroom to imply she might be influencing their testimony in some way.

Defendants' misrepresentations in internal reports and to school officials to cover up their violations of federal law, their dubious initiation of a criminal case weeks after Ms. McMurry filed a grievance against them, and uncontradicted testimony of Plaintiffs' mental anguish.

Improper jury argument may be the basis for a new trial even where no objection is raised where the interest of substantial justice is at stake.[4] *Alaniz*, 591 F.3d at 778. When an error is so obvious or serious, a new trial can be granted to avoid a miscarriage of justice. *Edwards,* 512 F.2d at 286. Citing *Hormel v. Helvering,* 312 U.S. 552 (1941), the Fifth Circuit noted that rules of practice and procedure are designed to promote the ends of justice, not to defeat them, and that rules of procedure should not require sacrifice of rules of fundamental justice. *Id.* Here, it would have been difficult for any curative instructions to unring the bell that defense counsel tolled. Counsel's argument was made in the final minutes of his closing argument leaving no meaningful opportunity to cure its maximum impact. By then, he had already put out false statements of both fact and law that were clearly prejudicial, thus making it difficult to eliminate the misleading impressions that he planted in the minds of the jurors even if the Court had given the jury a curative instruction.

For these reasons, the jury was necessarily swayed by defense counsel's prejudicial remarks designed to influence the final award and diminish it. Because of their egregious nature, substantial justice requires the Court to set aside the Phase II verdict and order a new trial.

---

[4] The undersigned attributes fatigue to his failure to object. He later confirmed from other parties who were in the court room about precisely what Ms. Weaver's defense counsel said to the jury.

Plaintiffs' Motion for New Trial                                                                                           Page 6

### III. LIMINE RULINGS

Aside from the grounds above, Plaintiffs also assert that the Court should grant a new trial on the basis that its limine rulings limited Plaintiffs in their ability to present relevant details about the post-seizure events in Phase II that did not allow the jury to hear a complete narrative about this matter. Exclusion of evidence may be the basis of a new trial if there is error in excluding the evidence and that it had a substantial prejudicial effect on the verdict.

Based on the Court's order of March 6, 2026 (Doc. #210),[5] Plaintiffs were compelled to tiptoe around the facts of the criminal prosecution of Megan McMurry, Defendants involvement in initiating the case, Ms. McMurry's arrest, and the trial itself in light of the Court's concerns about possible prejudice to Defendants.

Plaintiffs believe these facts had significant probative value because they would have reinforced Plaintiffs' arguments that Defendants acted maliciously or with reckless indifference on October 26, 2018, as confirmed by their subsequent acts which showed that the officers' plan from the start was to initiate a criminal prosecution against Megan McMurry or to show that they initiated the criminal case to coverup their actions on October 26, 2018.

The omission of this evidence appears to have left the jury with the false impression that Defendants were only incidentally involved in the criminal matter. Had the jury been

---

[5] The Order granted in part Ms. Weaver's Limine Request 1, 2, 5, and 6 and Mr. Brunner's Limine Requests 20, 21, 24, and 25. The Order further reads in part, "Absent the parties' stipulations and limited materials described below there shall be neither documents nor testimony elicited referencing the criminal matter, criminal trial, or acquittal. . . . During Phase II (damages), Plaintiffs may briefly reference the acquittal only to the limited extent necessary to avoid juror confusion or to prevent the jury from being left with materially incomplete information, and only in a manner consistent with Rules 401 and 403. If Plaintiffs intend to make such a reference, they must first approach the bench so that the Court may establish appropriate guardrails."

able to hear more evidence of Defendants' role in the matter, the jury award most likely would have been higher because it would have further reinforced how they acted maliciously or with reckless indifference to Plaintiffs' rights, thus having a substantial prejudicial effect on the final verdict.

WHEREFORE, Plaintiffs respectfully request that the Court order a new trial for Phase II of this case, and that the Court grant Plaintiffs such other and further relief to which they may be justly entitled.

Respectfully submitted,

LAW OFFICE OF PETER BAGLEY PLLC

by: _/s/ Peter F. Bagley_
    Peter F. Bagley
    Texas Bar No. 00783581
    peter@peterbagley.law
2304 West Interstate 20, Suite 240
Arlington, Texas 76017
(817) 961-1010
(817) 961-1080 Facsimile

ATTORNEY FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

By my signature below, I hereby certify that a true copy of the above and foregoing instrument was served on all attorneys of record via electronic service on this 6th day of April, 2026.

    _/s/ Peter F. Bagley_
Peter F. Bagley

# EXHIBIT

# 1

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF TEXAS

MIDLAND/ODESSA DIVISION


MEGAN MARIE McMURRY,          * CIVIL ACTION NO.
ADAM SETH McMURRY &           * MO:20-CV-242
ALESIA JADE McMURRY           *
                    VS.       *
ALEXANDRA WEAVER &            *
KEVIN BRUNNER                 * March 27, 2026


BEFORE THE HONORABLE DAVID COUNTS
EXCERPTS OF JURY TRIAL - CLOSING ARGUMENTS


APPEARANCES:

For the Plaintiff:   Peter F. Bagley, Esq.
                     2304 W. Interstate 20, Ste. 240
                     Arlington, Texas 76017


For Defendant        Tom Brandt & Angela Lee, Esq.
Kevin Brunner:       700 N. Pearl Street, 25th Floor
                     Dallas, Texas 75201

For Defendant        Dennis Eichelbaum, Esq.
Alexandra Weaver:    5801 Tennyson Parkway, Suite 360
                     Plano, Texas 75024

Court Reporter:      Tamara D. Ross
                     200 E Wall
                     Midland, Texas 79701


   Proceedings recorded by mechanical stenography,

transcript produced by computer-aided transcription.

INDEX

PAGE

Closing Arguments by Mr. Bagley                    30
Closing Arguments by Mr. Brandt                    36
Closing Arguments by Mr. Eichelbaum                45
Rebuttal by Mr. Bagley                             53

3

PROCEEDINGS

THE COURT:  All right.  Good morning. We're on the record outside the presence of the jury. Looks like everybody's here.  Just to review, Mr. Bagley, you want me to tell you at eight minutes -- the eight-minute mark.  And I won't tell you at 10. You were planning on taking about 10, but I'm not going to tell you.  And then I'll tell you at the 14-minute mark.  Okay?

MR. BAGLEY:  All right.  Yes.

THE COURT:  Because you'll have one minute left.  And of course, as I did the other day, when you stand back up to close, close, I'll tell you how much time you have left.

MR. BAGLEY:  Okay.

THE COURT:  Mr. Brandt, you want me to tell you at 10 and at 13.  And Mr. Eichelbaum wants me to tell him at 12.  Right?

MR. EICHELBAUM:  Oh, yeah.  Yeah.

THE COURT:  You said with three.

MR. EICHELBAUM:  Gotcha.  You threw me a bit.

THE COURT:  I'm sorry.  And I wrote it down the way you were thinking of it and said it the other way.  All right.  Mr. Bagley, anything you want

to take up before we begin?

MR. BAGLEY:  No, Your Honor.

THE COURT:  So you're good?

MR. BAGLEY:  Yes, I am, sir.

THE COURT:  Do we have a jury yet, by the way?  Where are we on the jury?

CSO:  Let me check with Rory.

THE COURT:  Mr. Brandt, anything you want to take up?

MR. BRANDT:  Yes, Your Honor.

THE COURT:  Going to have to get on a mic.  I'm not hearing very well.  I think the wind blew my -- blew all my stuff back into my nose.

MR. BRANDT:  Yes.  Amen.

THE COURT:  Enjoying the wind?

MR. BRANDT:  Yes.  And this Ms. Lee's first Texas sandstorm.

THE COURT:  West Texas sandstorm.  Well, it will be followed tomorrow by a gorgeous day, is the good news.

MR. BRANDT:  Chambers of Commerce.

THE COURT:  Today might be a  little ugly, but it will be all right.  It's clearly a Texas dust storm.  Yes, sir.

MR. BRANDT:  Your Honor, I don't know how

5

quite to bring this up.  I don't know what I don't know, and I'm not making accusations, but I have a concern.

THE COURT:  Okay.

MR. BRANDT:  I expressed that concern to Dani -- what's her last name?

THE COURT:  Harlan.

MR. BRANDT:  Yes.  And I would ask the Court to have someone --

THE COURT:  Wait one.  Can't find?  Be right back.

(Pause in the proceedings.)

THE COURT:  Mr. Brandt, go ahead.  You all have a seat.

MR. BRANDT:  Yes.  I'm not here to make any accusations.

THE COURT:  Okay.

MR. BRANDT:  I want that to be clear.

THE COURT:  Thank you.

MR. BRANDT:  But I have a concern about what I don't know.

THE COURT:  Okay.

MR. BRANDT:  Based on what I do know.

THE COURT:  Okay.  Tell me what you know.

MR. BRANDT:  I know that Ms. Megan

6

McMurry has been retrieving -- has been acting as co-counsel. She refers to herself as co-counsel in the case, and she's been acting in the capacity of retrieving witnesses. And we noticed that on Monday, there -- I don't know what happened, but there seemed to be a -- first of all, I think it's inappropriate for a party to be retrieving witnesses. I understand that he's solo practitioner, has no one else with him at trial hearing, so I didn't make a big deal about it. But then we noticed some discrepancy in how much time it took to retrieve some witnesses. You have access to information that I don't. I would just urge the Court to see if there was any indications with -- particularly with Ms. Rickerson when that was -- when she was brought in. I don't know if anything wrong happened, and I'm not accusing anything wrong. But based on all the constellation of circumstances, which the Court is well aware of -- and the Court has admonished Ms. Megan McMurry and her lawyer many times to -- Mr. Bagley to control his client and then you, directly to Ms. Megan McMurry. And we expressed concerns about the fairness of the trial because of her behavior, both before in social media, and also during the trial. So I feel with a somewhat heavy heart to bring this matter up because I don't know if anything

7

untoward happened.  But there is such a thing, as you well know -- you spoke eloquently about the appearance of impropriety and the need to protect this court and not let it be turned into candid -- a Kangaroo court, were your words.  I agree, and I -- as an officer of the Court and also as an advocate for my client, Lieutenant Brunner, and I suspect -- and I know Mr. Eichelbaum will join me in this.  We have grave concerns about the fairness of this trial.  And I can't really know that.

THE COURT:  Ma'am, if you would stop nodding along with him, please, that would be helpful.  It's just distracting.  I want to concentrate on what the attorney has to say.  Thank you.

MR. BRANDT:  Yeah.  I don't know where I was, but I'll get to it.

THE COURT:  Talking about the fairness of the trial.

MR. BRANDT:  Yes.  And I want to be absolutely clear.  I am not accusing this Court of any wrongdoing.  You know, I do have objections.  I do have things that I've preserved, as I'm supposed to do in my role.  But I'm not accusing this Court of intentionally doing anything to make this trial unfair.  I want that to be absolutely clear on the record.  So my concern is

8

Ms. McMurry -- Ms. Megan McMurry and her behavior as -- throughout. She has made it her life's mission, apparently, to crucify my client. And this courtroom is supposed to be where I believe my client gets exonerated. It hasn't happened yet, but the fight's not over. So with a heavy heart, I urge the Court to preserve the court video records that depict those circumstances. I urge the Court to look at those, examine those, and -- and then make a judgment. And preserve those in the record; sealed, of course. Whatever is most appropriate. Because I've never had this situation come up, so I'm not briefed on what's the appropriate thing.

But I do know that my clients are feeling very -- I mean, my client and Ms. Weaver have expressed numerous times how unfair they think this is because of Ms. McMurry's constant behavior, even after being admonished by the Court. I have fear of the Lord, and I have fear of you because of your authority. Right?

THE COURT: I'm sorry?

MR. BRANDT: I have fear of the Lord, and I have fear of you because of your authority. I don't fear you as a human being, but I do have respect for the Court. And I am afraid that our system deserves to be above reproach. And our -- my client -- Officer

9

Weaver and Lieutenant Brunner deserve to have a fair trial, and I think that we have not gotten a fair trial.  And I will conditionally move for a mistrial in this case, depending on what the Court finds -- determines in the videos.  And in addition, the constellation of facts, of which this Court is well aware, and of which I referred to generally.  And if I have to say something more to preserve that for the appeal, I'll do that.  But -- I mean if I take an appeal.  But I know that Your Honor understands the circumstances, and it's in the record, so I don't have to spell it out any more than that.  So Your Honor, thank you.

THE COURT:  Thank you, Mr. Brandt. Mr. Eichelbaum, do you want to --

MR. EICHELBAUM:  Do you want me to --

THE COURT:  I'd rather, just so I can hear a little better.

MR. EICHELBAUM:  Yes, Your Honor.

THE COURT:  Go right ahead.

MR. EICHELBAUM:  Defendant Weaver joins.

THE COURT:  Oh.  That's it?  You could have said that from over there.

MR. BRANDT:  He's showing me up again. And I --

—10—

THE COURT:  He is.

MR. BRANDT:  He wanted to be admonished for that.

THE COURT:  Okay.

MR. BRANDT:  Speaking of admonishment, Your Honor, I do believe that it is critical that you admonish everyone again before closing arguments with respect to behavior in front of the jury.

THE COURT:  I will.

MR. EICHELBAUM:  Thank you.

THE COURT:  You know I will.  I think you know I will.  It's at the top of my mind.  Part of the reason I got very few hours sleep.  It wasn't because I was watching basketball until midnight.

(Laughter.)

THE COURT:  But the games were too good to turn off.

MR. BRANDT:  Yes.

THE COURT:  All right.  All right.  So this appears -- Mr. Brandt, Mr. Eichelbaum, this appears to be -- okay.  You don't like -- and of course, yesterday is the first I heard -- I'll just say that I do think it's been a fair trial.  The jury has not complained to a Court Security Officer.  You mentioned yesterday for the first time, I think,

11

Mr. Eichelbaum, some of the -- possibly hearing that the Plaintiffs were speaking, either to -- or loud enough so that the jury could hear, maybe, or to the jury, or make any facial expressions or making eye contact.  I'm looking head-on with them.  And I'm not saying I see everything, but I haven't seen that.  Now, it could happen.  I'm not saying it didn't happen. I've not seen it.  I've not had a -- I had a juror on Monday who asked Officer McKinney for -- he said I have some migraine medicine down in my vehicle.

CSO:  Yes, sir.

THE COURT:  And can I go get it?  And I had Officer McKinney escort him through chambers away from the hallway -- because it was during a break -- down the elevator to his vehicle.  He got his migraine headache medicine and came back.  That's the only thing I have heard --

CSO:  That's it.

THE COURT:  -- from any of them that they were uncomfortable all week long.  And so all that was fine.  So I don't know if it's just a feeling you get. Now, I will say that I didn't hear anything about the fairness of the trial from the Defense until yesterday, which would have been after the verdict in which the Defense lost.  I'm not saying that means anything.  I'm

12

just saying that the first time all week I heard anything about the trial being unfair. And I think that ought to be on the record. I think the Circuit ought to hear that as well. That's the truth.

I know that we've done everything we can, and I've done everything I can. Ms. McMurry is a demonstrative person; a very strong personality. I told Mr. Bagley to talk to her. I know he has. I feel like since yesterday, I've been a cafeteria monitor at a grade school because we approached, I think, at least a couple of times yesterday at Defense request. The attorneys approached so that we -- they could quit having Ms. McMurry go out and get witnesses. And that was Thursday, again. It'd been going on since Monday, and that's the first I'd heard of that problem.

I've been watching. I'll tell you -- I try a lot of cases. I've tried a lot of cases. I had thought that it actually was working pretty well in that typically, I can see Ms. McMurry go to the doors, she opens the door, doesn't typically even go out in the hallway all the way, leaves the door open. Sometimes she'll go out. Sometimes she doesn't. And then they come back -- they come in really quickly. Compared to other trials I've had, I think it's been pretty efficient. I know in Pecos, we've got Pizza Hut

13

that's about a block away, and I always accuse the Government of keeping their witnesses at the Pizza Hut because it takes so long to get them into the courtroom.

And it's so difficult -- Mr. Brandt and Mr. Eichelbaum, I know you have tried cases by yourself. I have too. Like Mr. Bagley is trying it here without a paralegal, without a co-counsel, without anybody to go out and get your witnesses. And you know, we've all done it to where we've said, well, I call Jane Doe, and then you put your stuff down and you walk out yourself and go get them. It's tough. It makes it difficult. And the Court doesn't like it because it's not efficient. Because what's the first thing after the fairness of the trial, is the jury's time. I don't want this to be a goat rope for them. I want them to have in their minds that this is a professional outfit.

So I guess it's a general feeling that -- and I will say a couple other things. Again, we've been going since Monday morning. And the first I heard of any unfairness or concerns about that was yesterday. Now, I know we talked some time ago about the postings, and I've talked to Ms. McMurry about that. We've been trying to keep up with them. And I didn't get an

14

update yet from last night.  I don't know what -- but they've been fairly innocuous, fairly harmless, as far as I'm concerned.  But we can pull those off and preserve them for the record if you want to do that. We'll seal those.

I will say I take some issue and I take umbrage at the word unfair because I don't think it's been an unfair trial.  We talk about how emotions run high in a case like this.  Ms. McMurry -- I don't think she's trying to terrorize your clients.  I don't see them trying to terrorize her.  Everybody's lived this. Ms. McMurry has lived every second of this since 2018. Lieutenant Brunner, Officer Weaver have lived it as well.

So last night -- and again, I don't think there's any -- I think if you had any -- Mr. Brandt said I don't know what I don't know.  That tells me you don't have a source.  You don't have somebody that says I was out there and I heard them talking.  Right?

MR. BRANDT:  Correct.

THE COURT:  I mean, that's where -- I'm sorry?  Correct?

MR. BRANDT:  Correct.  I just have -- I just have my client, who obviously is biased, but he noticed that there was an unusual delay in time with

15

that particular witness, I believe.

THE COURT:  Okay.

MR. EICHELBAUM:  And --

THE COURT:  Is that right?  Would you confer and make sure?  With Ms. Rickerson?

MR. BRANDT:  No.  I would -- Ms. Rickerson?  No.  I have no relationship with her at all.

THE COURT:  No.  Would you confer with Mr. Brunner to make sure that was the one in particular -- and I agree that might not be the only one.

MR. BRANDT:  It was.  It was.

THE COURT:  Okay.  It was Rickerson?

MR. BRANDT:  And she --

THE COURT:  And I know that may not be the only one you have concerns with, but that was the one that was mentioned.  I don't want to exclude anybody else.  So Ms. Harlan, my law clerk that you all know very well now, told me last night -- I think the Plaintiffs were gone.  Defense were still in here, maybe.  I wasn't in the courtroom, but I was off the courtroom.  I think you all were talking about it, and she came and told me --

MR. BRANDT:  Okay.

THE COURT:  -- about that concern.

16

MR. BRANDT:  To be clear, I thought we were all supposed to stay here to get the jury instructions.

THE COURT:  Yes.

MR. BRANDT:  And that's why we were here. And Peter can leave if he wants to leave.

THE COURT:  Right.  And he left.

MR. BRANDT:  But I wasn't doing it outside his presence.

THE COURT:  No.  I'm not saying that, Mr. Brandt.

MR. BRANDT:  I'm sorry that you take umbrage at my words.

THE COURT:  Have a seat.  Have a seat.  I take umbrage at the concerns of fairness after the verdict was read and --

MR. BRANDT:  I understand.

THE COURT:  -- and you lost.  But the trial's not over.  There's a long way to go.  And you all know even after today, there's a long way to go.

MR. BRANDT:  Yes.

THE COURT:  So my point being -- not that you were talking to the Court ex parte.  You all were here, waiting on the -- for some reason, you were here, waiting.  It's perfectly fine.  Mr. Bagley and the

17

Plaintiffs had decided to leave.  I don't mean anything by that.  I almost feel like I'm in a discussion with my wife and I'm not going to win.  I get that.  I understand.  So I'll declare defeat now.

But she came in and told me because I was in chambers.  The attorneys have been in there.  It's just off the courtroom.  And told me the concerns.  So before I left, I went downstairs to the United States Marshals office.  I had called ahead and said pull up that video for me from Monday, from 10:30 to 1:30.  Because that's when Ms. Rickerson was here.  Rickerson.  Sorry.  I knew an old Army buddy named Ricketson.  But it's Rickerson.  So I pulled it up and looked at it with him.  We have video feeds of that hallway on the north, where everybody comes in and out of the courtroom.

DEPUTY CLERK:  I'm just guessing.

THE COURT:  Are you just now figuring out that's north?  You've been here for all your life?

DEPUTY CLERK:  My map is right in front of me.

THE COURT:  And to my left over here to the west, we have a video feed there with the elevator.  We do not have cameras in the restrooms.  You know, people went in and out of there.  I could tell they

18

went in and out, but that's all I could see.  And then we have a feed, of course, of here.  We've got two or three different looks of the courtroom.  And so looking at it, I see Ms. Rickerson show up.  She's sitting out there because -- because Mrs. McMurry was on the stand, I believe.  We took a break at one point.  I believe Mrs. McMurry went to the restroom.  When she goes out and goes to the restroom -- this is my memory.  We'll preserve the recording.  She goes out.  Ms. Rickerson and another witness are sitting on the pew to the left as you go out.  Ms. McMurry might have said hello to some people.  There were a lot of people in the courtroom.  And she turns and goes down to the restroom.  I don't remember seeing anything else until then we get her -- we go back in here and Ms. McMurry is still on the stand, still testifying.

So I've got at 12:07 and 26 seconds, Mrs. McMurry goes to the door -- and I can see it from in here.  You can see it from the video feed on the north side hallway -- and tells the two -- says something to the two to come -- and Ms. Rickerson immediately gets up and comes in.

Now, in the interim, Ms. Rickerson and the other witness -- I can't remember the other lady's name.  They come in and and I swear them during the

19

break -- or right before we bring the jury back in, probably.  I don't recall.  Then they go back out and sit and wait.  Ms. McMurry is at that door, and I think it remains open the whole time she stands in the doorway to get Ms. Rickerson, to notify her to come in.  Because Mr. Bagley has called her.  And there is no more than 10 seconds, total, and it's probably six or eight.  And there couldn't have been anything said by that.  During that time, the door is open.  The other witness is there as well.  And then -- I made a few notes.  Eventually then, Ms. Rickerson leaves and walks out.  I don't see them talking at all.  Now, they could -- they could have.  I mean, she could have said, you know, don't say this or -- I mean, that could always happen.  But holy cow.  That could happen at any other time.  So I did look at that because I take this seriously.

Yet again, I feel like the hall monitor.  And pretty soon, the Circuit will have it and they can hall monitor the whole thing instead of me.  But -- and I'm sure there will be more antics today from everybody, and we'll deal with that.  But I've done what I can.  I'll preserve the video of the entire week; all the feeds -- the multiple feeds.  We'll seal it.  I'll enter an order that will say that in case

20

anybody wants to use it or look at it, or anybody that we allow to look at it. I can't help it that she may call herself co-counsel. I just don't -- I can't help that. I don't know.

MR. BAGLEY: Judge?

THE COURT: Yes, sir.

MR. BAGLEY: Could I make a follow-up comment?

THE COURT: Of course.

MR. BAGLEY: I'll be short. On that note, I would just like to point out for the Court that on Wednesday, I called a witness who I ended up not calling because I ran out of time. Her name is Laura Nodolf. And it was observed that Lieutenant Brunner was out there, talking to her in the hallway; at least, according to Megan McMurry. So I -- but I heard it. I wasn't going to raise it because it's just conjecture about what was talked about. They could have just been saying -- exchanging greetings or whatever. So it didn't -- I didn't care. So I -- but anyway --

THE COURT: I understand.

MR. BAGLEY: -- I just wanted to bring that up as well.

THE COURT: Okay. I will say, Mr. Brandt, it's kind of interesting. And I say this

21

just because it was funny. The person who talked to those two witnesses sitting on the pew the most -- because there was break in there. There was a lot of -- in fact, at one point, I've got you all still in here, and the jury's going to lunch, and they walk by those two witnesses. I can't remember the other lady's name. I'm sorry. I'm sure I can figure that out if I looked at the notes. In the break, you're the one talking to them the most. You were talking -- and you know, you were talking to them like this because you use your hands. You're a very eloquent and very dynamic speaker. And you can see -- I can't hear, of course, but I can see. And if anybody talks to them -- which is perfectly appropriate. There's absolutely nothing wrong with that. People are coming and going. They're going to the restroom. They're just hanging around. I mean, you talked to them the longest. And I'm sure it was for good reason. I think you all were just visiting, mostly.

MR. BRANDT: No, Your Honor. Can I address that, please?

THE COURT: What's to address?

MR. BRANDT: I just wanted to tell you that I felt obligated because you told all of us, as officers of the Court, to make sure that witnesses

22

don't talk to each other.  I saw two strange people.  I asked them, are you witnesses?  And I said -- because I thought I was acting on your behalf.

THE COURT:  I appreciate that.

MR. BRANDT:  And that's what I was doing. I was saying, if you're witnesses, you're not supposed to be talking to each other.

THE COURT:  Thank you.  I appreciate that.  I couldn't hear.  It looked like you were telling a joke.  It looked like -- you could have been telling a joke.  You were just talking to them.  There was nothing wrong with it.  I'm not saying anything is untoward.  I'm just saying if you want to know, if you want to watch the video, I'll have it brought up here today, and you can see it.  The only person that really talked to them, besides them kind of -- and you can tell they're not even talking to each other very much -- is you.

MR. BRANDT:  Exactly.

THE COURT:  There's nothing wrong with that.  I'm just saying that's what I see on the video. And so until our next drama, why don't we get the jury in here?  Now, before I do, I have a United States -- a Deputy United States Marshal in the courtroom.  And if I need to, I'll bring him up here and sit him right

23

behind you.  Or you can absent yourself now, and nobody will think the worse of you.  I know you wouldn't dare in all your world, do that because you can't.  You can't do it.  I think you would be wise.  Because I don't want to have -- when we're reading the verdict later, I don't care what it is.  It doesn't matter.  You're going to have an emotional response, Mrs. McMurry.  All due respect for what you all have been through, what Brunner and Weaver have been through.  You'd be wise to absent yourself.  I just think it'd be smart.  Let somebody come tell you what happened.

But if we're in the middle or after one answer, or two answers, or three answers, you have a reaction, I'm going to have him take you out right then in front of everybody.  Because then it won't matter.  Because they've made their verdict.  They're done.  I won't taint them in any way.  I'll have you taken out. I don't want to do that.  I'll do that with anybody here who does that.  It's what he's here for.  He wouldn't normally be here for a civil lawsuit.  He just wouldn't be.  I mean, this is embarrassing for me to have to do this, but I don't know what else to do.  And on that happy note, we're going to bring in the jury. Let's rise for the jury, please.

(The following proceedings took place

24

in the presence of the jury.)

THE COURT: Be seated. Good morning. If you would put your juror badges on. And appreciate you being here. Hope you had a good evening. In your seats -- each of your seats, you found, as you walked in, your notebook if you had it there, and you also found, of course, your charge to the -- instructions to the jury. Excuse me. Which I'll read for you now. We're going to, again, have argument. Each lawyer has the same amount of time. Mr. Bagley, again, is allowed to break his up. Put a little bit at the end for rebuttal. He has the same -- he has no more time than the others, just to refresh your memory on that.

(Whereupon the jury charge was read by the Court.)

THE COURT: I'm going to stop right there. I'll come back and finish that after the lawyers talk, just like we did before. Like I said, you've got your foreperson already selected. He didn't know he was going to have to do double duty, but he can do that, I bet. There's no extra pay.

So anyway, what you don't have, what you shouldn't have, what you better not have is the verdict form. Because when -- again, once Ms. Lerma comes in and sets everything up for you, makes sure you're set up and ready to go, before she closes that door for the

25

final time before you begin your deliberations, just as before, she'll give you this one verdict form. This one is a little bit longer. It's not a lot longer. There actually are 12 questions to answer. I want to go through it just real quick. Saves the lawyers a little bit of time. They can go directly to they want to talk to you -- they don't have to go over the verdict form with you and use their time to do that.

So this basically breaks it down into Count I, Count II, and Count III, like we did before. Count I -- and this is question number one. As to each Defendant below, was the seizure of Alesia Jade McMurry a legal cause of any actual compensable injury to Alesia Jade McMurry? I just told you about compensable damages in the charge. And it says for each Defendant below, answer yes or no. It's got Alexandra Weaver, yes or no. Again, foreperson, initial in there whatever the unanimous verdict of the jury is as to each one. And then underneath that, Kevin Brunner, yes or no. And then there's some instructions in italics, a little bit smaller print in italics, that says for each Defendant as to whom you answered yes to question one, answer question two. For each Defendant as to whom you answered no, do not answer question two. The Court will award nominal damages of $1 as to that

26

Defendant on this claim.  And you go to question three. So it will step you -- it'll walk you through this. These instructions will walk you through this.

Question two, if you get there:  What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Alesia Jade McMurry for the actual compensable injury legally caused by the seizure?  Answer in dollars and cents.  Leave blank any line for which you answered no in a prior question. But actually, even though there's a backstop there, it tells you remember, don't answer this one if you answered no to that number up above.

Question three:  Do you find from a preponderance of evidence that Kevin Brunner and Alexandra Weaver acted with malice or reckless indifference to Alesia Jade McMurry's Constitutional rights by seizing her?  For each Defendant below, answer yes or no.  Again, initials are fine.  Alexandra Weaver, yes or no.  Kevin Brunner, yes or no.  Again, in italics, a little instruction:  If you answered yes to question three as to either Defendant, answer question four as to that Defendant.  If you don't, you'll leave it blank, and you go on.

Four is what sum of money, if any, should be assessed against Defendants for punitive damages for

27

the seizure. Then you get to Count II and question number five. As to each Defendant below, was seizing Alesia Jade McMurry from the Plaintiff's home a legal cause of any actual compensable injury to Megan Marie McMurry and Adam Seth McMurry, the parents? For each Defendant, answer yes or no. Again, the instructions. You answer yes, you go to the next question. If you answer no to that particular Defendant, you go to the question after.

Question six. What sum of money, if any -- so you can see how it goes. It takes you step by step. What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Megan Marie McMurry and Adam Seth McMurry for the actual defensible injury legally caused by that seizure? Answer in dollars and cents as to each Defendant.

Question seven: Do you find from a preponderance of the evidence that the Defendants acted with malice or reckless indifference as to Megan Marie McMurry and Adam Seth McMurry's Constitutional rights by seizing Alesia Jade McMurry? As to each Defendant below, answer yes or no. And if you answered yes to any Defendant in question seven, answer eight as to that Defendant. Skip eight as to that Defendant if you answered no. And go to nine. But eight is what sum of

28

money, if any, should be assessed against Defendants as punitive damages for the seizures?  As to each Defendant below, answer in dollars and cents.  Again, it says leave blank any line which you answered no in the prior question.  And it's got a blank for Alexandra Weaver and a blank for Kevin Brunner.

Then Count III, the search of the refrigerator and freezer.  Nine.  Question nine:  Was Defendant Alexandra Weaver's search of the refrigerator and freezer a legal cause of any actual compensable injury to the Plaintiffs?  Answer yes or no.  If you answer yes to question nine, you go to question `10.  Otherwise, do not answer question 10.  The Court will award nominal damages of $1 as to Alexandra Weaver's conduct in this claim.  Then answer question 11.  But if you get to 10, what sum of money, if any, if paid now in cash, would fairly and reasonably compensate Plaintiffs for the actual compensable injury legally caused by that search of the refrigerator and freezer?  Answer in dollars and cents.

Question 11.  Do you find by a preponderance of the evidence that Defendant Alexandra Weaver acted with malice or reckless indifference to Plaintiff's Constitutional rights by searching the refrigerator and freezer?  Answer yes or no.  And if

29

you answered yes to question 11, you go to 12.  If you answer no to question 11, you're done.

Question 12, if you get there:  What sum of money, if any, should be assessed against Defendant Alexandra Weaver as punitive damages for the search of the refrigerator and freezer?  Answer in dollars and cents.  And another reminder:  Leave question 12 blank if you answer no to the prior question.

And then it says that all important in bold, Mr. Foreperson, the jury foreperson must sign and date certificate on the last page.  Just like the other day, there's a certificate on here that says our verdict is unanimous.  All of us have agreed to each and every answer.  The jury foreperson signed the certificate for all of us, as set forth below.  There's a place for the signature of the foreperson, printed name of the foreperson, and the date.  Again, we'll have envelopes back in the jury room for you to slide just the verdict form.  Not the entire instructions. All the pages of the verdict form though.  If you'll put those in the -- into the envelopes, seal it like you did before, carry it in with you.  Once they no -- you notify the officers, he notifies us, we get everybody here, ready for you, when you come in carrying that envelope.  All right.  With that, I'm

30

going to recognize Mr. Bagley to begin our closing arguments on this phase of the trial.  Mr. Bagley, you may proceed.

MR. BAGLEY:  Thank you, Judge.

THE COURT:  Yes, sir.

MR. BAGLEY:  May it please the Court? Ladies and gentlemen of the jury, I'm sure everybody's happy this morning that we're near the finish line in this case.  I want to thank you for your patience and consideration of the testimony and evidence.

You've decided the Defendants are responsible for violating my clients' rights -- my clients' civil rights.  Now it's time for you to make them whole again, after seven and a half years, by granting them monetary damages to rectify the harm that they caused by their violations back in 2018 and to send a message to other government actors that this should not -- they should not be tempted to act as they did.

Now, you heard from the testimony that these breaches of duty not only caused my clients out of pocket costs, but other damages like mental anguish. Now, despite multiple witnesses coming in and praising Megan McMurry as an educator and someone who's been committed to helping people, you also heard that Megan

had to turn down a job in Kuwait, and she was not reimbursed $1,083 for the cost of her flight to go to Kuwait. She lost two years of work because she was put on administrative leave upon her return to Midland because of an ongoing criminal investigation. She was never allowed to return to the school district. She -- her teaching certificate was flagged. She had to wait -- and she had to wait for two years until she was cleared of criminal wrongdoing before her -- the flag on her teaching certificate was removed.

The testimony of Megan, Seth, and Jade revealed extensive mental anguish. Had to deal with their lives being turned upside down that stemmed from the officers' actions on October 26th, 2018. Seth even testified in an anguished voice, how am I so invisible to these people? I am the children's father, and no one seems to care.

Now, mental anguish is no less real just because you can't hold it like an object. But thankfully, we have a lot of video evidence. A plethora of video -- bodycam videos that shows mental anguish. But you can also see it in the demeanor of the witnesses who testified, and you can hear from what they said and about how these events continuously affected their lives for years.

32

Unfortunately, because Ms. Megan McMurry -- the McMurrys -- excuse me -- have fought to hold the officers accountable this time, they've had to endure some character assassination.  The strategy seems to be about blame-shifting.  One of saying pay no attention to what we did.  Look at the McMurrys.  But please don't fall for that strategy.  We leave it up to you, in your wisdom, to decide what the McMurrys should recover by way of compensatory damages.  That is, the expenses that Ms. McMurry incurred for the flight and the mental anguish that the Plaintiffs -- that can and should be awarded for the Plaintiffs for each of the counts.

Now, I know there was a lot of testimony that was kind of crammed in the last four days.  However, there were some things that wasn't even addressed that is in evidence, that's been admitted into evidence.  And so I would like to just draw your attention to some exhibits.  And I hope there's a good note-keeper among you.  And I'd like to go through the 16 exhibits I'd like to just touch on and ask you just to take a look at that when you have time during your deliberations.  These are not in sequential order.  They're in order of chronology of how they appear in time.  But they are P6 -- P means Plaintiff.  P6, P8,

33

P10, P32, P36 -- or excuse me.  P33, P36.  And on that one, look at pages 215 and 16.  P9, P44, P14, D54.  D is for the Defendant.  D54.  P34, P35, P13, P15, D7, and P40 to 43.

Now, I want to switch gears here.  Your instructions says that the law allows victims to recover punitive damages.  Punitive damages are permitted when an individual -- when a party acts with malice or with reckless indifference.  And malice -- in the definitions, malice is defined as purposely violating another's rights.  Reckless indifference is defined as conduct that shows a complete lack of concern for the rights of others.

Here, it was the -- it's obvious the officers crossed the line and violated the McMurrys' rights.  And I just want to point out a few examples. As I said before, this was a criminal investigation disguised as a welfare check.  The Defendants chose to seize Jade first and ask questions later.  Their search of the fridge was clearly aimed to collect evidence for a criminal investigation.  There was never any anonymous tip.  There was a failure to preserve evidence; namely, Tracy Rickerson's texts.  There was intimidation to Tracy Rickerson to make her misrepresent facts.  There was a violation of School

District policy concerning contacting parents before you get a statement from a juvenile. They ignored School District policy regarding body cameras by not letting it remain on during the whole course of the investigation.

There were lies made to the hearing officers in the MISD grievance process about the facts. About what Vanessa said and her availability so that they can consider violations of the McMurrys rights. They fabricated statements to CPS about some facts. There's a slew of factual misrepresentations and omissions in the police reports. They cherry picked whose statements they were going to record on the body camera videos. They refused to allow Cori Leal, who sat up there, who said that she was not allowed to comfort Jade in the Abell office. And then they held Jade incommunicado and refused to let her speak to her father for most of the day. Meanwhile, we've heard no regrets, no remorse, no apologies. The Defendants have instead doubled down and chosen to divert their focus on blaming the McMurrys in an effort to excuse their deliberate choices during these events and afterwards.

So punitive damages here are required to deter these individuals from acting in this way again and to send a message to others who think they can

35

completely ignore the law and blatantly cross Constitutional boundaries.

Now, Defendants can't overtly disregard the same U.S. Constitution that Seth McMurry was defending on this very day back in 2018.

THE COURT: Mr. Bagley, that's eight minutes.

MR. BAGLEY: Thank you. The officers can't wish away the protections we have under the U.S. Constitution, the 4 Amendment, the 14th Amendment just for their convenience. So they must be held to account to blatantly disregarding the law with malice and reckless indifference. Although I leave it up to you to decide the damages for each count, one option you might consider for mental anguish is how many days have elapsed between then, October 26th, 2018, and now, March 27, 2026? I count 2,709 days. So you may wish to consider how much you would award the McMurrys for mental anguish for each day between then, when the Defendants disregarded the U.S. Constitution, and today's date, when the McMurrys hope to obtain long overdue justice and vindication. One approach you might take is multiply 2,709 times whatever daily dollar figure you think is appropriate for mental anguish damages. That's just a suggestion to consider.

Again, as I said, we've heard no regrets, no remorse, no apologies. Despite Defendants Brunner and Weaver obviously being the initiators of this mess, as they call it, they insist that they did absolutely nothing wrong. So for punitive damages, I'm urging you to come up with the number -- dollar figure that you think is necessary to deter future violations by these two officers. And by -- and to deter other rogue cops so that no other family has to face what the McMurrys endured in the last seven and-a-half years. We'll leave it up to you make a fair and just finding that sends a strong message to deter future misconduct, including the choice to repeatedly lie to cover up the misconduct. So simply put, I'm asking you to award compensatory damages, including -- which includes mental anguish, as well as to award punitive damages. And so with that, ladies and gentlemen, I thank you for your service on this jury and your careful consideration of the evidence. Thank you.

THE COURT: Thank you, Mr. Bagley. Mr. Brandt, the floor is yours.

MR. BRANDT: I wanted my co-counsel, Angela Lee, to make this closing argument because I know I haven't gotten through to you. This is her very first trial. It may be my very last. I'm at the end

37

of my career.  She's at the beginning.  She declined, but I wish she had taken the opportunity because I haven't got through to you, and the truth is that I've wanted to get through to you for my client because I believe in him.

But let me begin with what I think might be weighing on your heart the most.  As a father, it's weighing on my heart.  When Seth McMurry talked, he was -- it was moving.  I'm a father.  I'm blessed to have a wife.  In July, we'll have 40 years of marriage, and we have six children.  And if I felt invisible, it would be very hard if people wouldn't listen to me about my children.

But the real answer to that is something I've experienced, and it's something that a lot of people have experienced, and it goes back as far as the book of Daniel in the Old Testament.  There's a story in the Old Testament where a woman was approached and molested, or tried to be molested by -- a man tried to molest a woman in a garden under a particular tree.  And in those days, women weren't believed as much as men.  And this man who got rebuffed -- you know, she wouldn't give in to him.  He got his buddy to falsely testify that she was the one who came after him.  And it was -- what happened in that story was they

separated the two men. They asked the two men where did it happen? One man said under the one tree. Another man said under another tree. They separated these two men, who actually were perpetrators but were claiming to be victims, and they decided that the woman was right. They separated the people who were at war with each other, were claiming against each other, and they separated them. It must not have felt good for them, but that is the protocol that has happened ever since the book of Daniel; ever since that story.

It's a protocol that I've experienced as well when you go into -- I have six children, and I've had the misfortune of having to take them to the emergency room many times. I've had -- my oldest, Nicholas, broke his wrist on Saturday morning while he was playing football, and I had to -- I wasn't there at the practice. There was other adults there, so I thought it was okay. But I got a call, and I ran over there. I got in the car, got over there and lifted him in, carried him to the car. He'd broken his wrist. One of the big players hit him hard. And instead of falling on the shoulder like he should have done, he reached out and hit his wrist and broke his wrist, and I had to take him in. And when I got in, I didn't realize this, but I felt like I was being a suspect.

39

And -- because I was trying to tell the doctor what happened, and he was getting between me and my son.  It was only later -- and he asked my son what happened.  He didn't ask me what happened.  He got in between me and my son and made me feel like I was -- I didn't like it.  I didn't like that feeling.  I -- like, why don't you listen to me?  Why don't you listen to me?  There was a protocol -- a medical protocol in place at that time, and still is to this day.  You remember the doctor who was over here when we -- way back on Friday, and he talked about medical protocols.  One of the medical protocols is that emergency room doctors are trained to look for child abuse.  So they didn't know if I was a good dad or a bad dad.  They didn't know me from Adam.  But they were there in their professional capacity doing their job and following the protocols.  So they got between me.  And it's happened again when my daughter Katherine broke her elbow on the jungle gym.  These two times -- my wife, who was a stay-at-home mom, for whatever reason, was not available, and I got there these two times.  And both times -- second time, saw it again.  And I was ready for it.  So I told Katherine, who's very funny -- she makes jokes all the time.  And I love to laugh because I don't want to cry, you know.  But Katherine was on

—40—

the jungle gym.  She was in the 3rd Grade and she broke her elbow, and I was the one who picked her up and took her to the emergency room.  And the same thing happened.  They got in between me and Katherine and they said sweetie, what happened?  I felt invisible too.  But it wasn't because the doctor was trying to make me feel invisible.  He wasn't -- he was doing his job to try to find out if I had abused my daughter.  That's what they do.

And so these officers were following protocols.  The injuries of feeling invisible were not caused by Brunner or Weaver.  They were caused by the protocol that were followed.  And the punitive damages -- I want to talk about that first.  You've got -- you're told on page seven of the instructions that -- it says you can punish to deter others from engaging in similar conduct in the future.

Now, you've found that this was a Constitutional violation.  I get it.  There's nothing I can do now about the before.  I can't convince you to change your mind.  It's gone.  That opportunity is gone.  But think about deterring others from engaging in similar conduct in the future.  You heard from Gilbert Villareal, who worked in CPS in Special Investigations.  And oh, by the way, speaking of CPS, I

41

don't know if you ever saw -- I love the movie, My Cousin Vinnie. The funniest lawyer movie you'll ever see. But there's one time where he has to go get a suit for court, and he goes, and -- he goes to the store, and it says out for the flu. And he goes -- in the New York accent, he goes, Your Honor, I'm wearing this ridiculous outfit because the whole store -- the entire store has the flu. And it was really funny. But that's what happened.

My client called CPS, and the whole CPS has the flu. He's following the protocols, and he's frustrated by the fact that everyone has the flu at CPS. So what -- what is the contact that you're trying to -- supposedly they want you to deter from engaging in? Okay. I guarantee you the message must not be punish these two for trying to help and trying to follow -- do their jobs, trying to follow protocols, because the system works when everybody does their job. The system breaks down when everybody gets the flu and you have to deal with it. And even Gilbert, the only one left, isn't really part of that section of CPS. He says I'm busy with this other stuff and I can't get to you right now.

And then Vanessa says I'm not going to talk to you. I don't want to -- you can't come to see

42

me.  Okay.  The parents -- the person who called herself the parent temporarily doesn't cooperate.  So he says well, let's go to someplace safe.  We need to go someplace safe and sit down and sort this out.

So the message, if punitive damages are assessed at all, even one dollar of it -- the message you would be sending is cops, stay in the donut shop.  Drink your coffee, eat your donut, and then pick up the body bags or, you know, don't respond to that call.  Wait until something bad happens.  Don't try to protect.  Just don't put yourself in harm's way.  Don't risk getting sued.  Don't do any of that.  Just don't do your job.  That's the message.  And that can't be the message that you send.  Zero is the answer for punitive damages.  No punitive damages for any of this.

And I understand mental anguish.  I understand.  But I think that in -- you know, it would be -- you know, I understand.  As a father, I feel for when Seth said he was invisible.  I've felt that way.  But it's pretty intense.  And you know, I like Seth and my father --

THE COURT:  That's 10 minutes.

MR. BRANDT:  Thank you.  Don't cry.  I mean, I do cry because I'm more like my mother.  My dad talked low, talked slow, didn't talk much, and he was a

good man.  He was the best man I ever knew.  Greatest man I ever knew.  In my opinion, the greatest man of the greatest generation in America.  He was raised in the Depression.  He went off to war.  He marched behind Patton's tanks.  I didn't learn until he was dead that he was a decorated war hero.  He never spoke of it, and he never encouraged us to go into the services because he didn't think it was best for us.  I never once heard him encourage me to do that.  So I went with my father's advice.  I went to school.  But -- and I didn't get drafted.  Because I was old enough to be in the draft.  But -- so I respect people who serve.

And he then came back from the war, married my mother, and they had 10 children.  I was number five.  And my mom stayed home.  And I was -- I described my childhood as we were wealthy, but we didn't have any money.  We were wealthy because we had a loving mother and father, and I had a bunch of siblings that -- sisters that annoyed me, and I annoyed them, mostly, but we still are very much a loving close-knit family.

But I see that -- that business, and I recognize how important family is and how they shouldn't be interfered with.  And that's why Gilbert said the main -- Gilbert Villareal said the main

44

function of CPS is to join families together.  But they're the ones who are supposed to be dealing with situations like this.  So -- and Brunner and Weaver -- they would get fired if they didn't go to the apartment.  And they contacted CPS, but CPS had the flu.  And the parents were at -- the parent -- Megan wasn't available.  Seth was available, but it's because of that protocol that I described when you go to the emergency room.  It was to separate them.  It wasn't to separate them out of anger or malice.  It was to separate them out of the investigation protocols. That's it.

So I understand that you're going to be awarding them a dollar of nominal damages.  I get it because you found there was a Constitutional violation. For the life of me, I don't know why, but I have to respect that.  But I want you to remember what their intent was and how -- how they were in a no-win situation.  That they were trying all the time, and they were frustrated.

THE COURT:  13 minutes.

MR. BRANDT:  Thank you.

THE COURT:  Yes, sir.

MR. BRANDT:  I understand this is a very emotional case.  And you may have had bad experiences

45

with police that made you think that -- I don't know. I mean, my client is a good man. And he looks like he's tough, and he's -- he's had a condition that -- when he's stressed, his face turns red, and it might seem intimidating. He says he's got RBF, if you know what that is. So he can't help it. But I would urge you not to punish.

And when you're talking about compensable damages, just give what you think is appropriate, but don't -- remember this is -- we're talking about a message you're sending. And do we really want -- it's hard enough. Police officers are hard enough to recruit and retain. I would say please be -- do what you think is right, but don't hit them. They were doing their job, plain and simple, to the best of their act. You disagree with what they did, but you can't say that they did it for any bad malice -- malicious reason. Thank you. Thank you.

THE COURT: Thank you, Mr. Brandt. Mr. Eichelbaum?

MR. EICHELBAUM: Thank you again for your service. I appreciate it. I know my client, Alex Weaver, also appreciates the fact that you take this job seriously.

In 40 years, I have to tell you I've

46

never had a case where the Plaintiff said to the jury it happened eight years ago, I never really think about it.  No, I'm over it.  That doesn't happen in court. If you've ever been part of a lawsuit, you know that every Plaintiff gets emotional when they get on the witness stand.  They pour out their heart about how terrible their life is because of whatever event that led for them to file a lawsuit.  No Plaintiff comes to court and says I have no damages.

This lawsuit is truly about nothing other than money.  Because that's all you can get.  You can't give them time.  You can't give them justice.  You can't give them anything but money.  So that's important to keep in mind.  No lawyer takes a case where the Plaintiff says I'm not -- I don't want money. I'm not entitled to money.  I'm fine.

Are there lawyers who teach witnesses to be theatrical?  Of course there are.  Are there also lawyers who teach Defendants to be likeable?  Sure. I'm putting the blame on the lawyers in this case for that kind of thing.  But what's different about this case is you've heard the Defendants.  They've taken the stand.  Now, a lawyer can try to mold their client to act a certain way when they take the witness stand, but in this case, you have videos to see how Officer Weaver

47

acted the day of the event.  You have videos that also tell you how Lieutenant Brunner acted the day of the event.  Alex Weaver, on the witness stand, as well as on the videos, was calm and caring the entire time for Alex (sic).  It's okay, Alex -- Jade.  Excuse me.  It's okay, Jade.  It's going to be okay.  We just want to find out what's happened.  She continuously tried to calm her down; never raised her voice, never was mean in any of it.

And Lieutenant Brunner, who you might have thought when he got on the witness stand and they're like, this big guy is really soft-spoken -- so was he the entire time on the video, talking to every person, because that's who he is.  That's who they are.  They weren't acting on the witness stand.  You saw who they are.  You made your decision that their conduct violated the Constitution.  Today, you're judging what you think is in their heart.  It's a little different.

The Plaintiffs gave you no evidence of actual lost wages.  Mr. Bagley came up and just testified and said oh, they lost this, this, this.  You didn't hear the witness say that.  The Judge has admonished you to remember not what Mr. Bagley tells you.  It's what you heard on the witness stand.  How much did they ever tell you that we're entitled to and

48

we didn't get? They didn't. So you can't just speculate and say well, it must have been maybe this much, or that much. No. They had a duty to give you that information. And if they didn't, they're not entitled to anything for that.

Ms. McMurry is still teaching, so this isn't a matter of -- you know, she didn't say she wasn't able to work for two years. Mr. Bagley said that. And it's not in the evidence anywhere that she was out for two years. Her certificate was flagged. I've worked with school districts. That's all I do. I defend school districts and school district employees on matters. And the fact -- I also terminate school district employees for school districts sometimes. But the fact is there are a lot of teachers out there who continue to teach while their certificate is flagged. Certificate is flagged just means that TEA is investigating. You realize there are about a thousand accusations a month right now because the laws have changed. But the Texas Education Agency investigates teachers and claims against them. They're getting a thousand a month. So they flag those certificates and say we're doing an investigation. And yes, it does take TEA a long time to get an investigation done when you have that many because they don't have that many

49

investigators.  But the fact is they never took any action against her.  She was able to teach the entire time.  All she had to do was apply.  She resigned from Midland, but she was allowed to come back as a substitute for a while.  She could have substituted elsewhere.  She could have gone anywhere.  A certified teacher can get a job in almost any community in Texas because the State is desperate for teachers.

And that's another interesting thing about this.  They're supposed to mitigate their damages.  Did they give you any evidence that they mitigated their damages?  No.  Their duty is to show how they mitigated their damages.  Jade went to college.  They never claimed they actually had medical or counselling expenses because there were none.

Now, I'm sure Mr. Bagley is going to come up in his last minutes and try to testify again about things that had nothing to do with what the evidence was here, but you just have to go by what the evidence was.  And that's all I'm asking you to do from my side, is to go by what the evidence was.

Now, if they're truly still suffering, why didn't they bring in evidence or testify that they're still in counselling?  They didn't.  They said they went to counseling for a couple of months.  That's

-- I'm not saying they're acting and making up that they were distraught when this happened. It had to be upsetting; absolutely. But to say and today, I'm still suffering from this, I can't -- when someone knocks at the door, I'm afraid, and they haven't had counseling? They didn't bring in a doctor or a counselor who came in and said yes, that they had issues all this time. No. They just took the stand and said oh, yeah, it's terrible to this day. Is that reasonable? This was a two and-a-half hour event. Mr. Bagley just said it was all day. That Jade couldn't talk to them all day. No. The evidence was for -- they came to the door, they brought her to Abell, and then she was able to talk to her father. This all day stuff is the theatrics of Mr. Bagley. But that's not the facts. It's not the evidence.

You know, he started talking about multiply 2000 by all this, and let's give them this much money. The average salary in Midland, Texas is $71,000. And for a person -- by the way, of course, they have to pay taxes. But the fact is the average person in Midland works probably 50 weeks to be able to get that $71,000. They work 9:00 to 5:00, 8:00 to 6:00, whatever they do, to be able to make that much money. It costs $55,000 for a brand new Ford F-150

51

2026.  Nice vehicle.  $55,000, but you're going to pay it over six years because we all know we don't pay cash for a vehicle that's brand new.  You've got to work at it.  You've got to work to be able to pay off that $55,000.

Attending UTPB -- anyone who's ever sent a child to college knows it's not cheap.  It's expensive.  And some people have to pay off their student loans for the next 20 years.  To get a four-year degree at UTPB costs you $100,000.  That's for a four-year degree.

Now, I recognize the Plaintiffs believe they were damaged, but they're asking for over a million dollars.  And what happened for one day while they figured out who was supposed to be supervising Jade and Connor does not equate to sending 10 kids to college for four years.  That's what they're asking for.  Give us that much money.

Verdicts are supposed to be sensible. The Plaintiffs have no monetary damages.  If they did, they'd have to tell you about them.  So the damages are going to be mental anguish.  I get that.  Mr. Brandt understands that too.  Should they receive what it takes the average Midland citizen a whole year to earn? Mind you, that's not even $71,000 because, like I said,

52

you've got to pay taxes and all the other things that that comes with.

Lieutenant Brunner and Officer Weaver each have families and children. Whatever your verdict is will affect their children. This isn't them suing Midland Independent School District, where they say oh, we have a fund balance, and we can pay it. This isn't them suing a police department that the Government says well, we've got money. We can tax and pay for it. They're suing these two individuals. It's coming out of their savings for their children, if they have savings for their children. It's coming out of their kids' 401K. It's coming out of -- or their 401K. Maybe their child's 529 plan or whatever. They're trying to save up for their kids to go to college.

I ask of you from my heart, be sensible. Be reasonable. These were not police officers using excessive force. That's when you use punitive damages. They beat someone up. They weren't police officers who handcuffed Jade and booked her and sent her to jail for no reason. That's not what happened in this case . Those are punitive damage cases. Punitive damages punish people who intend to hurt people.

THE COURT: 12 minutes.

MR. EICHELBAUM: Thank you. There is no

53

evidence Officer Weaver or Lieutenant Brunner ever intended to hurt anyone.  We ask nothing more than you be reasonable in your deliberations and your verdict. And I ask this on behalf Alex Weaver, as well as Kevin Brunner.  Thank you for your time.

THE COURT:  Thank you, Mr. Eichelbaum. Mr. Bagley, you have four minutes and 37 seconds.

MR. BAGLEY:  Thank you, Judge.

THE COURT:  Sure.

MR. BAGLEY:  Ladies and gentlemen of the jury, I just want to hit a couple points that I heard when opposing counsel was talking and just address those first.  Mr. Brandt used the word that the police might have been fired or something like that.  I ask you to look at another exhibit.  It's Exhibit 39 -- P39.  That sets out the rules or the guidelines about when police can remove a child from a home without any kind of court order.  Take a look at that.  And take a look at what conditions the child must be facing to be removed from a home.

Mr. Eichelbaum talked about red flags and how teachers can still teach with red flags on their certificate, but they didn't present a witness who offered testimony on that.  That was just Mr. Eichelbaum talking.  As the Judge said, the lawyers

54

-- what we're saying is not evidence.  It was just lawyer-speak.  And the evidence -- besides the fact that there is evidence that they went to one counselor, Jade and Megan, they also, for two months in Midland -- but also went to the military clinic, and they testified to that.  And there are therapy records in evidence on that.  So take a look out for those.

I just want to say in comment that I've come to admire the McMurrys as I've come to know them in this case because of their tenacity and how they have fought, you know, endlessly in the past seven and-a-half years to hold the officers to account.  They had to endure Jade's sudden removal from the apartment where they lived and the distress and panic that came with it, and how all this was exacerbated by subsequent events and weeks and years following that.

While Seth was deployed defending our Constitution that Mr. Brunner and Ms. Weaver violated, he was trying to -- he was worried about his family while trying to keep his soldiers safe.  And then back home, Megan, in Midland, was forced to hold it all together, essentially as a single mother, dealing with her own issues that stemmed from these events, and also while striving to be there for her daughter, who was also dealing with the impact of these events.  I

55

challenge you to put yourself in the shoes of the McMurrys.  What if this happened to you?  What if this happened to your family?  How would you feel?  What amount of money do you think would be appropriate to right these kinds of wrongs and restore you and your family and make your family whole, and also to hold other officers accountable?  Especially since here, they've shown no remorse.  So I think it's imperative that we strive to prevent this from happening to another family again.  The Defendant's lawyers have even argued that -- or one of them argued that the Defendants deserve a medal.  Really?  A medal for turning the lives of the McMurrys upside down?  The mindset is one of we're untouchable.  Even now, after you've told them that they were wrong and violating the rights of the McMurrys.  So I trust you to reach a just verdict, and I want to thank you for your service on this journey.  Thank you.

THE COURT:  Thank you, Mr. Bagley.  If you need to communicate with me during your deliberations, the jury foreperson should write the inquiry and give it to the Court Security Officer.  After consulting with the attorneys, I'll respond, either in writing or by meeting with you here in the courtroom.  Keep in mind, however, that you must never

56

disclose to anyone, not even to the -- to me, to the Court, your numerical division on any question. You may now proceed to the jury room to begin your deliberations. You're welcome to take your notebooks or not. You're welcome to take your jury instructions or not. Thank you. Let's rise for this jury as they retire to deliberate.

(The following proceedings took place out of the presence of the jury.)

THE COURT: Very good job. Mr. Bagley, anything you want to take up outside the presence of the jury before we take a brief recess?

MR. BAGLEY: No, Your Honor. Unless you have a lost and found room with extra winter jackets that you might be able to distribute.

(Laughter.)

THE COURT: Is it cold outside?

MISS McMURRY: It's freezing in here.

THE COURT: I know you're always cold.

MRS. McMURRY: I'm freezing.

THE COURT: Jade's always cold. Mr. Brandt, anything you want to take up, sir?

MR. BRANDT: Nothing further.

THE COURT: Very good. Mr. Eichelbaum?

MR. EICHELBAUM: No, Your Honor.

57

THE COURT:  My apologies.  I missed your mark at 12 minutes, but you didn't use all your time anyway, so I appreciate you.

MR. EICHELBAUM:  I looked down at my phone and said, hm.

THE COURT:  I gave you more time.

MR. BRANDT:  How many seconds did I have left?

MR. EICHELBAUM:  His was close.

THE COURT:  Yours was closer, but you were fine.  You weren't getting to where I was going to warn you or anything.  Thank you all.  All right.  We're going to do -- we have a criminal docket, and so you might want to clean up your area.

(Court in recess at 9:44 a.m.)

58

UNITED STATES DISTRICT COURT )

WESTERN DISTRICT OF TEXAS    )


   I, Tamara D. Ross, Official Court Reporter for the

United States District Court, Western District of

Texas, do certify that the foregoing is a correct

transcript from the record of proceedings in the

above-entitled matter.

   I certify that the transcript fees and format comply

with those prescribed by the Court and Judicial

Conference of the United States.

   Certified to by me this 31st day of March, 2026.


                              */s/ Tamara D. Ross*
                              TAMARA D. ROSS
                              Official Court Reporter
                              200 E. Wall
                              Midland, Texas 76703
                              (432) 685-0346
                              Tamara_Ross@txwd.uscourts.gov

# EXHIBIT

# 2

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
MIDLAND DIVISION

| | | |
|---|---|---|
| MEGAN MARIE McMURRY, Individually and a/n/f/ of J.M., and ADAM SETH McMURRY, Individually and a/n/f/ of J.M. Plaintiffs, | § § § § § | |
| | § | CIVIL ACTION NO: 7:20-cv-242 |
| v. | § § | |
| MIDLAND INDEPENDENT SCHOOL DISTRICT, ALEXANDRA WEAVER and KEVIN BRUNNER, Defendants. | § § § § § | |

## DEFENDANT ALEXANDRA WEAVER'S INITIAL DISCLOSURES

Defendant Alexandra Weaver ("Officer Weaver" or "Defendant Weaver") serves

on Plaintiffs Defendant Weaver's Initial Disclosures pursuant to the Federal Rule of Civil

Procedure 26(a) based upon available information existing at this time.

      A.      <u>Name, address, and telephone number of each potential testifying witness</u>

Megan Marie McMurry, Adam Seth McMurry, and J.M.
Plaintiffs and/or their family members
c/o Peter F. Bagley
BLUMBERG BAGLEY PLLC
2304 W. Interstate 20, Ste. 190
Arlington, Texas 76017
peter@blumbergbagley.com

Plaintiffs can testify as to the facts of this lawsuit, including the number of times they left their children without adult supervision, their communications with various witnesses, CPS, the police, the district attorney, MISD employees, as well as their experience being indicted and their criminal trial. One or more of the Plaintiffs can testify as to their motivation behind this lawsuit. J.M. can testify about the various times she was left without adult supervision, including the occasion that led to this lawsuit.

C.M.
Child of Plaintiffs Megan Marie McMurry and Adam Seth McMurry
c/o Peter F. Bagley
BLUMBERG BAGLEY PLLC
2304 W. Interstate 20, Ste. 190

Arlington, Texas 76017
peter@blumbergbagley.com

C.M. is a child of the plaintiffs and is familiar with the facts of this lawsuit and can testify with regard to the number of times he was left without adult supervision, including the specifics of the occasion that led to this litigation.

Cindy Diaz, Supervisor of Investigations
Gilberto Villareal, Special Investigator
Isaac Lopez, Program Director
Possibly other employees not currently known
Texas Department of Family and Protective Services (DFPS)/ Child Protective Services (CPS)3401 N. A Street
Midland, Texas 79705
(432) 686-2273

DFPS has information about its investigation of Ms. McMurry's leaving her children at their apartment while Ms. McMurry was away.

Kevin Brunner
Defendant
Lieutenant for Midland Independent School District Police Department
c/o/ Stephen D. Henninger
FANNING HARPER MARTINSON BRANDT & KUTCHIN, PC
4849 Greendale Ave., Suite 1300
Dallas, Texas 75206
shenninger@fhmbk.com

Lt. Brunner has information about his investigation of Ms. McMurry's leaving her children at their apartment while Ms. McMurry was away and Ms. McMurry's indictment and trial for abandonment.

Alexandra Weaver
Defendant
Former Officer for Midland Independent School District Police Department
c/o Dennis J. Eichelbaum
Eichelbaum, Wardell, Hansen, Powell, & Muñoz, P.C.
5801 Tennyson Pkwy, Suite 360
Plano, TX 75024
(972) 377-7900 Telephone
(972) 377-7277 Facsimile
dje@edlaw.com

Officer Weaver has information about Ms. McMurry's work, the McMurry family, her investigation of Ms. McMurry's leaving her children at their apartment while Ms. McMurry was away, and Ms. McMurry's indictment and trial for abandonment. Officer

Weaver is also aware of her own experience and reasoning for her actions and all aspects of her involvement in the actions related to this lawsuit.

Gabriel Vallejos & Vanessa Buendia-Vallejos
Neighbor-alleged caregivers of McMurry children between October 26-30, 2018



Mr. and Mrs. Vallejos and Buendia-Vallejos have knowledge as to how often and how long they were asked to watch C.M. and J.M., how often Ms. McMurry left the children without a parent, and of the incident that led to this lawsuit.

Jennifer Colvard, Manager
Ashley Seipp, Assistant Manager
Savannah Dimicelli



Former employees of Oasis at Pavilion Park Apartments who, on information and belief, have knowledge of the events of October 26, 2018, made the subject of this lawsuit.

Tracy (Pradon) Rickerson
Counselor, Abell Junior High School
c/o/ Kathryn E. Long
THOMPSON & HORTON, LLP
500 North Akard St., Suite 3150
Dallas, Texas 75201
klong@thompsonhorton.com

Ms. Rickerson has information from working as a counselor at Abell J.H. with Ms. McMurry where C.M. and J.M. previously attended school, including but not limited to Ms. McMurry's leaving her children without a parent at their apartment and Officer Weaver's investigation of Ms. McMurry which resulted in Ms. McMurry's indictment for abandonment.

Angelica Lewis
Teacher



Ms. Lewis was an employee of Midland ISD at the time of the events made the subject of this suit and was involved with taking C.M. to school during Mrs. McMurry's overseas trip.

Nicky Bowers
Teacher Aide, Abell Junior High School
c/o/ Kathryn E. Long
THOMPSON & HORTON, LLP
500 North Akard St., Suite 3150
Dallas, Texas 75201
klong@thompsonhorton.com

Ms. Bowers has information from working as a Teacher Aide with Ms. McMurry at Abell J.H. where C.M. and J.M. previously attended school, including but not limited to Ms. McMurry's leaving her children without a parent at their apartment and Officer Weaver's investigation of Ms. McMurry which resulted in Ms. McMurry's indictment for abandonment.

Cyndi Pyles
Principal, Abell Junior High School
c/o/ Kathryn E. Long
THOMPSON & HORTON, LLP
500 North Akard St., Suite 3150
Dallas, Texas 75201
klong@thompsonhorton.com

Ms. Pyles has information from working at Abell J.H. with Ms. McMurry where C.M. and J.M. previously attended school, including but not limited to an investigation regarding Ms. McMurry's leaving her children without a parent at their apartment.

Jeff Ellsworth
Assistant Principal, Abell Junior High School
c/o/ Kathryn E. Long
THOMPSON & HORTON, LLP
500 North Akard St., Suite 3150
Dallas, Texas 75201
klong@thompsonhorton.com

Mr. Ellsworth has information from working at Abell J.H. with Ms. McMurry, where C.M. and J.M. previously attended school, including but not limited to an investigation regarding Ms. McMurry's leaving her children without a parent at their apartment.

Jennifer Seybert
Principal, Abell Junior High School
Rosalinda Acosta
Assistant Principal, Abel Junior High School

Lauri Taylor
Assistant Principal, Abell Junior High School
c/o/ Kathryn E. Long
THOMPSON & HORTON, LLP
500 North Akard St., Suite 3150
Dallas, Texas 75201
klong@thompsonhorton.com

These employees have information from working at Abell J.H. with Ms. McMurry, where C.M. and J.M. previously attended school, including but not limited to an investigation regarding Ms. McMurry's leaving her children without a parent at their apartment. All three administrators may have spoken with the individual defendants in this matter on or about October 26, 2018.

Corina Seay, Christina Espinoza, Coach Jesse Gonzalez, Jacquelyn Franco, Jeri Partain Chadwick, Coach Megan Johnson, and other personnel assigned or previously assigned to Abell Junior High School
c/o/ Kathryn E. Long
Thompson & Horton, LLP
500 North Akard St., Suite 3150
Dallas, Texas 75201
klong@thompsonhorton.com

These individuals may have information from working at Abell J.H. with Ms. McMurry, where C.M. and J.M. previously attended school, including but not limited to an investigation regarding Ms. McMurry's leaving her children without a parent at their apartment.

Coach Deanna Bowers



Ms. Bowers is a former Midland ISD employee and alleged witness to a portion of the events made the subject of this suit.

Jeff Horner
Patrick Jones
Members of the Midland ISD Board of Trustees on June 24, 2019
615 W. Missouri Avenue
Midland, Texas 79701
(432)240-1000

Upon information and belief, these trustees have knowledge of Megan McMurry's grievance against Midland ISD.

Orlando Riddick

Former Superintendent of Midland ISD
9400 N. Central Expressway, Ste. 500
Dallas, Texas 75231
(972)925-4660

Superintendent Riddick is familiar with Megan McMurry's grievance against Midland ISD.


Midland Independent School District Board of Trustees
c/o/ Kathryn E. Long
THOMPSON & HORTON, LLP
500 North Akard St., Suite 3150
Dallas, Texas 75201
klong@thompsonhorton.com

The Trustees have information regarding MISD policies and procedures and may have knowledge or information about the facts in Plaintiffs' Amended Complaint.

Daniel Sarabia
DEANDA & SARABIA LAW FIRM, P.C.
119 E. 4th Street
Odessa, Texas 79761

Mr. Sarabia was Megan McMurry's criminal defense counsel for her trial in Midland, Texas.

M. Scott Layh
1400 N. Grandview
Odessa, Texas 79701
(432)498-4150

Ms. McMurry's criminal defense counsel for her trial in Midland, Texas.

Laura Nodolf
Kara Rex
Midland County District Attorney's Office
500 N. Loraine Ste. 200
Midland, Texas 79701
(432)688-4411

Employees in the Midland, Texas, District Attorney's Office involved in Megan McMurry's criminal trial in Midland.

Laura Carpenter
700 North Grant Ave., Ste. 104

*McMurry v. MISD, et al.*                                                                                           Page 6
Defendant Weaver's Initial Disclosures

Odessa, Texas 79761
(432) 580-3333

Megan McMurry's attorney who represented her during her employee grievance against Midland ISD.

Matt Powell
2529 74th Street
Lubbock, Texas 79423
(806)368-8712

Midland ISD's attorney for Megan McMurry's grievance proceedings against Midland ISD.

Slater Elza
THE UNDERWOOD LAW FIRM
500 S. Taylor, Suite 1200
Amarillo, Texas 79101
(806) 379-0347

Attorney who presented the case for Midland ISD at Megan McMurry's grievance hearing against the district.

Corporate representative(s)/Custodian of Records of Midland ISD, Child Protective Services

Any person/entity identified by any other party or identified in discovery, including written discovery and depositions.

Attorneys for the Parties

Defendant Weaver reserves the right to supplement this response.

B.    Designation of all potential proposed exhibits

At this time, Defendant Weaver has no exhibits with respect to her claims for relief for attorney's fees or reasonable costs, other than attorney invoices that will be produced should the Court dismiss the state law claims based upon immunity. Defendant Weaver incorporates by reference all identified documents listed in Plaintiffs' initial disclosures as potential exhibits that may be used for rebuttal of evidence presented by Plaintiffs.

Moreover, on information and belief, Defendant Weaver has no original records pertaining to this case in her possession. Defendant Weaver is aware of the existence of original records but does not have superior control or access to the following documents or records:

   1. Communications between Plaintiffs and/or their legal representatives and Defendants and MISD staff and/or legal representatives;

*McMurry v. MISD, et al.*                                                                          Page 7
Defendant Weaver's Initial Disclosures

2. Midland ISD and Midland ISD Police Department records and/or recordings relating to Plaintiffs;

3. Midland ISD employment and student records relating to Plaintiffs;

4. DFPS records relating to Plaintiffs;

5. On information and belief, there are also records in the possession of the Court and/or District Attorney's Office, as well as student records for J.M. in the possession of the Hallsville Independent School District

Defendant Weaver reserves the right to supplement this list if other documents are located or discovered.

C.      Computation of each category of damages claimed by the disclosing party

Because state law mandates attorney's fees and reasonable costs be assessed against a party whose claims against a professional school employee are dismissed due to immunity, Defendant Weaver's damages consist of attorneys' fees and costs for representation in this lawsuit. Currently, such damages are ongoing and cannot be calculated or predicted.

D.      Indemnity and insuring agreements

Defendant Weaver is covered for acts while serving in her professional capacity for the Midland Independent School District. On information and belief, Midland ISD has such an agreement with or is a member of the Texas Association of School Boards Risk Management Fund which covers Midland ISD employees for conduct consistent with Midland ISD policy.

E.      Identity of any expert witness

Defendants Weaver and Brunner may testify and are expert witnesses with respect to police procedures, duties, and conduct. At this time, Defendant Weaver is unaware of any additional expert witnesses.[1]

**Defendant Weaver reserves the right to timely supplement all initial disclosures as further information is received.**

Respectfully submitted,

**EICHELBAUM WARDELL
HANSEN POWELL & MUÑOZ, P.C.**

---

[1] Attorneys are not required to be listed in federal disclosures as experts in order to seek attorney's fees.

*McMurry v. MISD, et al.*                                                      Page 8
Defendant Weaver's Initial Disclosures

BY: /s/ DENNIS J. EICHELBAUM
DENNIS J. EICHELBAUM
TEXAS BAR NO. 06491700
DEICHELBAUM@EDLAW.COM
*LEAD COUNSEL*

SCOTT W. THOMAS
TEXAS BAR NO. 24075624
SWT@EDLAW.COM

EMMA J. DARLING
TEXAS BAR NO. 24110889
EJD@EDLAW.COM

EICHELBAUM WARDELL
HANSEN POWELL AND MUÑOZ, P.C.
5801 TENNYSON PARKWAY, SUITE 360
PLANO, TEXAS 75024
(TEL.) 972-377-7900
(FAX) 972-377-7277
*ATTORNEYS FOR DEFENDANT WEAVER*

## Certificate of Service

The undersigned certifies that a true and correct copy of this pleading was served on October 21, 2021, on the following counsel of record:

Peter F. Bagley
BLUMBERG BAGLEY PLLC
2304 W. Interstate 20, Ste. 190
Arlington, Texas 76017
peter@blumbergbagley.com
*Counsel for Plaintiffs*

Stephen D. Henninger
FANNING HARPER MARTINSON BRANDT &
KUTCHIN, PC
4849 Greendale Ave., Suite 1300
Dallas, Texas 75206
shenninger@fhmbk.com
*Counsel for Defendant Kevin Brunner*

/s/ DENNIS J. EICHELBAUM
Dennis J. Eichelbaum

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
MIDLAND-ODESSA DIVISION

| | | |
|---|---|---|
| MEGAN MARIE McMURRY, Individually and a/n/f of J.M., and ADAM SETH McMURRY, Individually and as a/n/f of J.M., | § § § § | |
| Plaintiffs, | § | |
| vs. | § | CA No.: 7:20-CV-00242-DC |
| | § § | |
| MIDLAND INDEPENDENT SCHOOL DISTRICT, ALEXANDRA WEAVER and KEVIN BRUNNER, | § § § | |
| Defendants. | § | |

**DEFENDANT KEVIN BRUNNER'S INITIAL DISCLOSURES**

TO :   Plaintiffs Megan Marie McMurry, Adam Seth McMurry, and J.M., by and through their attorney of record, Peter F. Bagley, 2304 West Interstate 20, Suite 190, Arlington, TX 76017.

NOW COMES Kevin Brunner, a Defendant in the above-entitled and numbered cause, and pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure serves its Initial Disclosures:

**(A)    The name and, if known, the address and telephone number of: (1) each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment.**

**Megan Marie McMurry, Adam Seth McMurry, and J.M.**
c/o Peter F. Bagley
Blumberg Bagley PLLC
2304 W. Interstate 20, Ste. 190
Arlington, Texas 76017

Plaintiffs are likely to know facts concerning this lawsuit, including the number of times they left their children without adult supervision, their communications with various witnesses, CPS, the police, the district attorney, and MISD employees.

**C.M.**
c/o Peter F. Bagley
Blumberg Bagley PLLC

2304 W. Interstate 20, Ste. 190
Arlington, Texas 76017

C.M. is likely to know facts concerning this lawsuit, including the number of times he and his sister were left alone without adult supervision, his parents' communications with various witnesses, CPS, the police, the district attorney, and MISD employees.

**Kevin Brunner**
c/o Thomas P. Brandt
Fanning Harper Martinson Brandt & Kutchin, PC
One Glen Lakes
8140 Walnut Hill Lane
Suite 200
Dallas, Texas, 75231
(214) 369-1300

Defendant Brunner is the former Lieutenant of the MISD Police Department. Defendant Brunner is likely to have information concerning the steps taken to investigate the complaints at issue in this lawsuit, the parties involved in the investigation process, and communications with other law enforcement agencies concerning the complaints.

**Alexandra Weaver**
c/o Dennis J. Eichelbaum
Eichelbaum, Wardell, Hansen, Powell, & Muñoz, P.C.
5801 Tennyson Pkwy, Suite 360
Plano, TX 75024
(972) 377-7900

Defendant Weaver is a former Police Officer of the MISD Police Department. Defendant Weaver is likely to have information concerning the steps taken to investigate Ms. McMurry, the parties involved in the investigation process, Ms. McMurry's indictment, Ms. McMurry's prosecution, and communications with other law enforcement agencies concerning the investigation.

**Tracy (Pradon) Rickerson**
Counselor, Abell Junior High School
c/o Kathryn E. Long
Thompson & Horton, LLP
500 North Akard St., Suite 3150
Dallas, Texas 75201

Ms. Rickerson has information from working as a counselor at Abell J.H. with Ms. McMurry where C.M. and J.M. previously attended school, including but not limited to Ms. McMurry's leaving her children without a parent at their apartment and Officer Weaver's investigation of Ms. McMurry which resulted in Ms. McMurry's indictment for abandonment.

**Nichola Bowers**

Teacher Aide
c/o Kathryn E. Long
Thompson & Horton, LLP
500 North Akard St., Suite 3150
Dallas, Texas 75201

Ms. Bowers may have information from working as a Teacher Aide with Ms. McMurry at Abell
J.H. where C.M. and J.M. previously attended school, including but not limited to Ms.
McMurry's leaving her children without a parent at their apartment and Officer Weaver's
investigation of Ms. McMurry which resulted in Ms. McMurry's indictment for abandonment.

**Jacquilyn Franco**
Teacher
c/o Kathryn E. Long
Thompson & Horton, LLP
500 North Akard St., Suite 3150
Dallas, Texas 75201

Ms. Franco may have information from working as a Teacher with Ms. McMurry at Abell J.H.
where C.M. and J.M. previously attended school, including but not limited to Ms. McMurry's
leaving her children without a parent at their apartment and Officer Weaver's investigation of
Ms. McMurry which resulted in Ms. McMurry's indictment for abandonment.

**Cyndi Pyles**
Principal, Abell Junior High School
c/o Kathryn E. Long
Thompson & Horton, LLP
500 North Akard St., Suite 3150
Dallas, Texas 75201

Ms. Pyles may have information from working at Abell J.H. with Ms. McMurry where C.M. and
J.M. previously attended school, including but not limited to an investigation regarding Ms.
McMurry's leaving her children while she left the country.

**Jennifer Seybert**
Principal, Abell Junior High School
**Rosalinda Acosta**
Assistant Principal, Abell Junior High School
**Lauri Taylor**
Assistant Principal, Abell Junior High School
**Jeff Ellsworth**
Assistant Principal, Abell Junior High School
c/o Kathryn E. Long
Thompson & Horton, LLP
500 North Akard St., Suite 3150
Dallas, Texas 75201

---

These employees may have information from working at Abell J.H. with Ms. McMurry, where C.M. and J.M. previously attended school. They may also be familiar with the investigation regarding Ms. McMurry's leaving her children alone while she left the country. Additionally, they may have information concerning Ms. McMurry's complaint against Defendant Weaver.

**Midland Independent School District Board of Trustees**
c/o Kathryn E. Long
Thompson & Horton, LLP
500 North Akard St., Suite 3150
Dallas, Texas 75201

The Trustees have information regarding MISD policies and procedures and may have knowledge or information about the facts in Plaintiffs' Amended Complaint.

**Arthur Barclay**
Police Chief, MISD
c/o Kathryn E. Long
Thompson & Horton, LLP
500 North Akard St., Suite 3150
Dallas, Texas 75201

Chief Barclay is likely to have information concerning the steps taken to investigate the complaints at issue in this lawsuit, the parties involved in the investigation process, and communications with other law enforcement agencies concerning the complaints.

**Cindy Diaz**, Supervisor of Investigations
**Gilberto Villareal**, Special Investigator
**Isaac Lopez**, Program Director
Texas Department of Family and Protective Services (DFPS)



DFPS has information about its investigation of Ms. McMurry's leaving her children while she left the country and the representations she made to CPS investigators.

**Gabriel Vallejos**
**Vanessa Buendia-Vallejos**



Mr. and Mrs. Vallejos and Buendia-Vallejos have knowledge as to how often and how long they were asked to watch C.M. and J.M., how often Ms. McMurry left the children without a parent, and of the incident that led to this lawsuit.

---

**Jennifer Colvard**, Manager
**Ashley Seipp**, Assistant Manager
**Savannah Dimicelli**



Former employees of Oasis at Pavilion Park Apartments who, on information and belief, have knowledge of the events of October 26, 2018, made the subject of this lawsuit.

.

**Rule 26(a)(2) designation**

**Thomas P. Brandt**
**Stephen Henninger**
Fanning Harper Martinson Brandt & Kutchin, PC
One Glen Lakes
8140 Walnut Hill Lane
Suite 200
Dallas, Texas, 75231
(214) 369-1300

Mr. Brandt and Mr. Henninger may testify in rebuttal to Plaintiffs' claims regarding the reasonableness and necessity of attorneys' fees in this lawsuit.  On the basis of their skill, knowledge, training, education, experience, and documents to be provided in this lawsuit, Mr. Brandt and Mr. Henninger may testify that the attorneys' fees claimed by Plaintiffs in this lawsuit are unreasonable and unnecessary.

**(B)      A copy—or a description by category and location—of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control that are relevant to the claim or defense of any party, and/or that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment.**

Please find attached documents Bates Labeled "Brunner 0001-309." Defendant will supplement.

**(C)      A computation of each category of damages claimed by the disclosing party—who must also make available for inspection and copying as under Rule 34 the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based, including materials bearing on the nature and extent of injuries suffered.**

Not applicable.

**(D)      For inspection and copying as under Rule 34, any insurance agreement under which an insurance business may be liable to satisfy all or part of a possible judgment in the action or to indemnify or reimburse for payments made to satisfy the judgment.**

Defendant Brunner is covered for acts while serving in his professional capacity for the MISD. On information and belief, MISD has such an agreement with or is a member of the Texas Association of School Boards Risk Management Fund which covers MISD employees for conduct consistent with MISD policies.

Respectfully submitted,

/s/_Thomas P. Brandt
**THOMAS P. BRANDT**
State Bar No. 02883500
tbrandt@fhmbk.com
**STEPHEN D. HENNINGER**
State Bar No. 00784256
shenninger@fhmbk.com
**FANNING, HARPER, MARTINSON BRANDT & KUTCHIN, P.C.**
One Glen Lakes
8140 Walnut Hill Lane, Suite 200
Dallas, Texas 75231
(214) 369-1300
(214) 987-9649-Telecopier

**ATTORNEYS FOR DEFENDANT KEVIN BRUNNER**

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing instrument has been delivered to all parties of record, in compliance with the Court's ECF/CM system and/or Rule 5 of the Federal Rules of Civil Procedure, on this 28th day of June, 2023.

/s/_Thomas P. Brandt
**THOMAS P. BRANDT**